**DENISE D. KRAUSE vs UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, ET AL.**
Denise D. Krause on 05/04/2021

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DENISE D. KRAUSE                                    PLAINTIFF

VS.                    CIVIL ACTION NO. 3:19-CV-571-HTW-LGI

UNIVERSITY OF MISSISSIPPI MEDICAL
CENTER; and JOHN DOES 1-5                          DEFENDANTS


*****************************************

DEPOSITION OF DENISE D. KRAUSE

*****************************************


Taken at Butler Snow,
1020 Highland Colony Parkway, Suite 1400,
Ridgeland, Mississippi,
on Tuesday, May 4, 2021,
beginning at approximately 9:04 a.m.


*****************************************

CATHY M. WHITE, CCR
Certified Court Reporter #1309
Notary Public



EXHIBIT
A - Volume 1

A P P E A R A N C E S


LILLI EVANS BASS, ESQUIRE
bass@bbjlawyers.com
Brown Bass & Jeter
1755 Lelia Drive, Suite 400
Jackson, Mississippi   39216
601.487.8448

                    COUNSEL FOR PLAINTIFF


ROBIN BANCK TAYLOR, ESQUIRE
robon.taylor@butlersnow.com
MARCELLUS D. CHAMBERLAIN, ESQUIRE
Butler, Snow, O'Mara, Stevens & Cannada
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi   39157
601.948.5711

                    COUNSEL FOR DEFENDANTS


ALSO PRESENT:   Molly Brasfield

A.   Just my son, Alexander, well, and several animals.

Q.   Okay.  So you're an animal lover?

A.   Uh-huh.

Q.   You said earlier that Alexander is 15?

A.   (Witness nods head up and down.)

Q.   What is his date of birth?

A.   1/23/2006.

Q.   And what grade is he in?

A.   Ninth grade.

Q.   How many animals do you have?

A.   Currently just four.

Q.   And what are they?

A.   Three dogs and one cat.

Q.   No one else lives in the home with you?

A.   No.

Q.   Where does your son go to school?

A.   Ashland High School.  Really, in the other room.

Q.   Pardon?

A.   He hasn't really been physically at school until just this last week.

Q.   You mentioned that earlier.  So he's been remote learning from home during COVID?

A.   Yeah.

Q.   And he returned to school last week.  Is that correct?

A.   Uh-huh.

Q.   Has he enjoyed the schools in Ashland?

A.   He loves it so much.

Q.   And are you happy living in Ashland?

A.   It's good for both of us.

Q.   Where did you live before you lived at 2146?

A.   I lived in a trailer park.  We all six lived in a trailer park in a camper for over a year.

Q.   Okay.  And what was the address?

A.   I think it's 2799 Siskiyou Boulevard.

Q.   So it's just down the road from where you are now?

A.   It's close, yeah, turned out to be close.

Q.   And what type of camper did you live in?

A.   Well, if you talk about right before that -- see, first, we were in a little bitty camper, the one that we pulled from Mississippi.  So it was a little pop-up Aliner, didn't even have a bathroom.

Q.   Okay.  How long were you in that camper?

A.   Turned out we had to live in that for over -- almost two months, I think, and we didn't have any spot, so we had to move day-to-day.  And then we finally landed in somebody's parking lot, a

stranger -- I mean, a stranger's driveway. We lived in a driveway for over a month while I begged every day for a spot in the trailer park, and I finally got one. I had to -- I bought a bigger trailer, a 19-foot. At least it had bathroom.

Q. Okay. And how much did the larger trailer cost?

A. It was right around 8,000.

Q. What year was it?

A. What year was it that I purchased it or the year of the trailer?

Q. The year of the trailer.

A. 2008.

Q. You said you lived in that 19-foot trailer for approximately year?

A. Yeah, over a year.

Q. And just so I understand, so when you went to Oregon, you did not have housing planned. You had planned to live in a trailer for a time?

A. Well, I -- I planned on -- I thought I would be able to find housing, but I still had my house in Mississippi. I wasn't really planning to make this kind of permanent move at the time, so I didn't plan to live in that tiny camper or the bigger camper.

Q. What do you mean by you did not plan to make

a permanent move at the time?

A.    Well, we had been in discussions, you know, about working remotely and, you know, I thought I would be able to stay connected to UMC and I would have time to get to Ashland and figure out where we were going to live, find a house.  My house -- I still had a house in Mississippi, so...

Q.    Am I correct that you moved to Oregon in order to get your son in middle school?  Is that correct?

A.    Yeah, yeah.  He had graduated from the fifth grade at Power APAC, and APAC goes through fifth grade, so it was time for a big school change.

Q.    Was your house in Jackson on the market at the time that you moved to Oregon?

A.    No.

Q.    When did your house go on the market?

A.    I really don't know.  As I realized, as I was in Oregon, that things were not turning out the way I thought they would, and I needed a house in Ashland, and, you know, I had a mortgage here so that I would have to sell the house here, and I can get that date.  I'm not really sure.

Q.    Have you made any plans, like, have any garage sales or had done anything in preparation of

the move to Oregon?

A.   Well, I had been thinking over the years, and I knew I wanted to, you know, ultimately get back closer to family and so, you know -- but I was trying to figure out how I could continue working at UMC and get my son in school in Ashland, close to family.

Q.   When did your house in Jackson ultimately sell?

A.   It was -- it took quite a while.  It's shocking, actually.  I really don't know the date.

Q.   Okay.

A.   But it did seem like it took forever.

Q.   Is that something that you would be able to locate --

A.   Oh, yeah.

Q.   -- and provide?

A.   Yeah.

Q.   And what did your house sell for?

A.   A hundred and ninety-nine thousand.

Q.   And how much was your mortgage?

A.   It was around -- maybe around 22.  Did I say my mortgage earlier was 33?  I think it might be 23, yeah.

Q.   Your monthly mortgage?

A.   Yeah.

Q.   Have you ever been in any type of treatment for any substance abuse?

A.   I can see why that might be a question of interest, but I actually gave up all forms of anything alcohol, no substance abuse for over 30 years.  So I haven't -- I haven't tasted a drop of alcohol since before I even arrived in the state of Mississippi.

Q.   And did you do that because you had a problem with alcohol?

A.   Probably.  I was speaking Russian and my job at Conoco was to drink vodka with the Russians.

Q.   And I'd like to hear about that.  We're going to go through your background in just a minute.  Did you go through a 12-step program --

A.   Yeah.

Q.   -- in order to --

A.   Yeah, but I quit -- yeah.  I went -- I'm still in a 12-step program, but I quit drinking in my 20s.  It wasn't working for me anymore.

Q.   Do you attend meetings in Ashland?

A.   I do.  I grabbed straight onto -- when I first got to town, I got -- Alexander and I got library cards and I found a home group, and I hung on to that meeting.  I went five times a week because I was trying to figure out what the heck is going on.

It was a hard time right then, and it's great to have a recovering community wherever you go. It's amazing.

Q. And how many times do you attend a meeting now?

A. You know, I've gone to meetings probably two or three times a week for many, many years, but since COVID, I started doing a few Zoom, but I just don't really get it with the Zoom thing. So I did more gardening and -- but I'll be back as soon as the meetings open back up, you know. It's not about not drinking. It's about a spiritual program.

Q. Okay. When did -- you said that that was 30 years ago and it was before you moved to Mississippi.

A. Uh-huh.

Q. When did you move to Mississippi?

A. I think it was the early '90s, so 19- probably '92, because one date that I do remember, if I have it right, is my UMC hire date. I'll always remember that.

Q. Okay. And when were you hired?

A. March 23, 1993.

Q. And what brought you to Mississippi?

A. I would have to -- that's always a great question because I didn't -- it was not on my plan. It was not in my plan. I came and I was visiting,

visiting friends, but I -- I didn't really plan to stay. But then I got a little temporary job through a temp agency working for IBM teaching computer systems, and that was pretty successful. And I was trying to figure out what I need to do with my life, because I am -- you know, I have a master's in Russian, and how useful is that, what am I going to do with that.

And so I decided to apply for a few jobs, and one day, I went out and did four job interviews, and I got four job offers. And one of them was -- well, two of them were at UMC. They weren't the best offers, but I was -- you know, but I thought that would be a good employer. So I did one of those. And, again, I wasn't really ever planning to stay long. You know, Mississippi can kind of pull you in.

Q. Okay.

A. And I started just putting roots down here, and it was -- it was very -- it was working for me.

Q. Okay. And you were hired as a secretary at UMMC?

A. Senior secretary II for $8.59 an hour.

Q. Okay. And you said at that point you had a master's in Russian?

A. And international policy.

Q. And where did you get your master's?

A.   The Monterey Institute of International Studies in Monterey, California.  It was the best school in my field in the country at that time.

Q.   Okay.  And tell me about your other education.  Do you have a bachelor of science or --

A.   Well, I went to the University of Kansas and I got a bachelor's in Russian and a joint master's -- or a -- I mean, a joint bachelor's in Soviet studies. Then I went to Monterey Institute of International Studies for graduate school and got a joint master's in Russian studies and international policy studies. Then I went on a scholarship for study abroad in Russia and got -- it was a, you know, postgraduate in Moscow and a certificate, basically.

Q.   Okay.  So I see, according to your curriculum vitae -- and we can include this as an exhibit.

A.   Uh-huh.

MS. TAYLOR:  Exhibit 5.

A.   And when I started at UMC, I also was teaching.  I was teaching English to Russian immigrants on the side.

(Exhibit No. 5 marked.)

BY MS. TAYLOR:

Q.   Okay.  So looking at what's marked as Exhibit 5, and I believe that this was a document that was

produced by you during litigation, it has a revised date at the top of March 8 of 2018.

A.  Okay.

Q.  So this is -- is this the latest copy of your curriculum vitae?

A.  No.  I would always add things to it, but the only thing I've added, really, lately is just a whole lot of -- I'm a really active volunteer nationally.

Q.  Okay.  Okay.

A.  So my volunteer section is growing really well, and community service.

Q.  So looking at this, it looks like you -- let's see.  You got your master's in preventative medicine in 2003.  Is that correct?

A.  Yeah.  I was working in the School of Dentistry as a director of IT and -- or whatever title at the time.  It changed several times -- and went back to school in preventive medicine while I was working full-time.  So part-time school.

Q.  And did UMMC help you with the tuition because you were an employee?

A.  Yeah.  There was a program of you could take, like, one or -- a certain number of quarter hours as an employee.  It might have been something like four hours a week or something.  So I just did what I could

do each quarter.

Q. Okay. And was that at no cost to you?

A. Yeah.

Q. Okay.

A. It's an employee benefit.

Q. What about -- I see that you got your Ph.D. in 2007. Is that correct?

A. Uh-huh.

Q. And were you able to get your Ph.D., was that paid for by the University --

A. I did it the same way, quarter by quarter by quarter. I mean, I was working full-time, so I was very busy, so that was the best way to do it. It took me over eight years to do it, the whole thing.

Q. Okay. But that was a benefit to you as an employee. Is that correct?

A. Yes, available to everyone.

Q. And you did not have any student loan debt when you either got your master's or your Ph.D.?

A. Oh, I had a lot of student loan debt from all this other stuff.

Q. Okay. So you had a lot of student loan debt from your prior education. Is that correct?

A. Right, yeah.

Q. But you didn't have student loan debt from

your education at UMMC.  Is that correct?

A.    That's correct.

Q.    Do you have any student loan debt now?

A.    No.  I paid off every one of them and, I mean, it just took a long -- many years.

Q.    When did you finally pay them off?

A.    You know, I was probably close to 50, I don't know, 40s, somewhere in my 40s, and I just paid, you know, just whatever was due each month.  So I just took a long time.  But you know what?  I am so proud of the fact that I paid for my entire education.  My mom and dad never had to help me.

Q.    Okay.  That's good.  That's good.

A.    Yeah.

Q.    I noticed, as I was looking through the different curriculum vitaes in your personnel file, that the description of your Ph.D. initially was preventative medicine, but then, in later curriculum vitaes, there was an addition to epidemiology.

A.    So Preventive Medicine --

Q.    Hold on.  Let me ask a question.

A.    Oh, I'm sorry.

Q.    It's just for her benefit so that, when we read the record, there's a clear record.  I don't want to interrupt you, but --

Q.    So when you became the director of information technology, was it for the School of Dentistry?

A.    When I became which one?

Q.    The director of information technology.

A.    Oh, yes.  It was for the School of Dentistry. And during that time, I think I was, you know, I was going to school and working in the Preventive Medicine department.

Q.    Let me ask you this.  Who was your -- and I know it's going to be difficult to remember, but who was your supervisor or manager?  Who oversaw you in your position as network administrator?

A.    Well, at first it was Thomas Smith, the clinical dean.  And then after he left -- oh, and then I started, you know, studying.  So I ended up having the clinical department -- I mean, a department for my faculty appointment.  So that was Dr. Frank Serio.

Q.    And what -- Dr. Frank Serio, what was -- he was a dean or --

A.    He was the chair of -- he was the chair of Periodontic and Preventive Sciences.  It was always confusing.  They didn't really know where to put me because I was sort of before my time, I guess, with epidemiology before it was cool.  So it's the

preventive sciences department that he was in.

Q.   Okay.   Now, during that time, was your --
during that time, your focus was on the information
technology and the networking system.  Right?  In the
Dentistry?

A.   Uh-huh.

Q.   Okay.   So when you became an instructor in
2002, at that point, who was your direct supervisor or
manager, who was --

A.   Dr. Serio.

Q.   Okay.

A.   And I was also then teaching, you know, the
informatics and teaching the students and the faculty
how to use all these new technologies that we were
inputting.  But I was also -- I'm not sure when, but
at some point, I got a grant for an HIV needs
assessment for the State of Mississippi.  So I was
also being able to bring -- start bringing in grant
funding.  It was a $217,000 grant.

Q.   Was anyone else on that grant with you, or
were you the only person on the grant?

A.   I was the principal investigator, and then I
had a small staff.  I had field investigators
collecting data all over the state.

Q.   Okay.   So that would have been in 2004 when

you were the principal investigator.  Is that correct?

A.   Let me see.  Yeah.  But it wasn't my only grant.  It was my first big one.

Q.   Okay.  And then it looks like, in 2008, you say you were promoted to assistant professor and then your title was director of research and education, information technology?

A.   Well, I was an assistant professor.  So I was still in the School of Dentistry as director of information technology when DIS approached me and asked me to become -- they created this position of research and education information technology.  They wanted me to do that for the whole campus because I had experience working with the schools and the faculty and having a faculty perspective that a lot of the IT people didn't have.

Q.   Okay.

A.   So then I basically moved from School of Dentistry to DIS.

Q.   Okay.  So at that point, you were the -- you were in the information systems or the DIS department?

A.   Uh-huh.  But I still had a faculty appointment in the School of Dentistry and was -- had been granted tenure by Dr. Jones.

Q.   Okay.  And I want to -- we can go through the

policies in just a minute, but did you understand, when you received your tenure, that it was tied to the School of Dentistry, meaning when you went and worked at DIS, your tenure didn't go to your employment or work with DIS.  It stayed with the School of Dentistry.  Is that right?

MS. BASS:  Object to the form.

A.    No.  That's not what I understand at all.

BY MS. TAYLOR:

Q.    Okay.  What is your understanding?

A.    That, I mean, I was still -- my faculty appointment was still in the School of Dentistry, and I still served the School of Dentistry, but I also now served all the other schools, as well, and I still did my faculty stuff and my grants through the School of Dentistry.  My tenure was given to me as a University of Mississippi Medical Center employee or faculty member.  It was not tied to the School of Dentistry.

Q.    Okay.  And why is that your understanding?  I mean, because after you left DIS, you went back to the School of Dentistry.  Is that correct?

A.    Yeah.  HR told me, you have tenure in the School of Dentistry so you're going back to the School of Dentistry.

Q.    Okay.  So you understand that -- you

understood that your tenure was in the School of Dentistry. Is that correct?

A.   No.

MS. BASS:  Object to the form.

A.   It was because they didn't have any appropriate place to put me still, like any better place. So there was still -- at that time, there was still -- I think, the Department of Preventive Medicine had been disbanded. The School of Population Health was still just a concept. And so a logical fit was the School of Dentistry, but it wasn't the only possibility. As Dr. Didlake was looking for a better fit for me, you know, he -- there were all sorts of possibilities, but -- even pediatrics was mentioned. But School of Population Health was the right fit. It just didn't exist.

BY MS. TAYLOR:

Q.   Okay.

A.   I have a tenure letter somewhere. You probably have it, too.

Q.   I think so. I just need to find it.

Let's do this. Let's take a five-minute break while I look for your letter of tenure, and then we'll restart.

A.   Okay.

(Recess.)

BY MS. TAYLOR:

Q. Okay. So during the break -- and we're back on the record, and you're still sworn in to tell the truth under penalty of perjury. Did you have any conversations with your attorney during the break about your deposition testimony?

A. No.

Q. And you didn't discuss your deposition testimony with anyone else. Is that correct?

A. No. I mean, that's correct, yes.

Q. Okay. So I was not able to put my hands on the letter of tenure. However, I was able to find the recommendation of tenure dated January 20th of 2009. Does that sound correct, that that was around the time that you were tenured?

A. Yeah, probably so.

Q. Do you have any reason to dispute that?

A. No.

Q. And then I also saw in the documents -- and we can mark this as an exhibit. There's a memorandum of understanding of transfer of your tenure.

(Exhibit No. 6 marked.)

BY MS. TAYLOR:

Q. And this appears to transfer your tenure

award from the Department of Periodontics and Preventive Medicine to the Biomedical Materials Science, School of Dentistry.  Is that correct?

A.  Yes.

Q.  And it states at the top of the document that, "According to IHL board policy."  Do you know what IHL is?

A.  Yes.

Q.  What is that?

A.  Institutions of Higher Learning.

Q.  It says that, when a faculty member receives tenure, he or she must be tenured to a certain school and department, and he or she receives a certain portion of his or her salary that is guaranteed tenure-protected salary.  Is that correct?

A.  Uh-huh.

Q.  So would you agree that your tenure was attached to a certain department in the School of Dentistry?

A.  Yes.

Q.  Okay.  And that when you began working for the biomaterials science department, that your tenure needed to transfer to that department.  Is that correct?

A.  Yes.

some of the policies just to confirm that you were aware that this was the policy of UMMC. On page 48, there's a policy regarding outside employment for faculty and staff. Isn't that correct?

A. Yes.

Q. And as part of that, you would not engage in a business or profession that would compete with a similar business or profession over which you have direct supervision. Isn't that correct?

A. Yes.

Q. And in order -- and as I reviewed the file, I saw that there were a couple of requests to have speaking engagements or consulting duties outside of your normal employment at UMMC. Was that the typical process that you would need to request approval in order to engage in --

A. Yes.

Q. -- outside employment?

A. Make sure there wasn't a conflict of interest.

Q. Okay. And do you understand why that's important?

A. Oh, yeah.

Q. Why is that?

A. Because it's the policy. I mean, yeah. It

would be a conflict of my employment, so -- and we had to sign something every year that we understood the, you know, conflict of interest statements or something.

Q.   Okay.

A.   So you declared everything and then, if there was a problem, you didn't do it.

Q.   Okay.  Now, if we look to page 54, it's the policy for leave for both faculty and staff.  And I should have said this earlier.  You can take a moment to review the policy, if you would like.  I'll ask you a question.  If you'd like to review it, you're welcome to do that.  Okay?

A.   Okay.

Q.   If you look on the very next page, they have a portion for personal leave that is provided for personal business or vacation for employees.

A.   Uh-huh.

Q.   And it states that all employees are required to submit leave requests for each instance when they are away from their official or regular duties.  Is that your understanding, that you would need to submit a leave request in order to have paid time off approved?

A.   Yes.

Q.   And did you also understand that paid time off approval was subject to your department's chair or dean's approval?

A.   Yes.

Q.   If we go to page 62, this touches on what we talked about earlier, about the terms of employment and tenure not attaching to administrative positions. If you look on the second paragraph, it indicates that appointment to an administrative position does not vest in the appointee tenure or any expectation of continued employment in that particular post.  Such appointments, i.e., associate vice chancellor, dean, associate or associate dean, et cetera, receives and holds the appointment at the pleasure of the vice chancellor as the designated administrative head of the institution.

So would you agree that appointments to administrative positions would not hold a tenure or an expectation of tenure?

A.   Yes.  But they also didn't change our tenure status elsewhere.

Q.   Okay.  Now, when you were employed at UMMC, you understood that UMMC had a policy prohibiting discrimination or harassment on the basis of gender or any other protected class.  Isn't that correct?

A.   Yes.

Q.   You understood that there was a process or a way that an employee or faculty member could raise complaints or reports of allegations of discrimination or harassment based on one of those protected categories.  Isn't that correct?

MS. BASS:  Object to the form.

A.   So can you restate the question?

BY MS. TAYLOR:

Q.   You understood that there was a policy where a faculty member or an employee could raise concerns, complaints or reports of discrimination or harassment based on their gender or anything else.  Is that correct?

MS. BASS:  Object to the form.

A.   Yeah.  Yes.  Which I did, actually.

BY MS. TAYLOR:

Q.   You said that you did?

A.   (Witness nods head up and down.)

Q.   Okay.  And when did you make a complaint or a report of discrimination or harassment?

A.   More than once, and probably round 2016.  I don't remember exactly, but the dates are all available.

Q.   Okay.  Who did you report that to?

A.    The Office of Compliance.

Q.    **What does the Office of Compliance do?**

A.    Well, I'm not sure.  They do a lot.  But we were doing -- we had the yearly training online where you do the harassment stuff, the module and stuff, and I really -- I saw that totally pertained to what I was going through, and so I followed the proper channels that were in the harassment document of what you do, and that was, you know, to go take it to Compliance.

Q.    **Okay.  How did you report it to Compliance?**

A.    In writing.

Q.    **And was there a certain point of contact that you had with the Department of Compliance?**

A.    Carol Denton.

Q.    **And tell me what you reported.**

A.    Harassment, hostile work environment.  My chair, Jason Griggs, was with me.  He was reporting it with me, trying to get an investigation going.

Q.    **Okay.  And who did you claim was harassing you?**

A.    Part of it, a lot of it, some of it, you know, you don't always know who's pulling all the strings, but specifically John Showalter was one named.  Julie Smith was named.  Possibly Charlie Enicks.

you thought that that communication had happened in 2016, and I just wanted to refresh your recollection that perhaps that actually occurred in 2012.

A.   2012.   It started early, yeah.   It's been happening for a while.

Q.   So it would be approximately five years before you left UMMC.   Is that correct?

A.   That part, the John Showalter thing, that particular incident.

Q.   And how was -- how was your complaint resolved?

A.   It also involved that they just kept, like, destroying my research data, destroying my servers, taking -- cutting my access off from anything but my research.   They destroyed research that I was legally obligated to maintain for federal grants.   I even went back to my SOD, School of Dentistry, servers.   They'd been cleaned off.   I was told that the DIS people were told -- they told me -- the quote was, "When Denise asks for anything, the answer is not only no, but hell no."

Q.   Is that -- did this occur around the time that you were removed from your position in DIS?

A.   It was after I was removed from my position in DIS.

Q.   Okay.

A.   Yeah.  And then my new job was to -- as faculty, you know, do my research and publish and, you know, do faculty, you know, certain roles and responsibilities.  So, fortunately, I had a lot of research I had done and I just hadn't had time to write it up, but as I'd go back to my data, it was gone.  It was wiped.  It was cut off.  They even took my -- literally took my equipment, wiped it off digitally, and also just removed equipment that I'd bought on grants.  It was...

Q.   And why were you removed from your position at DIS?

A.   They said there was no reason.  I was told by Mike Estes, who is the chief HR officer at the time, he said, "You did nothing wrong.  They are able to reorg, you know, and I'm able to put you with your tenure back to the School of Dentistry."

Q.   Okay.  And you were unhappy with that decision?

A.   No.  No, I wouldn't say I was unhappy with it.  You know, I was familiar with the School of Dentistry, and I liked the people there mostly, and I was glad to -- I, you know, I was glad to still have my job because I saw a lot of people really get, you

know -- Charlie and Julie were, as they said theirselves, Julie and what's his name, Al somebody, they sit around the table and laugh about the reign of terror that they were conducting on the University and the employees of DIS were terrified of them. But there were two groups that were not -- that were successful, and one was Hank de Weerdt and one was me. They were doing pretty well with the schools.

Q. So when you were the director of DIS, who was your immediate manager?

A. Charlie Enicks.

Q. And you did not get along with Charlie?

A. I didn't not get along with Charlie. It was fine.

Q. Okay.

A. Yeah. I didn't have any problems with Charlie, really. He didn't know what my job was and he wanted me to do it, so that was, you know -- but mostly -- yeah. I don't know. I was in meetings with Charlie, but the -- it was Julie, and Al, and Hank and I.

Q. Why did you think that you were being harassed in 2012? What --

A. That's after my position was eliminated. Right? That's when -- well, I was cut off from my,

you know, my servers, my data.  I couldn't get access to any resources that I needed to do my job.  When I would enter, I would submit a help desk call.  They would be unanswered.  I was meeting with a lot of hostilities and resistance that -- you know, Julie Smith was kind of a bad character.  She was walked out with -- I think with police eventually.  So was John Showalter.

Q.   John Showalter was walked out with police?

A.   Uh-huh.

Q.   Why was he terminated?

A.   Compliance violations.

Q.   You don't think that, in 2012, that you were being harassed because of your gender.  Is that right?

MS. BASS:  Object to the form.

A.   I absolutely do.

BY MS. TAYLOR:

Q.   And why do you think you were harassed because of your gender?  Is Julie female?

A.   Yeah.

Q.   Okay.

A.   Females can be some of the worst.

Q.   Why do you think you were being harassed because of your gender?

A.   Well, I can understand that my administrative

title can be taken away, but I saw instances where that happened with men, and they didn't get the salary reduction that I got.  And then with the -- about cutting me off from all of my resources, I never saw -- and then also, when they took away my position, they gave it all to -- split it up into pieces and gave it all to men.  I felt -- I always got -- I was allowed to build something wonderful, and then it would be taken and given to men.  This happened more than once throughout my tenure.

Q.  So let's talk about the instance -- and this would have happened before October of 2012.  Isn't that correct, because that's --

A.  Well, I think the first thing I have trouble reported was 2010, and that was -- yeah.  It's probably -- it's kind of where I went back to. There's a long pattern of this kind of behavior.

Q.  And what did you report in 2010?

A.  So I was the director of research and education IT, and I was a co-study director for the National Children's Study, which was a multi-million-dollar grant.  Sharon Wyatt was the PI, principal investigator.  I was co-study director for data with Dr. Warren May.  We were co-directors doing, you know, the same role on the National Children's

Study.  And that was the first time that, as faculty, I was able to -- that made me -- Sharon Wyatt, as the PI, was paying the research salary enhancement to the people on her grant, and Warren May, in the same role as me, received his, and I -- that was the first time I didn't receive mine.

Q.    Who did you complain to there?

A.    I know I went to Charlie Enicks, Sharon Wyatt.  Conveniently, both of those people are gone.

Q.    Okay.  Any other reports of discrimination or harassment that you made?

A.    Yes.  So when the part of my job was given -- the enterprise data warehouse was begin given to John Showalter, who was paid twice what I was paid for a much bigger job, and then the REDCap that I had built for the whole institution for research informatics, that was given to Mike Griswold, and I built this entire GIS, geographic information systems infrastructure to support population health research and every kind of research informatics for the whole institution, that was given to Fazlay Faruque, all of which has died and gone.

Q.    Would that have been things that happened before October of 2012?

A.    Yes.

Q.   Okay.  And you said that you made a report of discrimination and harassment as it relates to John Showalter and Mike Griswold?

A.   No.  I -- no.  I went obediently back to the School of Dentistry, but I -- you know, Jason, I worked with Jason to try to figure out what we could do to restore my salary, because I was a sole supporter of my family.

Q.   Okay.  And that would have been around 2012, 2011, that you were working with Jason to restore your salary?

A.   Right.  And doing my faculty role and agreement.

Q.   So are there any other -- you had mentioned the -- that you had complained to Compliance about harassment by Julie and others in the DIS department in October of 2012, and that you said, in 2010, you complained about your -- did you complain about your salary, or did you complain about the research?  What did you complain --

A.   Well, I was upset about my salary because I had, you know, financial obligations.  So that was kind of a shock to lose that much money.  What was the other part of the question?  And then -- yeah. Dr. Summers called me in and actually asked me to take

the high road and make John Showalter successful.

Q.   You said that that happened in 2010?

A.   When I didn't get the research enhancement
for the National Children's Study?  Yeah.

Q.   Okay.  And who did you complain to in 2010?

A.   Charlie Enicks and Sharon Wyatt.

Q.   And how did you complain?

A.   Just in a meeting with them expressing why am
I not getting it when Warren is, and we're doing the
same job.

Q.   So you had mentioned that Dr. Griggs, in
2012, went and assisted you in complaining to
Compliance about Julie and Dr. Showalter.  Is that
correct?

A.   Showalter, yeah.  He tried to make
appointments with John Showalter, and Carol Denton,
and I.

Q.   I understand that he is the department chair
of the biomedical material science?

A.   Yeah.

Q.   Do you think that Dr. Griggs was a fair
department chair?

A.   Absolutely.  He was a wonderful department
chair.

Q.   And do you have any reason to believe that

Dr. Griggs would say anything untruthful about you?

MS. BASS:  Object to the form.

A.    I really don't know that.  I know that we had a very good, professional working relationship, and that I met and exceeded his expectations.

BY MS. TAYLOR:

Q.    So you worked as a faculty member in that department I guess from approximately 2012 until August of -- or I guess September of 2017.  Isn't that correct?

A.    Yes.

Q.    And during that entire time, you worked under Dr. Griggs?

A.    Yes.

Q.    And you said that you met or exceeded his expectations?

A.    Yes.

Q.    Did Dr. Griggs ever counsel or discipline you in your position as a faculty member?

A.    No.  We did a faculty role agreement each year, and so I knew what he wanted and I would do more than that.

Q.    Now, did you have performance reviews each year while you were in the Department of Biomedical Material Science?

A.   Each year during my entire tenure at UMC, yes.

Q.   Okay.  And as of part of that process, you would have an opportunity to rate yourself and your, I guess, department chair would have an opportunity to rate you, as well?

A.   Uh-huh.

MS. TAYLOR:  Let's mark this as Exhibit 8.

(Exhibit No. 8 marked.)

BY MS. TAYLOR:

Q.   Dr. Krause, this is a performance evaluation from 2014 through 2015.  If you go to the second to the last page, it appears that it was electronically signed by you on September of 2015.  Is that correct?

A.   Yes.

Q.   Now, it appears that under -- on the second page, Dr. Griggs had some criticism or concerns about your activities and staying focused.  Isn't that right?

A.   Yes, that's in his comment.

Q.   Okay.  And he said that you had been challenged in the past in staying focused to satisfy the planned number of grant applications in order to meet the submission deadline.  Isn't that right?

A.   Yeah.  The disconnect that we had was that he

was a biomedical materials researcher and I was a population health researcher, and you can do a lot more grant applications in the materials sciences when you're just torquing screws as opposed to when you're studying populations. So there was a little bit of -- he was a great chair. He didn't really understand population health.

Q. But he did say that he'd decreased the requirements to much lower than other faculty members and asked you to focus on submitting manuscripts. Isn't that correct?

A. Yes, which -- then he says, which she did. And then I did something in the next grant that met the requirement.

Q. So it actually states that the grant application requirement was one grant that would support student and a salary, a staff salary. Her intramural grant was not aimed at meeting that purpose. And it says, towards the end of the last fiscal year, she did submit an extramural grant application not funded that met that requirement. Isn't that right?

A. Yeah. You just have to do it sometime in the year. And you don't just do one. You might submit multiple grants.

Q.   And he states on the next page that he's hopeful that your speaking engagements would help you acquire an extramural --

A.   Right.

Q.   -- grant in the next year.  Is that right?

A.   Yeah.

Q.   Now, Dr. Griggs also talked to you about submitting grants outside of the deadlines for the grants set by the school so that it can be reviewed before it's submitted.  Isn't that right?

A.   Yeah.  The School of Dentistry had some of their own earlier deadlines that the Office of Research didn't have.  So I had that initial, you know, understanding that the deadlines were one thing, but, yeah, he cleared that up for me.

Q.   Okay.  And he said --

A.   He needed more time because he liked to review everything before it went to the Office of Research, and so he needed to set those deadlines a lot earlier than the rest of the university had.

Q.   And then he states on the next page that -- this is positive -- you have a tendency to get excited about helping other researchers, which can lead to problems with maintaining focus, and developing your research niche, and becoming independently funded, an

independently-funded principal investigator.  Isn't that right?

A.   That was a bit of my transition from being the person that helped everybody on campus, that I had all the schools, six schools, and building their programs and their, you know, their technology needs, and so I had to then become not so other focused.  I was trying -- I really wanted to do so much for the state of Mississippi.  This was a very difficult transition for me to become self -- self-centered, very limited, you know, like, okay, I just have to focus on what's good for me and meets these requirements.  That was a challenge for me.

Q.   So I guess, at least in September of 2015, you did understand that, to be successful in your role, that you would need to be awarded grants.  Isn't that right?

A.   Yes.

Q.   Okay.

A.   And write papers.  And I really wrote papers.

Q.   Okay.  And he also provides some critical feedback about you canceling your grand -- the School of Dentistry grand rounds lecture two weeks before the lecture date.  Is that correct?

A.   I think I had a conflict.  I transferred it

to someone else, yes.

Q.   And --

A.   I didn't -- yeah.  He didn't really like that.

Q.   Okay.

A.   I didn't really realize that would be a problem.

Q.   And wasn't it Dr. Griggs that had to present on your behalf?

A.   Yeah.  I thought he wanted to.

Q.   Okay.

A.   Did you see that page right there that says, "Dr. Krause mentored at least two students in research this year and her students presented excellent award-winning presentations"?  Even got an award right out of Washington, D.C.

Q.   I see that.  Congratulations.

A.   Thank you.  I was very proud of my students. That was -- it turned out being fun.  It was just a huge transition, you know.

Q.   Now, if you look on -- it is page -- if you look on the small lettering, it's UMMC 583. Dr. Griggs had some very strong criticisms saying that you were insubordinate and provided false information in the previous year.  Isn't that correct?

A.   That's what he wrote.  I remember that and being -- yeah, we had a talk about it, but I had no choice than to sign it.  I mean, you had to sign it.  So that really -- that hurt, actually.

Q.   And isn't it true that Dr. Griggs counseled you or warned you about padding your curriculum vitae?

A.   Yes.  He did not want me to report a particular publication in the Mississippi Journal of Sciences, and that that didn't count.  Although it did count in other schools and departments, it didn't count in his.

Q.   Okay.

A.   He has high, very high expectations, higher than the rest of -- and, you know, the rest of the schools, which I appreciate that.  It was, you know -- you have to figure out what they are and then learn how to play with them, learn how to meet those goals.

Q.   And that was related to the peer-reviewed articles.  Is that right?

A.   Yeah.  It was just that one.  It was the Mississippi Journal of Academy -- of Sciences or something.

Q.   And what is a peer-reviewed article?

A.   It's when -- see, I submit most of my articles to really top-tier epidem- -- there are

different tiers.  The Mississippi Journal is a lower tier.  He didn't like the lower tier.  But I was, you know, on the editorial board of Journal of Epidemiology.  He liked most of my -- I submitted to high-quality journals.  And so here is when you submit your article and then, if it gets far enough to even get reviewed and sent out for review by other experts in your field, and then they will make a recommendation, and I was one of these reviewers, as well, to -- whether to accept with corrections or, you know, edits, or to reject the article.  So you have to get through the board of reviewers and then work on getting it accepted for publication.  I had actually one paper that got accepted with no changes.  That, like, almost never happens.

Q.    Okay.  And are online journals considered peer-reviewed journals?

A.    Yeah, some are, but not all.  Not all are created equal.  The online Journal of Public Health Informatics is a good journal, but you have some journals that are online that are -- you have to look on -- you have to find out what are the -- kind of fake research publications and don't send -- I don't send it to those.

Q.    And he says that he met with you about the --

what he said is that you began to put yourself up for promotion and misrepresented the number of peer-reviewed articles and lack of active extramural grant.

A.    Where is that?

Q.    If you look on -- it's page UMMC 584, at the very top.

A.    Yeah.  Okay.

Q.    And he says, that when you met with him, that you told him that he was referring to an outdated version, but then when you gave him a new version, it had the same identical information as the last version.  And he said it did not even have the minimum number of publications to even be considered for promotion.  And so this was in -- I guess it would have been in September of 2015.  Had you put yourself up for promotion in 2015?

A.    You don't put yourself up for promotion.  All I -- you ask your chair if you can be put up, if he'll put you up for promotion.  And I asked him if he would put me up for promotion and he told me that I didn't meet his basic criteria.  I did meet the criteria for general School of Dentistry guidelines, but he always had a little higher guidelines for his department.

Q.    Okay.

A.   So it was his personal, you know, feeling that he wanted a little more.  The carrot kept moving, and I kept chasing it.

Q.   So you did not go outside of that and request to be promoted --

A.   No.

Q.   -- outside of the normal protocol?

A.   No.

Q.   Okay.

A.   There was a chair that was willing to put me up because they thought that I really did qualify, but I knew that to pursue that would be really not a good idea with Dr. Griggs because he's, you know, basically the chair you don't want to go around.

Q.   Now, if you look at UMMC 585, it's the -- it starts on the bottom.  He says that your primary focus should be in writing extramural grant applications, and he notes that other faculty with this focus have written between three and nine per year, so three would be a minimum number for you in that year.  And then in this final paragraph, Dr. Griggs told you that you need to entirely revise the way in which you interact with him and that you were in violation of policies against providing false information and against uncivil behavior, and that you need to stop

these --

A.    Where are you seeing this?

Q.    The last paragraph.

A.    On 585?

Q.    586.  And that you need to stop those behaviors lest your employment would be terminated for cause.  So given the performance evaluation in September of 25, wouldn't you agree that Dr. Griggs had some serious concerns about your performance and your work in the department?

MS. BASS:  Object to the form.

A.    I think that there was, you know, some misunderstanding here and that we were able to talk it out.  I had to sign it as is.  It couldn't be changed.

BY MS. TAYLOR:

Q.    But you don't deny that Dr. Griggs told you, that if you didn't improve, that you would be terminated for cause.  Isn't that right?

MS. BASS:  Object to the form.

A.    I don't think I see it that way.  I had to learn how to interact with Dr. Griggs.  He -- he is -- he has Asperger's and it's a different way you have to figure out.  If you have one digit of -- like, if it's 36 cents and it should have been 37, it's a horrific mistake.  And so I had to just kind of learn to go

above and beyond.  I don't think you'll see any of this after this.

BY MS. TAYLOR:

Q.  But you don't dispute that he said that you need to stop these behaviors lest your employment would be terminated for cause in your performance evaluation.  Isn't that right?

A.  He put that in this, yes.

Q.  Okay.

A.  He didn't want you to talk to anybody outside of your department and I had relationships with the entire campus.  So I had to try to learn to not -- really just to stay under his thing, you know.  It was challenging at first.

MS. TAYLOR:  Okay.  Let's go ahead and mark this as the next exhibit.

(Exhibit No. 9 marked.)

THE WITNESS:  Now we can look at my 24 other years.

BY MS. TAYLOR:

Q.  Okay.  Let's see what we have marked as Exhibit Number 9.  And, Dr. Krause, this appears to be your faculty evaluation for the year 2015-2016.  Isn't that correct?

A.  Yes.

Q.    And based on the signature page, you electronically signed it on May 31st of 2016.  Is that correct?

A.    Yes.

Q.    Now, on the second page of the performance evaluation, it appears that Dr. Griggs says that you, quote, seem to have applied for the minimum of three extramural projects plan.  These grant applications did not pass through my office, and he says, I encourage her to apply through my office so I can help her to be awarded appropriately for her accomplishments.  Did Dr. Griggs expect you to work through his office in submitting grant proposals?

      MS. BASS:  Object to the form.

A.    Dr. Griggs was -- I don't know when he started being dean of research, but he set some extra criteria that we had -- you know, you were only subjected to if you were in the School of Dentistry.  So, yeah, you had to -- he made sure that you wanted it to go through the School of Dentistry.  But normally, it would just go through -- to the Office of Research, and you would work with the Office of Research, which is the standard procedure.  Just like if you wanted to even buy something from the bookstore, you had to go through the business -- his

extra steps for the School of Dentistry.

BY MS. TAYLOR:

Q.    Meaning he wanted to review the grant application before it was submitted.  Isn't that right?

A.    Yeah.

Q.    Okay.  Now, if we look at UMMC 593, Dr. Griggs criticizes you for breaking the chain of command, stating that you frequently break the chain of command, and that you fail to keep your direct supervisor in the loop, which I assume is Dr. Griggs, and that you break departmental policy, that you argue against departmental policy, and that you fail to attend departmental faculty meetings, and that you need to file all of your requests and appeals through me, which I assume is Dr. Griggs, and respect the concept that they may stop at me.  So Dr. Griggs appears to be continually counseling and talking to you about breaking the chain of command.  Isn't that right?

MS. BASS:  Object to the form.

A.    So Dr. Griggs had a group of biomedical materials sciences researchers, and a lot of my -- none of my stuff applied.  And so I didn't do that kind of research.  And population health involved

being -- having Asperger's, he's incredibly focused. He's incredibly focused, and he is an expert, absolute expert, in his field. But I was in a very different field, which is a lot broader, and so it was kind of like a -- some of the things just -- they didn't apply to my research.

BY MS. TAYLOR:

Q. But you would agree, that as your supervisor, that Dr. Griggs could require you to submit applications for grants to him before they --

A. Yes.

Q. -- were submitted for approval. Isn't that right?

A. Yes. And after I was reprimanded, yes, I was -- clearly changed my behavior.

Q. And that Dr. Griggs could require you to keep him in the loop with what you were doing in your job. Isn't that right?

A. Yeah.

Q. Now, if we look on the next page, it's UMMC 594. And Dr. Griggs states that, "Dr. Krause continues to fail to plan ahead and meet deadlines regarding her travel and grading." Tell me what deadlines you had trouble meeting as far as your grading goes.

A.   I have no recollection of that.  My grades were always submitted on time.

Q.   Now, he complained earlier that you did not attend departmental meetings.  How often were there departmental meetings?

A.   I don't know.

Q.   Is that because you didn't attend them or --

MS. BASS:  Object to form.

A.   No.  They put me -- I was not in the School of Dentistry physically.  I was put clear across campus.  I was in the nursing dorms, and I didn't really know what was going on in the School of Dentistry.  He gave me my faculty role agreement and pretty much just wanted me to meet these -- line up these widgets.

And so I was working on my papers, my courses, my research, and I -- you know, the departmental meetings were all about materials, like -- you know what I'm talking about?  Like dental appliances and screws that you would use in hip implants and things that, you know, torque.  I don't, you know, I don't have any expertise in those areas.  None of the meetings that kind -- the departmental meetings, they just didn't apply at all to my research because I was not a biomedical material sciences

person.  I didn't -- and I wasn't summoned to those meetings or I would have come.

BY MS. TAYLOR:

Q.  But you would agree that Dr. Griggs, as the department chair, could require you to attend --

A.  Sure.

Q.  -- departmental meetings.  Is that right?

A.  Sure, yeah.  And if he told me to do it, I would do it, whether I thought it was, you know -- I do remember sitting in many meetings thinking, my God, I'm losing two hours, and this is not doing anything worthwhile, but I sat.

Q.  So it sounds like it was an odd fit for --

A.  It was.

Q.  -- your work in the biomaterials science department?

A.  It was not a fit at all.  I was a square peg in a round hole.  But as far as being, you know, clear about his requirements, he was clear, but I had to, like, try to figure, you know, then I'd -- okay.  Okay.  I don't do that here.  Okay.  And now I try to do my research within this context that just didn't fit.

Q.  Now, on UMMC 594, at the bottom, Dr. Griggs, I guess, revisits the School of Dentistry grand

rounds, and he said that -- he references that you had cancelled the year before two weeks prior, and that he had hoped that you would be well prepared for the grand rounds in 2016.  And he said that, however, you complained about having to present it and ended up presenting an off-topic lecture.  Do you remember what you presented?

A.    I don't.  I think I might have -- I don't remember what I presented, but it was probably something to do with my dental workforce research.  See, I didn't have -- that was weird because how do I present -- what do I present to these dentists?  When he thinks my research is off topic, it's epidemiology and population health, but he doesn't understand that because it's not in his vision.

Q.    Okay.

A.    I do remember the students really liking my research, and they thought I should really launch it for them.

Q.    So what did you present on?

A.    I don't know if it was in this particular grand rounds, but I might have -- because I wouldn't, you know, know how to do any kind of case, a dental case.  I just don't know anything about any of that.  So the only thing I would know to present is my oral

health research, you know, with population health disparities, you know, the -- I developed a platform to help with health outcomes and then be specific about oral health.

Q. Okay.

A. But to him, that might be off topic because it's not a perio case or, you know, it's -- it's not a clinical dentist.

Q. Okay. Now, he also, on the next page, he states that you violated the departmental policy against curving grades for your class, and that he discussed it with you, and you appeared confused and couldn't explain how your final grades were curved.

A. I'm going to have to dispute that.

Q. Okay. Do you --

A. It's not true.

Q. Do you agree that Dr. Griggs talked to you about his concerns that you had violated departmental policy by curving the grades?

A. I see that he said that I curved grades, but I did not curve grades. I had -- it's pretty clear. I did all of my grading in Blackboard. It calculates it itself. I don't even -- I was actually one of the toughest courses in the School of Dentistry curriculum. So I don't -- I don't really -- I can't

relate to that.

Q.   And then the last page is UMMC 597.   It appears that Dr. Griggs, under the "Comments" section, was very positive, and says it was a relief to conduct your evaluation, that you didn't argue against the performance expectations or pad your curriculum vitae. So he's being very favorable of your response to your performance review --

A.   He was.

Q.   -- for May of 2016.   Isn't that right?

A.   Uh-huh.   He set his clear goals, I set off to meet them, and he was happy with that.

Q.   So as of May of 2016, you had been awarded one small grant.   Isn't that right?

A.   So you're talking about only what was happening in 2016?

Q.   That's right.   Just confirming what he said in your performance evaluation, that you had been awarded one small grant.

A.   Where -- what page are you looking at?

Q.   On the second page.

A.   Second page of the whole thing?

Q.   Yeah.

A.   Received -- oh, four articles accepted for publication.   Is that the page you're on?   And a five

out of five on accomplishments and research.  Where are you?

Q.  On the third page.  I'm sorry.

A.  Okay.  And this is 2015-16.  Okay.  So that's a Health Department grant.  Okay.  What was the question?

Q.  That by, I guess, at the time of June of 2016 or May of 2016, when you signed that, that you had received one small grant.  Is that correct?

A.  Right.  I had got one small grant and another one was coming, another notice of award was coming, is what it says.

Q.  Okay.  Now, when did you decide to relocate to Oregon?

A.  Sometime in 2017, I started talking to Dr. Griggs about it and I started talking to others about how we might be able to make that work, and he started talking to HR about it.

Q.  Okay.  So that would have been the year that you moved, in 2017?

A.  Yeah.

Q.  Okay.

A.  I had not really preplanned this.

Q.  So it was something that had been planned much earlier?

A.    Someday, but I was at the height of my career. I just got -- Jason Griggs just put me up for full professor, and I just got an amazing promotion, you know, full tenured professor. He promoted me with a salary of $170,000. He was, you know, he was -- the thing I like about him is that he's like straightforward. If he doesn't like something, he clearly let's you know, and then you can respond, which is really awesome, because sometimes at UMC, it's not so clear and you don't know how to respond.

Q.    Yes.

A.    So I appreciate that because then I know where he's coming from, even though we are very different and we have very different fields of research and he didn't really understand, you know, my stuff, but still, you know, at least he was clear.

Q.    Right. Okay. In the documents in your 2016-2017 performance evaluation --

MS. TAYLOR: And we'll go ahead and mark this.

(Exhibit No. 10 marked.)

BY MS. TAYLOR:

Q.    This Exhibit 10 is the performance evaluation for 2016-2017. And if you'll look on the second to last page, it appears to be electronically signed by

you on May 1st of 2017.  Is that correct?

A.    Yes.

Q.    Now, this is the third page.  It indicates --
or you indicate, because that's your self-review --
that's the highlighted section.  Is that correct?

A.    Uh-huh.

Q.    And you state that you obtained 53,000 HRSA
grant from the Mississippi Department of Health, and
then you state, "Confusion from OMPW caused the grant
to be lost."

A.    Yeah.

Q.    That you obtained another grant with the
Mississippi Board of Nursing and that --

A.    That was about 175,000 or so, I think, too.

Q.    -- and that OMPW was creating some confusion
about that, as well.  What is the confusion that they
were causing?

A.    Dr. Mitchell at the Office of Mississippi
Physician Workforce, he ended up buying 10 percent, I
think, of my effort.  Actually, it wasn't his.  It
was Dr. Beebe.  It started with Dr. Beebe, and she was
amazing, but then she was interim, and Dr. Mitchell
came, and I was -- you know, Jason was telling me get
these grants, get these grants.  And so I was pursuing
these grants.  And then Dr. Mitchell, with his little

10 percent, was like, "I want these grants."  He didn't want me to have faculty credit for them.  He wanted them to go through the OMPW, which was putting me at a really difficult place because, to satisfy Jason, I needed them, and Dr. Mitchell -- I had the -- the whole thing was all done with the Office of Nursing Workforce.  It was going to be like -- I really don't remember the amount, but for some reason, it seems like it was around $175,000.  I was going to do all the nursing workforce in my Mississippi mapper platform and set up all the state analytics for them, and they were delighted.  And it was all documented and almost done.  The ink was almost dry.  And Dr. Mitchell did something because he wanted to control it.

Q.   Okay.  So was he listed as the -- what is it, principal or primary investigator?

A.   No.  No.

Q.   Was it a contract with the Department --

A.   Yeah, it was like a -- yeah.  It was kind of like a grant contract kind of.  It was -- I don't know specifically.  It wasn't, like, a federally-funded grant, but it was a state contract, like the Mississippi State Department of Health would be, but it was a different agency.  It was the Mississippi

Board of Nursing Licensure or Board of Nursing.  But Dr. Summers said all money is green and Jason reminded him of that, all money is green.

Q.  And who is Dr. Summers?

A.  Dr. Summers is associate vice chancellor of research.

Q.  And what is he in charge of?

A.  All of research.

Q.  Okay.

A.  It was going to be a great grant.  It was complicated that Dr. Mitchell was, you know, interfering with what I was trying to do for Jason, too.

Q.  And so Dr. Mitchell, that was the Office of --

A.  Mississippi Physician Workforce, OMPW.

Q.  Now, I noted in the comments -- let's see. This is the fourth page in the back.  It's UMMC 607. It indicates that you needed to quickly decide whether you'll relocate to Oregon between now and September of 2017?

A.  Uh-huh.

Q.  And that if you will relocate, you needed to provide him with certain information and a plan?

A.  Uh-huh.

Q.   And so let's see.  This was signed by you on May 1st of 2017.  Does that sound correct on about when you began to discuss your desire to move to Oregon with Dr. Griggs?

A.   I'm not sure exactly when we started discussing it, but we started -- we had worked on it -- we were talking about it for a while and trying to figure out how -- you know, by now, there is a School of Population Health, and you are allowed to work remotely from the School of Population Health, and Dr. Beech wanted me to teach as faculty in the School of Population Health, and I -- she even decided I could teach research methods I and II, I could live in Oregon, I could work remotely.  And she said go straight up to Dr. Didlake and talk to him, because we were -- you know, we're very interested in doing this.  And Dr. Didlake said great, because he's up -- for two years trying to figure out how to get me in a place that -- Jason's a great guy and a great chair, but it was just not the right fit for my background.

So Dr. Didlake had been trying to find a better fit for me, and he was all for moving me to the School of Population Health, and the team I was in was great.  And then he said he would reach out to Dr. Felton, and Dr. Felton said no.

Q.   Okay.   And we will -- we're going to go through kind of the sequence of events so that we can understand kind of how that unfolded.

A.   Uh-huh.

Q.   But at least as of May 1st, Dr. Griggs is telling you that, by June 1st, that he needs a plan that includes your proposed retirement date --

A.   Yeah.

Q.   -- your justification for continuing to be an employee without being a resident of Mississippi, and copies of all of your records from previous years of teaching D-1 evidence-based dentistry course.

A.   Uh-huh.

Q.   And so at least at that point -- well, let me ask you this.   At that point, you were planning on retiring?

A.   No.   What we were talking -- what we were trying to arrange was that I would continue working full-time remotely through the School of Population Health, continue my Mississippi mapper program, bringing in the money and the research.   And it would have been, you know, it would have been a perfect fit.

Q.   Do you know why he's asking you for a proposed retirement date on May 1st?

A.   He's asking me for a proposal with a written

plan by June 1st, and he -- because he said his -- he didn't think I could do this indefinitely, so he wanted me to come up with a proposal of something.

Q. Okay. So he did not -- he was of the opinion that you could not work from Oregon --

A. No.

Q. -- indefinitely?

A. He thought that wouldn't work. In fact, there was an e-mail from him that said it looks really positive from HR right now. He just didn't think I could do it forever. So we needed a plan of what it would look like.

Q. With a proposed retirement date?

A. Uh-huh.

MS. TAYLOR: Guys, it is noon right now. We can continue on or we can take a break for lunch and then reconvene after lunch. What would y'all like to do?

MS. BASS: It's up to you.

THE WITNESS: I'm good to continue a little while. I'm not hungry. I just ate breakfast a little bit ago.

MS. TAYLOR: Okay. We'll just keep going then. Let's take a five-minute break and then we'll keep going.

(Recess.)

BY MS. TAYLOR:

Q. Dr. Krause, I wanted to switch topics just for a moment. Okay. So if you look in your complaint, which is Exhibit 3 -- you're much more organized than I am. If you look on page 3 of your complaint, you allege that on or about July of 2017, Dr. Krause was denied a research salary enhancement by UMMC, that the enhancement was approved for several male faculty members, and you allege that you were equally qualified. Tell me about that. So in July of 2017, had you moved to Oregon at that point?

A. No, no.

Q. When did you move to Oregon?

A. I mean, I went on leave in August. I didn't move -- well, I didn't know I was moving.

Q. When did you leave for Oregon to put your child in middle school?

A. In August of 2017.

Q. So this is about -- so July of 2017 is about one month before you would have left to put your son in middle school in Oregon. Is that correct?

A. Yep.

Q. And you allege that you were denied a research enhancement, salary enhancement.

A.    Yes.

Q.    **Tell me about that.**

A.    It actually happened two years in a row. You're required to -- well, one of the -- so clinical faculty make a lot more money at UMC just because of the nature of it and different sets of skills, and then research faculty, there's a research enhancement. program. So if you're productive, you can use this program to enhance your salary. So you have a lower base, but you can -- you know, if you're successful and productive, you can increase that. So that's what Dr. Griggs always wanted us to do, you know, was to bring in funding. And, you know, he was really good about putting people up for the research enhancement.

And so what happened in my instance was that I obtained the external funding. It doesn't cost the University anything, actually. I brought the money in, did the work, and had the money in the account to pay my research enhancement award, which he put me up for, and mine was singled out and denied, and he -- he went around and around and around to see -- he went to bat for me a lot. In fact, Cari and Leslie in the Office of Research were wondering why does he go to bat for her so much. But he was -- you know, he wanted to know what is going on, why is she being

denied.  So he was getting one answer from HR and then they'd push him back over to the Office of Research.  Then he'd go there, and he'd get pushed over here.  He was getting batted back and forth.  He wasn't getting any clear answers.

Q.  Okay.  Let me ask you this, because in your -- in you last performance evaluation from, I believe it was, May of 2017, that would be Exhibit 10, you had referenced confusion with the Office of Mississippi Physicians Workforce.

A.  Uh-huh, yes.

Q.  OMPW.  Is that what you're referring to about the research enhancement, or is that a different process?

A.  It's a different process.

Q.  Okay.

A.  No.  That was affecting my extramural grant funding because Dr. Mitchell was trying to figure out how to control that, when Jason, Dr. Griggs, needed me to do what faculty do.  So I was caught in the middle of that.  But I was 90 percent Jason's, so I was trying to satisfy him.

Q.  Okay.

A.  So he put me up for the research enhancement, and I had the money to fund it, and it was denied and

A.    Looks like it, yes.

Q.    Would you have any reason to doubt whether or not this was the policy that was in effect at the time that you left UMMC in August of 2017?

MS. BASS:  Object to the form.

A.    I don't have any reason to doubt it.  You just gave it to me, so I'm trusting you.

BY MS. TAYLOR:

Q.    Okay.

A.    I know it's got the Bronze Award.  I won that.  I did get awarded the Bronze Research -- Excellence in Research Award.

Q.    So when did you get the Bronze award?

A.    When did I get it?

Q.    Yes.

A.    I always have to refer to my CV.

Q.    That's fine.

A.    2009.

Q.    Okay.

A.    This is before all the -- everything hit the fan.

Q.    Okay.  So that would have been while you were the director of --

A.    Research and education IT and associate professor.

Q.   Okay.

A.   But I was doing the grant, brought in the grant funding.  This is based on bringing in X amount of dollars in grant funding.

Q.   Okay.  Now, I just want to make sure we're in agreement on what the research enhancement award that you reference in your complaint, what we're talking about.

A.   Okay.

Q.   Is it the research administrator, increase in negotiated institutional base salary?

A.   Are you on a page?

Q.   It's on page 5 of 11.  It's UMMC 72.

A.   It looks like this is the -- yeah, it's got a lot of research enhancements or salary supplements or -- yeah.  And when you get it, it comes on your PAR as a research administrator with an attached salary that is included.

Q.   Now, when you look at the qualifications and guidelines, it says, "Full-time faculty with a rank of assistant professor or higher; strong evidence of research performance;" and then it says, "as determined by the number and amount of applications and extramural research awards; payment of full and direct cost on grants obtained; and limited/no cost

sharing or in-kind matching of University funds requested for grants received." And then it goes on. There's a lot of other requirements.

But, however, was it your understanding -- and I guess we can go first to 2016. Was it your understanding that the Office of Research -- is it the Office of Research that Dr. Summers is the head of; is that right?

A. Yes.

Q. Okay. Is it your understanding that the Office of Research determined that your grants didn't qualify for this award under the program?

A. They said that at some times and -- but mine was the same as the others that did qualify. But there were a lot of other going back and forth. HR was saying, well, we're going to do a fair amount market value thing and, no, she's already making too much money, which had nothing to do with anything. There's no fair market value at all related to anything about the research enhancement award. And Jason was very clear about that, like, "That's totally irrelevant. Who asked for that?" And so we were getting a lot of back and forth between HR and the Office of Research.

Q. Were you aware that, other than your

department chair, that you were the highest paid faculty member in your department?

A.    No.  But I'm -- you know, I didn't know anybody else's salary, but part of that was probably because I was moved over to DIS, which pays -- you know, IT pays pretty well at the University.  But when I got demoted, I got demoted straight back down to associate professor base salary, so I couldn't have been the highest paid.

Q.    Okay.  Would you have any reason to dispute that?

A.    Dispute what?

Q.    That you were the highest paid professor --

A.    Yes.

Q.    -- or faculty member in the department?

A.    Yeah, I would probably -- you know, I don't have everybody's PARs, but there's no way I could have been because I was sitting on base salary.

Q.    Now, didn't your work with the Office of Mississippi Physicians Workforce, weren't you given a certain portion of your salary --

A.    Yeah.

Q.    -- for that?

A.    I did get that after a while because that was one of the things that Jason thought could help repair

my loss in funds.  So that's when I went on to the 10 percent with, when they added me 10 percent with the Office of Physician Workforce to try to help repair some of that.

Q.   And didn't they increase your effort in the Office of Physician Workforce in order to increase your overall salary?

A.   Well, they gave me effort in that.  I thought it was 10 percent, but I'm not sure what it was exactly.  I think it was 10, wasn't it?

Q.   We can look at it.  I'm sure there's a document related to that.  So looking at this, as of July 1st of 2017 -- which was the date you were promoted to professor.  Isn't that correct?

A.   Yes.

Q.   You were earning $169,328.85 a year?

A.   That was my brand-new salary because that was included -- I think that was assuming that I got the research enhancement.  I'm not sure.

Q.   And that would have been an increase from your 2016 salary, which was $154,999.  Isn't that right?

A.   That sounds about right.  That was -- Jason was in charge of those numbers.  He sent me an e-mail and asked me, he said, "Look at this spreadsheet.

These numbers look okay with you? Do you have the money to support that part in your" -- and I said yeah. So that was agreed upon.

Q. Would you have any reason to dispute that you were paid $30,000 more than any other faculty member in the department except for the department chair?

A. I don't know what people made. I know they were rewarded on their research, so I really have no -- no access to that kind of information. But I was like -- as I said, I went up through DIS. So that put me on a different track. But then when I was thrown back to faculty, it -- I lost all that.

Q. You would have been paid as a faculty member. Isn't that correct?

A. Uh-huh, base, the lowest of the base. And I think that was at least a year before I was able to get effort from the Office of Physician Workforce.

Q. It appears that, between 2012 and 2013, you had a $20,000 increase in those two years. You went from $100,00 to $120,000. Is that right?

A. That's probably when they added the OMPW effort.

Q. Okay.

A. Still didn't put me back where I was, so, you know, he was promoting the external consulting.

Q.   And then it looks like, from 2014 to 2015, you had another significant increase in your salary from $120,264 to $154,999.

A.   Okay.  I don't know why.

Q.   You don't know why there was that increase?

A.   It would be on my PAR.  Maybe that was where the Office of Physician -- I don't know exactly where or how much that added or how much of it was -- well, I didn't get research enhancements, but I think -- I guess that wouldn't be calculated in there.

Q.   Would you be surprised to learn that Dr. Roach, in 2016, earned $105,700?

A.   Would I be surprised?

Q.   Uh-huh.

A.   No, because isn't that close to what base was?  Because I got put back to 100,000.  So it seems like it would be about right.  And he was in school. He was a brand-new faculty member.  He was one of the students who turned faculty.

Q.   Now, was Dr. Janorkar, was he promoted to professor at the same time that you were?

A.   Yeah.  I think that Jason kind of wanted to put us up at the same time.

Q.   And why is that?

A.   Because he made me wait.

Q.  Okay.  Dr. Janorkar, is he a male?

A.  Yes.

Q.  Were you aware that Dr. Janorkar, after being promoted to professor, only made $140,900 a year?

A.  No.  But I'm not sure that's relevant to my situation because we were entirely different, doing entirely different work, and he did really good work. I think that there were great people in the department.

Q.  But he was also promoted at the same time. Isn't that right?

A.  Yes.

Q.  Okay.  But he earned significantly less than you did.  Right?

A.  I don't -- you said that.

Q.  Okay.

A.  I have no way of knowing.  He never -- he was always faculty.  They were all only ever faculty. They didn't have the administrative title that I had had.

Q.  You mean because you worked in DIS?

A.  Yeah.  They had a whole different payment structure.

MS. TAYLOR:  We'll go ahead and mark this as the next exhibit.

(Exhibit No. 12 marked.)

BY MS. TAYLOR:

Q.    Okay.  Dr. Krause, this is an e-mail that you produced during litigation.  It's Plaintiff 198.  And it appears to be an e-mail that Dr. Griggs sent to you and copied Dr. Mitchell related to your -- the research enhancement.  It's very light, but it appears to say -- and it's from Molly Brasfield to a number of people, but directed to Dr. Griggs, and it states that the Office of Research determined and communicated that the contract was not eligible under the research enhancement program guidelines, and that based on that ineligibility, the only rationale to increase your compensation would be the fair market value.  Is that what you were referring to earlier about the fair market value?

A.    Yeah.  But there's a lot more to this thread.  Yeah.  There's a lot more to this thread about Jason trying to really get to the bottom of what really was going on, and it was -- yeah, he made it -- you know, it was clearly not fair market value, and he still was trying to find out why it was denied, because he wanted to make sure this didn't happen again, you know, why is hers not going through, and so he was trying to get very clear.  He couldn't get anything

very clear.

Q.   Okay.  But at least at this point in 2016, the information that you had was that your contract was ineligible for the research enhancement guidelines and that --

A.   That was not ever accepted by Jason Griggs or me.  That wasn't even relevant.

Q.   Okay.  You didn't agree with it, but it's what you were told.  Is that correct?

A.   It was what was said at the time, but even that -- yeah.

Q.   Okay.

A.   But I think he shot that down, like, real quickly in another e-mail.

Q.   Okay.

A.   And then he was told by Dr. Summers in writing that mine was being treated differently than the others in our department.

Q.   Okay.  And what was the rationale for that?

A.   He wasn't told.  He tried to get a meeting with us, but I was pushed out of it, so I don't know.

Q.   And you say -- did you produce that writing in the litigation?

A.   Yes.

Q.   Okay.  And can you identify that for me?

A.   Well, I don't have it with me, but you should have it in the discovery documents.

Q.   Okay.  And you say that it's an e-mail?

A.   Uh-huh.

Q.   Do you know when that writing occurred?

A.   You know, I'm so good with dates.

Q.   Okay.

A.   No.  But, you know, it was from Dr. Summers.

Q.   Now, was the grant proposal in 2016, was that the work that you were doing with the Office of Workforce -- or the Office of Mississippi Physicians Workforce?

A.   What grant proposal?

Q.   The one that you had tried to get an award for, a research enhancement award for.

A.   Oh, that was -- no.  That was going to be -- I had already -- that was funded through a grant that I was doing for the Mississippi State Department of Health.

Q.   And was it the only grant that you had received that year?

A.   That year, yeah.

MS. TAYLOR:  Let's go ahead and mark this as the next exhibit.

(Exhibit No. 13 marked.)

BY MS. TAYLOR:

Q.   Now, Dr. Krause, you are not copied on that e-mail.  It's an e-mail between Dr. Summers and Dr. Griggs.

A.   Okay.

Q.   But have you ever seen this e-mail before?

A.   I didn't see the e-mail, but, you know, Dr. Griggs discussed this with me regularly.  We were, you know, in constant talk about this.

Q.   Okay.  And so did you understand that there was some concern about the size of the grant and that was your only award in 2016?

A.   Yeah.  That didn't really fall in the guidelines because, like, Michael Roach, Scott Williamson, theirs seemed to be fine, so it was --

Q.   And do you --

A.   And you have grants.  Some years you have heavier grants than other years.  So if you don't have grant funding the next year, you just don't get the research enhancement.  You have to be able to fund it yourself.

Q.   So do you know, for the 2015-2016 period, what Dr. Roach's -- the value of the grants that he brought in?

A.   I don't know.  I'm sure that's available.

Q.   Would you have any reason to believe that it was significantly higher than the $25,000 grant you brought in?

A.   I have no idea.  Like I said, grant funding is very cyclic.  You know, I had a $217,000 grant and I had a $25,000 grant and 150 or something.  You know, it was just a -- the nature of grants.

Q.   But you don't dispute, that according to the policy, that you had to have strong evidence of research performance, and it was based on the number and the amount of --

A.   Right, but not in --

Q.   Let me finish my question.  Let me finish my question.

A.   Oh, I'm sorry.

Q.   And it was based on the number and amount of research grant applications or extramural research awards.  Isn't that right?

A.   That's correct.  And that's up to Jason, your department chair, of whether they think you meet those criteria or not.  He could have again said, "I don't think you're eligible," but he didn't.  He said that he thought that I was and he put me up.

Q.   Did you --

A.   As he's not an easy one to satisfy, as you

can see.

Q.    But you would agree that, when it comes to determining whether someone is qualified for the program, that it was the Office of Research and Development's decision to review your grant applications or awards and determine whether you were eligible.  Isn't that right?

A.    Maybe.  I don't know.  That was never clear. Jason wasn't getting a clear answer from them quite -- many times, but -- and there is no guideline of what is the number or what is the amount that is a minimum. You know, it's up to the discretion of the department chair.

Q.    Would you be surprised if the department -- I guess if Dr. Summers determined that one grant for $25,000 was not strong evidence of research to warrant an award?

A.    And yet he gave me the Bronze Research -- Excellence in Research Award.  So I believe that I had real strength in research and quite a bit of grant funding.

Q.    But that would have been in 2007.  Isn't that right?

A.    Oh, 2007?

Q.    That you received the Bronze --

I'm not really -- maybe she's in HR, but HR really shouldn't be involved in this, but...

Q.   So they indicate that your work doesn't meet the criteria stated below, it's not research and, even if it was, it would only be one award, and it doesn't pay any indirects.  Do you know what indirects, paying indirects are?

A.   Yes.  Something like federal grants will have, like, you have to pay the University X percentage to -- you know, it's basically applied towards infrastructure and costs, indirect costs.

Q.   So it would have to pay --

A.   Keeping the lights on.

Q.   So it would pay not only, I guess, you for your time, but also cover overhead costs.  Is that the idea?

A.   Yes.  And they pay at different rates.  Some things have high indirects, and usually -- they're going down now -- but somehow set a limited cap on indirects.  Some have no indirects.  And, you know, and Michael Roach's also didn't.  He had been paid off of grants that didn't have indirects.

Q.   Okay.

A.   And HR wasn't really ever involved with anybody else except mine, and that's why Jason was so

confused. See, HR has never asked for verification on whether the guidelines were being followed until this time. So we need to take a hard look at the guidelines to see who might be left out of this program due to the guidelines, even though they're very productive in research, we can change this at council. That's kind of the bone they threw to Jason, that he'll be able to fix this so that, you know, it's not unclear and that there isn't all this room for confusion.

Q. Was it your understanding, that before 2016, that the Office of Research Development would determine awards without any input or review by human resources?

A. Well, in fact, it was even more than that. Usually, there was -- if the department chair put it through, it happened. There wasn't -- the Office of Research wasn't really the police for this, either.

Q. Would that have been before you went to the DIS, meaning was that the practice when you were an instructor?

A. As far as I know, it was always the practice. Jason was shocked. He was like -- you know, he knew that, if he put it in, it went through. There was never a time that anybody questioned his -- he didn't

like to be questioned when he knew what he was doing. So it was -- he just wanted to know what's going on.

Q. Were you aware that other faculty members had also been questioned or denied the research salary enhancement for their projects?

A. No. All I knew was that everybody else's went through.

Q. So you don't know that there was any scrutiny given to other professors in your department?

A. No. Theirs went through and mine was singled out and treated differently.

Q. But you don't know the value of --

A. No, I don't.

Q. -- the other faculty members' grants?

A. No.

Q. You don't know the number of the other faculties' grants. Is that correct?

A. Right. That's rather -- it's rather irrelevant because, if you don't have enough, you know, to qualify, your chair shouldn't put you up.

Q. Now, it says in the last paragraph that they think "It's a bad precedent to give someone salary enhancement for a $25,000 nonresearch contract that pays zero indirects, especially knowing that HR will be more involved than in the past. I just don't think

there's any way to justify her getting the enhancement."

Was the research grant that you asked for a research salary enhancement, was that one that did not pay indirects?

A.    Correct.  And I could have gotten a lot of those.  I could have brought in so much money on those contracts, and Dr. Summers was saying all money is green, and Dr. Griggs is saying pursue it, and they'd never run into an obstacle before.  Because Michael's didn't pay indirects.  He was doing the same kind of stuff.  So this is the first time it became an issue.  And then, after the confusion, Jason wanted to understand how to fix it.

Q.    How do you know Michael's did not pay indirects?

A.    Because Jason told me.  We didn't get into numbers, so...  He told me he was really sorry.  He was -- like I say, he's a really direct and, you know, sincere person, and he was pretty -- he was really sorry that everybody, including his and everybody else's, went through.

Q.    Did Dr. Griggs have significant research and grants awarded to him?

A.    Yeah.  He's outstanding in his field.

A.   Yeah.  But we had -- it was the same discussion, but it was still -- it was still kind of limited to -- yeah.  All we had was basic sciences research, so they had to start to think about the policy difference, how do we accommodate these other kinds of research that aren't the one that we know to be federal grant with indirects.

Q.   Okay.  So I see --

A.   So they also had the question with Michael Roach, too, and said, well, is his research or is it not.  But then his did qualify.  And now I'm sure -- I mean, I'm not sure, but I would suppose that because they have a lot of -- they probably have a lot of population health research that they understand, they probably have expanded the policy to accommodate different types of research.

Q.   Okay.

A.   Epidemiology is no longer an unknown term.

Q.   Now, I see, let's see, in the e-mails, it appears that you began reaching out regarding the salary supplement for 2017 on May 30th of 2017.  Does that sound right?

A.   That's probably about right.  Usually it would be in response to Jason asking us, you know, to put it -- you know, let him know if we were doing that

or how we wanted to proceed.

Q.   And it appears -- at any point, did you request from Dr. Mitchell that he release grant monies for you to receive without the award --

A.   Dr. Mitchell --

Q.   Let me finish my question.

A.   Excuse me.

Q.   -- with the award having been given.  So in August of 2017, did you request that Dr. Mitchell release the funds without going through the award process?

A.   No.  Dr. Griggs contacted Dr. Mitchell about releasing the funds, because the funds, I had brought it in, it was sitting in an account and everything was done.  It was a done deal.  But Dr. Mitchell had to sign off on it because Dr. Mitchell didn't want my money to sit in the School of Dentistry.  He wanted it to sit in the OMPW, and Jason didn't want it -- so...

Q.   So that would have been in August of 2017. Is that right?

A.   Might have been.

Q.   So that would have been after you had gone to Oregon?

A.   No.  It would have been before I left.  And Dr. Griggs asked Dr. Mitchell to meet with us, and we

did have a sit-down meeting, which was very odd, very -- the oddest meeting I've ever sat in.

Q.  Why was it an odd meeting?

A.  Well, because, as you know by now, that Dr. Griggs is very focused and wants clarity, and Dr. Mitchell was extremely jumpy and very evasive and really strange, and he didn't get -- we didn't get any answers from him.  But Dr. Griggs was really pretty surprised by that meeting, as well.

Q.  At that meeting, did Dr. Mitchell not want to release the funds to you?

A.  He wouldn't say much of anything.  He just -- he really acted like a little skittish something, and, you know, I just -- it was -- he was very uncomfortable.  I don't have any follow-up from that, after that.

Q.  At that point, had you created your company?

A.  Oh, I don't know.  I think I created that a long time ago, just the name.  I didn't have any business in it.  I had a name, but I don't know when I created it.  It was just an empty company for years.

Q.  At that point, were you using your company name on presentation materials related to the work that you were doing for the Office of Mississippi

Physicians Workforce?

A.    On one version, I had Healthy Analytics and the Office of Physician Workforce, and Dr. Mitchell did not like that, so that was a no-go, so...

Q.    Okay.  So he did talk to you about his concerns about you using your -- or trying to promote it with your company?

A.    Yeah.  It was a very difficult time because Jason was wanting me to promote my external consulting and do my research and do all that, and Dr. Mitchell was trying to not let that happen.

Q.    Was that around the time that you met with Dr. Mitchell about your research enhancement?

A.    Well, I don't know about timing on that.  I don't think -- it wasn't about that.  It was about the research enhancement.  He never said anything really about that being a problem.  See, Dr. Mitchell was the opposite of forthcoming, and Jason was absolutely forthcoming, so that's probably why it was such a strange meeting.

Q.    At the time that you moved to Oregon in August of 2017, had you been notified whether or not you had been approved for or denied for the research enhancement for 2017?

A.    Yeah.  I'd been denied again.

Q.   And when were you denied?

A.   I don't know.  I don't really know.  I just knew, oh, my God, it's so -- this is so discouraging.

Q.   Do you know how you were?  Do you know whether it was by e-mail, or telephone call, or a meeting?

A.   No, I don't know.  I probably had an e-mail about it, but it might have been just a meeting in Jason's office.  He was shocked the second year because he thought they could work things out after that first year.

Q.   What were the grants that you used to submit for the research enhancement award?

A.   Well, it was the one from the Health Department that one year, and I'm not sure what it was after that.  Oh, I -- I don't know if I -- I don't know.

Q.   You don't know?

A.   No, I don't know.  And I could have gotten -- I could have gotten more of those, but I was -- by this time, I was -- it was really confusing.  I was losing my incentive to get money when it was, you know, not -- it was just a constant issue, and Jason wanted to know, because he said, you know, "Denise can bring in all this funding.  How can we make sure" --

he has an e-mail, "How can we make sure that this doesn't happen to her again?"

Q.   And you testified earlier that you don't know what the grant awards were that other faculty members in your department --

A.   No, that's not --

Q.   -- had?

A.   That's not information available to me.  I don't even really -- you know, I know that Michael had some kind of contract that do torquing of screws, I think.  That's what I know.  And I think Jamal did something with livers maybe.  I'm not sure.

Q.   Okay.  Okay.  So I'd like to move to the circumstances surrounding your departure to go to Oregon.  I said earlier, we -- I saw the reference in your May 2017 performance evaluation that, you know, that you needed to provide a plan by June 1st to Dr. Griggs, and then you have produced in litigation an e-mail that includes a draft plan.

        MS. TAYLOR:  So let's go ahead and make that part of the record.

        (Exhibit No. 15 marked.)

BY MS. TAYLOR:

Q.   You can take a minute to review it, if you need to.

A.   All right.

Q.   So looking at the proposal you submitted, you state in there that the School of Dentistry does not allow for remote employment so that your position would need to be moved to the Office of Mississippi Physicians Workforce.  Is that --

A.   That's what --

Q.   -- what you were proposing?

A.   No.  That was what Jason found out from Dr. Felton, that we don't allow -- even though Nursing did and the other schools did, but Dentistry doesn't allow remote, and we don't -- because you -- with being dentists, you have to have your hands in a mouth.  That makes sense, except for that I'm not a dentist.  And so Jason was okay with the idea of me moving to, you know, the School of Population Health because it made sense.

Q.   Now, here, you don't propose to move to the School of Population Health.  You propose to move to the Office of Mississippi Physicians Workforce in your proposal.  Isn't that correct?

A.   No, I don't think so.  This might not be the last -- this is a draft.  Right?  So, no, I -- my proposal was to move to the School of Population Health.

Q.   Okay.  So as of January 1st of 2017, the proposal you submitted has you moving --

MS. BASS:  You mean June?

MS. TAYLOR:  Thank you so much.  Did I say January?

MS. BASS:  Uh-huh.

BY MS. TAYLOR:

Q.   As of June 1st, 2017, your proposal said that you would move to the Office of Mississippi Physicians Workforce.  Isn't that correct?

A.   This version does, but I don't think that was the final version.

Q.   Okay.  But it's what you were envisioning as of June 1st.  Is that right?

A.   You know, I was trying to figure out how to make this work for Dr. Mitchell because he was really -- he was really stymieing my research, but I didn't -- I wanted to be move to School of Population Health.  There was no question about it.  That's why I had those discussions with Dr. Beech, Dr. Didlake, and Dr. Griggs.

Q.   Okay.  So as of June 1st of 2017, you understood that Dr. Felton would not allow you to work remotely.  Isn't that right?

A.   I'm not sure when I found that out, but Jason

did give me that message, that we couldn't do it from the School of Dentistry.

Q.   And you were aware of that before you left for Oregon.  Isn't that correct?

A.   Yes.  And he knew I was going to go talk to Dr. Beech, and Dr. Didlake, and that Dr. Didlake contacted Dr. Felton.  I learned by now to do the chain of command thing much better.

Q.   So it looks like you had three different proposals; one which would have you no longer working in the School of Dentistry.  Correct?

A.   They all had me leaving the School of Dentistry because it was just not the right -- I couldn't -- I couldn't function in it to my -- as Dr. Didlake said, "You are not able to realize your potential in the School of Dentistry."

Q.   And we saw earlier that your tenure was tied to the School of Dentistry.  Isn't that correct?

A.   That's correct.

Q.   So your proposal would have you not working in the school that you were tenured in.  Is that correct?

A.   Right.  It would involve moving my position and my tenure to the School -- the brand-new School of Population Health, which happens to some people.

Q.    One of your options was to retire.  Is that correct?

A.    Well, Dr. Felton said -- he suggested I -- you know, I talked to him a little bit about it, and he said -- he suggested that I go ahead and plan for retirement.

Q.    Okay.

A.    And I didn't want to.  My goal was to continue to work full-time remotely for the School of Population Health, teaching research methods I and II, and continuing my research and my software development.  That was my wish.  But then Dr. Felton said you should go ahead and plan for retirement.  So then I -- you know, then I was -- said I've got these options, that it would help me to finish up some projects to make a seamless transition, and to work, continue to be involved with the School of Population Health, and that I -- so then after I had proposed that I would retire from the full-time on June 30th of, what, '18.  So I'd finish the year, and then go to part-time, come back part-time, and still be able to finish, you know, continue working with the School of Population Health, which was my dream always.  I always wanted to be in a School of Population Health. They just didn't have one.

Q.    So I just want to make clear, none of the proposals or the options that you presented were approved.  Isn't that right?

A.    Well, they were still being discussed, you know, and so, no, they weren't approved or denied.

Q.    Didn't Dr. Griggs advise you to stay in Jackson and continue doing your work with the school so that you could enjoy the benefit of your promotion to full professor?

A.    He mentioned that it would be easier if I could stay a little longer, but we also talked about the fact that Alexander was graduating from Power APAC and I'd always had him in public schools, and now we were going to have to make a big school decision, and this was the time when he'd start middle school, and it was a really good time to move him.  So we were -- I thought we were close to figuring out which of these options might actually work.  And then time was drug out somewhat, and so I had to go on leave and go ahead and get Alexander into school.  But the discussion hadn't shut down yet.

Q.    Okay.  So I want to make sure that I understand just based on the e-mails.

A.    Uh-huh.

Q.    As of June 1st, 2017, you knew that you could

not work in the School of Dentistry from Oregon. Correct?

A.   Right.

Q.   Okay.

A.   But I also knew that Dr. Didlake and Bettina Beech were very happy to have me work remotely in the School of Population Health from Oregon.

Q.   But you also knew that Dr. Felton would not allow your position to transfer --

A.   Yeah.

Q.   -- before -- hold on.  Let me finish my question.  Before you moved to Oregon.  Isn't that right?

A.   Yes.  So Dr. Didlake ran into that brick wall that he wasn't going to release me from the School of Dentistry, and that's when he suggested that I plan for retirement, and I thought that was really sad because I was at the height of my career, and I was, you know, I had so much to offer, I thought, you know, to Mississippi and...

Q.   So I want to make clear, before you left, you knew that you would not be allowed to work remotely with the School of Dentistry.  Correct?

A.   From the School of Dentistry.  But we still were working on transferring.

Q.   Before you left, you knew that Dr. Felton would not allow your position, your budget line, to go to another school.  Isn't that correct?

A.   Yes.  He told me to plan for retirement.

Q.   In fact, you tried to work with the School of Nursing and have your position transferred to the School of Nursing before you left.  Isn't that right?

A.   I did ask if that was a possibility.  I don't know why it was so hard for me to get to the School of Population Health.  So then I came up with the three options, you know, acting on Dr. Felton's desire that I go ahead and retire, so these are the options that said I would retire as of June 30th, 2018, and how I might still be able to continue doing some of my work.

Q.   So as of June 26th of 2017, you knew that you wouldn't be allowed to transfer to the School of Nursing.  Isn't that right?

A.   I don't know about -- I never had really an opportunity to transfer to Nursing.  I don't remember having that opportunity to do that.  But Nursing did allow remote work, and so did Medicine, and so did everybody else except for Dentistry.

Q.   Didn't you ask the School of Nursing if you could have an unpaid appointment?

A.   I did check in with Kim Hoover to see if that

We were trying to get it figured out because August was approaching.

Q.   And when you went back to him on the 26th, you asked if you could just keep it between the two of you that you would move to Oregon and continue to work.  Isn't that correct?

A.   What do you mean?

Q.   When you went back to Dr. Griggs, you asked him if you working remotely could just be between the two of you,

A.   I don't know what -- I don't know about that.

Q.   Okay.

A.   What do you mean, between the two us?  Oh, to finish the year?  Is that what you mean?

Q.   I don't know.  That's just what the e-mail says.

     (Exhibit No. 17 marked.)

BY MS. TAYLOR:

Q.   If you read down to the third paragraph -- actually, in the second paragraph, I guess you reference your prior communication with Kim Hoover.

A.   They allow people to work remotely as long as they're doing their work.

Q.   Well, actually, what she stated is "would allow people to do their work and not question where

they are."

A.   Uh-huh.

Q.   "Whether they're in the office, as long they're accessible during business hours."  Isn't that correct?

A.   Yes.

Q.   And then you quote her statement to Dr. Griggs and state, "In that case, Dr, Felton wouldn't have to craft a School of Dentistry policy. It could just be handled between you and me.  Do you think that I could get six months or one year max that I need that way?"  Isn't that right?

A.   Uh-huh.

Q.   And Dr. Griggs, his response to you was pretty definitive.  Isn't that correct?

A.   Yeah, but then -- yeah, because then Dr. Felton had told him, and he's chain of command, so that was the -- you know, then it was like Dr. Felton, he won't go against that.  So that was clear.

Q.   And he said, "My supervisor has already made a decision on this and stated his position strongly."

A.   Yes.

Q.   So at least as of June 30th, you knew that Dr. Felton was not going to let you work remotely?

A.   Uh-huh.

Q.   You knew that Dr. Felton was not going to allow your position to transfer to another school, and you knew that Dr. Griggs wouldn't go behind Dr. Felton's back and allow you to work remotely --

A.   Right.

Q.   -- without his approval.  Correct?

MS. BASS:  Object to the form.

A.   Right.  And that Dr. Felton had asked me to get with HR and get a -- you know, work on a retirement date, which I provided June 30th, 2018.

BY MS. TAYLOR:

Q.   Which would have been -- excuse me.  Go ahead.

A.   No, that's okay.

Q.   Which would have been a year from that?

A.   It would have completed that year.  It would have just completed one year at the new salary.

Q.   So what --

A.   It would have given me a chance to work -- you know, to clear up any IP issues and finish some projects and make a more seamless transition.

Q.   So couldn't you have stayed in Jackson until June of 2018 in order to have that additional year of --

A.   I couldn't.  Where would I put my kid in

school?

Q.   So --

A.   He was done with Power APAC, so it would have been like where do I put him?  Murrah was -- or -- was, like, the only option, and it wasn't really a very good option.  I didn't want to -- I couldn't move out to -- move to Madison, you know, to go to -- or -- whatever, Ridgeland, you know.  The schools are -- Power APAC was fantastic, but I couldn't compromise my child's education.  And I lived in the center of Jackson.  I'm sad.  I mean, I'm very much a public school supporter and I kept him in public schools as long as I could, I mean, actually, always.  He's never been not in public school.  But it was middle school time.

Q.   But you don't dispute, that had you chosen to stay in Jackson and work until June of 2018, that you could have carried out your plan and retired with the benefit of your higher salary.  Isn't that right?

        MS. BASS:  Object to the form.

A.   That's not what was on my mind at all.

BY MS. TAYLOR:

Q.   I know it's not what was on your mind, but it would have been a possibility.  Isn't that right?

        MS. BASS:  Object to the form.

3.  There was nothing.  It was a ridiculous case.

Q.   And then he forced y'all into an all-day mediation in April of 2017.  Isn't that correct?

A.   Yeah.  These records were supposed to have been sealed.  The judge didn't want -- the judge sealed the records, but, yeah, we did try, you know, mediation.  In fact, we worked it out pretty well, and I even told her, I mean, you -- I was never cutting her off.  She could see him any time she wanted to.  And you don't even have to pay me child support.  I don't care about that.  But the lawyers cared and the judge cared, so they said we're going to do it this way.

Q.   Now, in April of 2014, y'all reached an agreement during the mediation, and then you backed out of it.  Isn't that correct?

A.   I don't know.  What --

Q.   On the advice of your attorney?

A.   What was our agreement?  I don't remember that.

Q.   You don't remember reaching an agreement and then backing out?

A.   No.

Q.   You don't remember firing your attorney?

A.   Well, yeah, I do remember that because

somebody said -- I mean, I was spending a lot of money for -- you know, it wasn't really doing any good.  It looked like -- somebody told me that I was going to have the same outcome whether I had an attorney or not, so I just went with it.

Q.   Are you aware that, in May of 2017, there were statements made in that lawsuit that you had placed your house on the market and that you had had a garage sale preparing to move to Oregon?

A.   I had a lot of garage sales.  That was not a -- that was not a big thing for me.

Q.   Dr. Krause, did you place your house on the market in May of 2017?

A.   I don't know when I placed my house on the market.

Q.   It was before you left for Oregon.  Isn't that correct?

A.   It may have been.  I don't know.

Q.   And then in May of 2017, you came to an agreement with Ellen Langford about visitation.  Isn't that correct?

A.   I don't know.  The judge decided the agreement, really, mainly, I think.  Well, it went back and forth, I think, with the guardian ad litem, but, yeah.

Q.    And it was at that time that you decided to take your son to Oregon.  Isn't that correct?

MS. BASS:  Object to the form of the question.

A.    No.  I mean, I was always -- no.  The custody had absolutely nothing to do with my moving to Oregon. I had been planning to move -- I had been planning to move to Oregon my whole life, but I didn't know when. But the culmination of having breast cancer and running up against one obstacle after another at work -- we had a really, you know, for the most part, we had a pretty good life here, and my career was enjoyable.  But it was, for me, it was all -- it was all about middle school and Alexander, and I don't regret that at all because he is thriving.  He's doing well.

Q.    Now, after you moved to Oregon, you asked for the visitation to be limited or shorter.  Isn't that correct?

A.    No.  I asked for the jurisdiction to be moved to Oregon from Mississippi so that we wouldn't have to talk about it every summer here in Mississippi.

Q.    And you actually filed a petition in Oregon?

A.    Uh-huh, to move the jurisdiction.

Q.    Without having the Mississippi court transfer

the case to Oregon. Is that correct?

A.   It was a motion to ask them to transfer the case, I think.

Q.   So in the Court's denial of your motion to transfer, the Court indicated that you had represented to the Oregon court that there was confusion because the petitioner, which would be Ellen Langford, continues to file in the Mississippi court. Isn't that right?

MS. BASS:   Object to the form.

A.   So can you restate the question?

BY MS. TAYLOR:

Q.   When you filed your pleading in Oregon, you represented to the Oregon court that there was some confusion because Ellen Langford continues to file pleadings in Mississippi. Isn't that correct?

A.   Yes, yes. So she would file in the Mississippi court and I would just get noticed.

Q.   And the judge in Mississippi took issue with that and said that Ellen Langford had not filed anything in the court since 2017. Isn't that correct?

A.   I don't know. She -- I think she did or -- because it was about summer. Every summer was in question. So I don't know. All I know is, about every summer, I started hearing from her about when we

needed to set some dates, and so we worked out dates. It's really not that big -- it's not that bad. It's actually rather nice. I actually enjoy having a little break once in a while. And she comes out to Ashland regularly to see him, so it worked out.

Q. Now, before you left for Oregon, you did not firmly tell Dr. Griggs or anyone else at the University when you planned to depart. Isn't that correct?

A. No. I did. It was always, "School starts in August, and I've got to get there by this date." That's why I thought that -- we were trying to work all this out before, so I could leave, and then it still wasn't worked out, so I wasn't concerned because I had personal leave to continue to let the wheels turn and hopefully work something out. I had met with Benefits about the retirement date of June 30, '18, just like Dr. Felton instructed me to. It seemed like everything was fine. I didn't want to have to retire then, but they wouldn't let me move, no.

Q. Now, on August 21st of 2017, according to Dr. Griggs, you responded to his attempts to contact you and told you that -- told him that you had already relocated to Oregon. Isn't that correct?

A. Well, that I had -- yeah, that I had gone

there to set up Alexander, yeah.

Q.    And at that time, Dr. Griggs reminded you that you did not have approval to work from Oregon, and that he had not received or approved any leave request.  Isn't that correct?

A.    No, that's not correct.  I submitted my leave requests just like I always did any other time over my whole 25 years, and I thought I was only going for a couple of weeks at that point, that it would work -- something would work out.  But then he called me at one point, I don't know the date, and said that HR had instructed him not to not communicate with me anymore.

MS. TAYLOR:  Let's look at this.  We'll mark this as the next exhibit.

(Exhibit No. 18 marked.)

BY MS. TAYLOR:

Q.    Exhibit 18 appears to be an e-mail between you and Shakita Quarles.  Isn't that correct?

A.    Yeah.  Which date?

Q.    Dated August 10th, the very bottom one.

A.    Oh.  Yes.

Q.    And you asked for Monday, Tuesday and Wednesday off for personal leave.  Isn't that right?

A.    Yes.

Q.    Nowhere in that e-mail do you ask for

indefinite personal leave?

A. Not this -- not this e-mail, no.

Q. And then the next day, on Friday, August 11th, you change it and say, I don't need three days, I only need two days, Monday and Tuesday will --

A. I needed --

Q. -- be needed.

A. -- to keep working on Monday and Tuesday, I think.

Q. But you say just Monday and Tuesday will be needed, not Wednesday. Isn't that correct?

A. Yes.

Q. But you knew in June that you wouldn't be allowed to work remotely from Oregon because Dr. Griggs had told you that. Isn't that correct?

A. Right. So I was going to retire, yes.

Q. And Dr. Griggs had told you that he wouldn't do it behind Dr. Felton's back, either. Isn't that correct?

A. Yes.

Q. And then -- again, so this is on August 10th and 11th. And then 10 days later, on August 21st, you asked for to her to change it to Tuesday and Friday rather than Monday and Tuesday. Isn't that right?

A. That's what it says, yes. I don't remember

these dates exactly, yes.

Q.    And at that point, you had already relocated. Correct?

MS. BASS:  Object to the form.

A.    I don't think so.

BY MS. TAYLOR:

Q.    So if you called Dr. Felton on the 21st of August and told him that you had already relocated --

A.    I called Dr. Felton on the 21st --

Q.    I'm sorry.  Dr. Griggs.  Thank you.  It's getting late.  So if you called Dr. Griggs on the 21st of August to tell him that you had already relocated, and you had asked for Monday, Tuesday and Wednesday for leave on August 10th, it would be fair to assume that, by the 21st, you were already in Oregon.  Isn't that correct?

A.    No.  I don't know exactly what day.  I know we rolled in, like, very late in August, but I don't know what day.  And I also put in a leave request that is not reflected here.

MS. TAYLOR:  Let's go ahead and mark this as an exhibit.

(Exhibit No. 19 marked.)

BY MS. TAYLOR:

Q.    Okay.  So, Dr. Krause, this is an e-mail.

You're not copied on it.  It is between Dr. Griggs and Rebecca Keefer, and it's dated August 22nd of 2017. And in it, he states that he was looking for you the previous Friday, but he didn't find you.  He sent you an e-mail asking you to contact him by the end of the day on Monday, August 21st, to give him an update on your plan, and that you called him and told him you had already relocated to Oregon.

A.   "Relocated" that's kind of -- that's not the right word.

Q.   Do you have any reason to dispute Dr. Griggs' statement that, as of August 21st, 2017, you told him you were already in Oregon?

A.   I will have to confirm.  I'll look at my records.

MS. TAYLOR:  We'll mark this as the next exhibit.

(Exhibit No. 20 marked.)

BY MS. TAYLOR:

Q.   So this appears to be an e-mail dated August 25th of 2017, which I believe is a Friday, following that Monday where you spoke to Dr. Griggs, and you state that you haven't been able to get all the answers yet, as these things don't happen fast. Therefore, Dr. Felton's deadline will leave you no

choice but to execute your retirement. So as of August 25th of 2017, at that point, you decided that your only option would be to retire. Isn't that correct?

A.   Right, to retire and take leave.

Q.   And at least at that point, you were unwilling to return to Jackson to live and work in order to keep your job. Isn't that right?

MS. BASS:  Object to the form.

A.   That wasn't even on the table. The fact is that my son was in the sixth grade, just going to start the sixth grade. So I think that the question was did you want -- you know, was I supposed to take him out of school in Ashland and bring him back and put him in a Jackson school. It wasn't really an option.

BY MS. TAYLOR:

Q.   So, really, I understand that you did not feel that it was an option, but I want to make sure the record is clear that, at that point, you could have simply returned to Mississippi and continued to work. Isn't that correct?

MS. BASS:  Object to the form.

A.   No, I don't see -- no, that's not correct.

BY MS. TAYLOR:

Q.   And the only reason that you didn't return is because of your desire to have your son in Oregon schools?

MS. BASS:  Object to the form.

A.   I had to have my son in a good school system, but I also was really concerned about my health.  It was a big deal, a big deal.  Cancer is scary, and I was starting to have a lot of other issues, physical issues, so it was -- yeah.  It's not good.  You know when you feel like you're in a really toxic environment and you've got to get out of the negativity.  I sure wanted it to work, though.  I keep trying to look for solutions, keep going back saying maybe we could do this, or can we do this and this. Then he would be checking with HR, checking with Dr. Felton, and we were just exploring every possible way.  And then, you know, it seemed like, well, if there's absolutely no alternative, at least I have enough leave to get through the year and...

BY MS. TAYLOR:

Q.   But, now, we've established that, in June, you knew that Dr. Felton wouldn't allow remote work and you knew that Dr. Felton would not --

A.   Yeah.

Q.   -- allow your budget line to transfer --

seemed to be -- he wanted the retirement date and that was the proposal, was, okay -- and it's written in here, okay, if I do retire June 30th of 2018, then I can finish this X, Y, Z, and do this with the software thing, and I will retire.

Q. But they told you you wouldn't be allowed to work remotely. Correct?

A. Yeah, indefinitely I would not be allowed to work remotely, correct. They were not going to change the policy, and I was not going to be able to transfer. So the next -- last proposal was, can I just do it until the end of the year.

Q. So in your e-mail dated July 5, 2017, you asked Dr. Felton -- let's go back to Exhibit 17. So in Exhibit 17, on June 30th of 2017, you asked Dr. Felton if it could just be handled between the two of you, "Do you think that I could get six months or one year max that I need that way?" And you know, at that point, he is unequivocal that he's not -- the decision is made and he's not going to challenge it. So you know, on June 30th of 2017, that there would be no possibility for you to work remotely. Isn't that correct?

MS. BASS: Object to the form.

A. No. I will go back to the later one, on

August 25th, when we're working out a -- we're still negotiating, that, okay, I can start the process for a June 30th, 2018, retirement date, work out the salary enhancement, and then establish a secondary appointment in the School of Population Health, not moving the line, and I could finish up my work and then become professor emeritus so that I could continue working post-retirement.

BY MS. TAYLOR:

Q.   Now, on Friday, August 25th, Molly Brasfield clearly communicated to you that your requests for paid personal time, time for days that you aren't available to report to campus, was being denied. Isn't that correct?

A.   I got that message.  It was, yeah, very surprising because usually HR doesn't approve your leave or disapprove your leave, and I have never been denied leave request in my 25 years.

Q.   But you would agree that you didn't have approval to take paid leave off --

A.   I put in --

Q.   -- until -- let me finish my question.  Until June of 2018, at the time that you left for Oregon. Isn't that correct?

A.   Yeah.  I was going to add to that, I put in a

request through Jason to extend my leave, because that's the process.

Q. And that would have been after you were in Oregon. Isn't that correct?

A. I'll have to look at the dates.

Q. And then three days after Molly Brasfield with Human Resources tells you your request for paid leave is denied, you sent a text message to Kristen Nalls asking her if she can -- quote, "Can you just not use my leave for last week," question mark. Isn't that correct?

A. I'm not sure what I meant by that, but...

Q. Well, let's look at the text message.

A. "Can you just not use my leave for last week?"

Q. So on August 25th, the Human Resources Department tells you that your request for leave is being denied.

A. Which was the shock, yes.

Q. And so you sent a text message to Kristen Nalls three days later asking her to just use your leave for last week. Isn't that correct?

A. I don't know. I've never been denied my leave. What comes before this?

(Exhibit No. 21 marked.).

MS. BASS:  Have you got a copy?

MS. TAYLOR:  What exhibit number is that?

COURT REPORTER:  Twenty-one.

BY MS. TAYLOR:

Q.  Do you have the same cell phone that you had when you were at UMMC?

A.  No.

Q.  You have a different cell phone?

A.  Uh-huh.

Q.  Would you have your text communication with Kristen Nalls at UMMC?

A.  Maybe.  I mean, there's probably always some sort of way to find that, I guess.

Q.  Do you have any reason to dispute Kristen Nalls' text message, that you sent her a text message asking her to --

A.  I don't know what this means.  I don't have context.  I know that I wanted to use my leave.  I wasn't -- and I'm not sure when Molly became involved, but she hadn't been, then all of sudden, she was. Then all of a sudden, everything ended up really weird.  Is that about being -- was the e-mail asking me to put myself on uncompensated leave?  Because I remember getting an e-mail saying to do that, and I was like, I have leave, why wouldn't I just use my

leave.  Is that maybe the context?  I'm not sure.  Do you have the rest of the context?

Q.   So the e-mail on August 25th that's part of -- did we mark that as an exhibit?  Do you have an exhibit where the first number is UMMC 881?

A.   I don't think so.

MS. TAYLOR:  Okay.  Let's mark this.

(Exhibit No. 22 marked.)

BY MS. TAYLOR:

Q.   So if you go to the last page of this exhibit, it's an e-mail from Molly Brasfield to you dated August 25th of 2017, and she states that your request for leave is being denied.

A.   Yeah.  How is that?

Q.   And then your response to her e-mail, which is dated Saturday, August 26th, in the last paragraph, you say, "If I'm not allowed to work temporarily for the School of Population Health to finish up with my projects, I'll be able to start taking leave immediately.  I knew that might be an eventuality, but, obviously, I hoped it would have worked out differently and that I could continue to serve UMMC and Mississippi."  You said, "I'll kick off the retirement process."

And then you see, in the e-mail above, that

Dr. Felton, that same day, tells you, "Your best option is to seek retirement. I'm unwilling to give up your faculty budget line."

A. Yeah. And, see, he asked me for the retirement date, so I provided that.

Q. And then you responded to him saying that you're set up for a retirement date for June 30th of 2018.

A. Yeah.

Q. But you hadn't gotten approval from anyone to retire in a year without working. Isn't that correct?

A. I had checked and I had enough leave, and we knew that was an eventuality, but hoped that that would -- that it would not come to that. But I hadn't put in the leave request for the entire year. I had just put in the first part, and then I said, well, okay, now I have no choice. I'll go on to leave.

Q. So the only leave request that I see is your request for Monday, Tuesday, and Wednesday, August 10th.

A. Yeah. I'll have to pull -- no. That's all you've given me, but that doesn't mean -- see, I did put in a leave request.

Q. Before you left --

A. Yes, before I left.

Q.    -- for Oregon?  And then again on Tuesday, August 29th, Molly Brasfield e-mailed you and says again that an employee's use of accrued pay personal requires a request to be submitted, reviewed, and taken at the approval of the employee's supervisor, and that accrual balances don't indicate an entitlement to take leave outside of the policy and protocol.  And then she gives you a copy of that. Isn't that correct?

A.    Yes.  That's standard proceeding, yeah, standard procedures.  And I put in my leave request the same as I'd always done it, and had never in my life been denied.

Q.    But you'd agree that you did not ask for indefinitely until June of 2018.  Isn't that correct?

A.    Well, not then, not at that time, until I found out that there was going to be absolutely no other way, that I wasn't going to be allowed to even finish working the year for the School of Population Health, but at the worst case scenario, it was I would have to go on to leave.

Q.    And then it appears that you respond on August 30th of 2017 asking Molly Brasfield what the process is to appeal the decision --

A.    Uh-huh.

so many opportunities for it to end well.

Q.   Now, it appears that, if you look at page 4 of this e-mail string, it's e-mail from Molly Brasfield to you, and she explains the rationale for having a single point person to respond to your requests.  Isn't that correct?

A.   (No response.)

Q.   It's stating the purpose was to articulate a unity of leader thought across areas of assigned work effort.  Isn't that right?

A.   Yeah, that's -- that's basically when all the rest of the, yeah, communication with anyone else was shut off.

Q.   She also indicated that your approach to others had been abrupt and aggressive in --

A.   I don't agree --

Q.   -- communicating with them.

A.   -- with that at all.  We had been having actually very constructive conversations trying to work out something really nice for UMC and for being able to continue my work, and there was nothing aggressive going on until Molly got involved, and it became utterly hostile abruptly.

Q.   And again, Molly lets you know, that if you wish to file a formal grievance, that you could do

that using the formal grievance information.  Isn't that correct?

A.   Yeah, she said that.  Although my grievances continued to fall upon deaf ears, so...

Q.   You never submitted a formal grievance.  Isn't --

A.   No.  I'm talking about when I'd gone to Compliance before and, you know, it was always drug out and nothing ever came of it, so...

Q.   But you never submitted a grievance related to your move to Oregon, related to your paid time off, related to your --

A.   Following some --

Q.   -- request to work --

A.   Wait a minute.  I don't know for sure.

MS. BASS:  Object to the form.

A.   I don't really -- I don't think that's correct.  But are you saying did I not follow a link in an e-mail?  I don't know what the grievance process is.  I'm sorry.

BY MS. TAYLOR:

Q.   You don't dispute that Molly provided you with a faculty grievance process and policy.  Is that correct?

A.   There is a link there.

Q.   And she instructs you that the "references" portion of the policy will have a hyperlink to the electronic faculty grievance report to exercise your due process entitlement related to this matter if you so choose.  Isn't that correct?

A.   It's there.  I don't remember if I did it or not.

Q.   And she sent it to you on August 20th of 2017?

A.   I think I was still trying to communicate until then she shut down communications.

Q.   And if UMMC has no record of you ever complying with that process and filing a grievance, you would have no reason to dispute that.  Isn't that correct?

MS. BASS:  Object to the form.

A.   No, that's not correct.  If you read -- I know you're picking out pieces that serve your purposes, but if you'll read the rest of this, I am stating my case over and over, you know, in different ways at different times appropriately, so...

BY MS. TAYLOR:

Q.   But let's be clear.

A.   Are you specifically saying did I click this link and follow this process?

Q. Correct.

A. I do not know.

Q. Okay.

A. I may very well have done it.

Q. You have no memory of filling out a grievance, a formal grievance to aggrieve any concerns. Isn't that correct?

MS. BASS: Object to the form.

A. Do you know what distress I was in at this point in time? I was really -- I was emotionally a train wreck. As she cut off my communication, she cut off my salary, she denied me leave, I was in a -- I was in a new place in a tiny camper with six individuals in this camper. I did not know -- everything was working out so wonderfully and then, all of sudden, enter Molly Brasfield, everything went crazy. So I would just -- you know, you can read, read the rest of them.

BY MS. TAYLOR:

Q. So Dr. Krause, my question is, you have no memory of completing a formal grievance form.

A. I may have.

Q. Isn't that correct? You don't know?

A. I don't know.

MS. BASS: Object to the form.

A.   I may have.

MS. BASS:   She answered it.

A.   It was kind of one assault after the other. It was rather overwhelming.

Kind of referring back to earlier conversations, John Showalter, who violated compliance policies and was walked out with security, was allowed to finish the year, was paid for the rest of his year.

BY MS. TAYLOR:

Q.   And when did that occur?

A.   I don't know what year it was.

Q.   Would that --

A.   And then other people, I know other people who were rather pushed, but males, they were paid throughout the end of the year. I would have worked throughout the end of the year. I would have taken leave throughout the end of the year. And I didn't even violate any compliance policies or anything. But I wasn't allowed to continue to finish the year in any way.

Q.   And you didn't have approval for paid leave before you abandoned your job. Isn't that correct?

MS. BASS:   Object to the form.

A.   I did have leave to use, and I put in my leave request.

BY MS. TAYLOR:

Q. You had no approval for your leave before you left for Oregon.

MS. BASS: Object to form.

A. I had the same approval I have ever had, always. I did nothing different on that leave request than I had done for 25 years.

BY MS. TAYLOR:

Q. Now, when you left for Oregon, you took your laptop with you and you took your cell phone with you. Isn't that correct?

A. Correct.

Q. And --

A. Still was hoping that I could, you know, finish up my work. I had some transition to do. This wasn't going to be an abrupt -- I had a lot of work that was outstanding that needed to be transferred. Jason had asked me to get me course stuff to him. There was a lot of different things I needed to do.

Q. But you had no housing plans. You planned to live in a camper, and you had not reserved a spot for the camper. Isn't that correct?

MS. BASS: Object to the form.

BY MS. TAYLOR:

Q. Isn't that correct?

Q.   Let me finish my question.

MS. BASS:  Let her finish before you answer.

THE WITNESS:  Right.

BY MS. TAYLOR:

Q.   It appears what you're saying here is I'm not going to return the property until you give me what I want.

A.   That's not --

MS. BASS:  Object to the form.

Let her ask you --

THE WITNESS:  I'm sorry.

MS. BASS:  -- give me a minute, and then respond.  And it will help the court reporter because she's going to get real upset with us in a minute.

THE WITNESS:  I'm anxious to answer.  Go ahead.

BY MS. TAYLOR:

Q.   I did finish.

A.   Okay.  All right.  So now restate the question because I want to make sure I answer the right question.

Q.   Isn't it correct that, when UMC asked for its physical and intellectual property back, you responded that you're not going to comply until you get what you want?

MS. BASS:  Object to the form.

BY MS. TAYLOR:

Q.    Isn't that right, until you get your research --

A.    That is not true.

Q.    -- enhancement, until you get your paid leave?

A.    No, that is a misinterpretation.  In fact, I did promptly return the laptop and phone when I was given the address to send it to, and done by certification, as requested, and then they said we still didn't get it, but then they tracked it down finally.  But what -- Dr. Summers was not asking for that.  That was not what Dr. Summers was asking for. It actually had nothing to do with the equipment. What he was asking had to do with more of the software platform background, which would have required a lot of effort.  It's not something you just turn over. It's not like that.  So what he was asking was going to be a significant amount of work, and I was no longer working there, so I was trying to figure out how I would do that.  I was also cut off from all of my resources, so it wasn't something that I could really respond to effectively.

Q.    Now, your laptop that you returned to UMMC

you have wiped clean --

A.    Uh-huh.

Q.    -- of everything that was on the laptop.
Isn't that correct?

A.    That's correct.

Q.    So all data, research projects, information,
that you had that was related to your work at UMMC was
destroyed when you deleted that laptop.  Isn't that
correct?

MS. BASS:  Object to the form.

A.    That is not correct.  That is so incorrect.
Because we have a policy at UMC.  We don't keep that
kind of data on laptops.  You don't keep HIPAA data,
research data, proprietary UMC data on laptops.  So
none of that was on that laptop.  So when Molly asked
for that laptop back, she -- before she did that, she
just abruptly cut me off of my laptop.  I couldn't log
in.  I couldn't use the laptop.  I couldn't clean my
personal data off the laptop.  And that's all that was
on there, tens of thousands of pictures and stuff like
that, which I would have cleaned off.  But I had been
cut off from the laptop and nobody in IT could answer
any questions.

So there was no data destroyed at all because
I actually saved my data on UMC network drives, as I

explained in great detail where everything was to them, but they were not listening to me. They had this vision in their head that I was doing something wrong, and I wasn't at all. And so I didn't want to send in all my personal data, so I just wiped it off. They didn't lose anything.

BY MS. TAYLOR:

**Q.   You never provided UMMC with the mapping software that you had worked on with the Office of -- or Office of Mississippi Physicians Workforce. Isn't that correct?**

A.   That is -- I did not have it in my possession. It was created -- so I have all this e-mail stuff about how DIS would not allow me to have servers, they would not allow me to have resources to develop any of my stuff. So it had to be developed at the contractor's -- on his server. It wasn't on UMC's servers. So they have access to it through the contractor. It wasn't -- I wasn't keeping it.

**Q.   Did you not have a private server that you had the mapping software on?**

A.   There was a copy of it on there for a while, but then it was not -- it was not paid for anymore. So the original -- all the software was on Gary's server.

think there was just a huge misunderstanding. Everybody thinks that software is something that is on a disk that you can install.

(Tornado warning sirens sounded.)

MS. TAYLOR:  Go off the record.

(Recess.)

BY MS. TAYLOR:

Q.    Looking at Exhibit 23, which hopefully is the last one we'll be looking at.  So on the first page there, Dr. Summers indicates that his priority is the OMPW software and database, and --

A.    It's funny that he called it the OMPW software or database.  It started in, like, 2007 as part of my master's thesis long before OMPW ever even existed.

Q.    And I understand, based on your response to him, that you consider it your IP?

A.    I consider it my life's work.

Q.    Okay.

A.    I mean, more than two decades of learning and ideas and putting it all together in a platform which everybody misunderstands to be software, and it's not that.

Q.    Okay.  And your response to Dr. Summers or -- yeah, Dr. Summers is that, if you're still interested

in my IP, we need to resume discussions on how to proceed.

A.   Uh-huh.

Q.   And you tell him that you're being represented by counsel, an IP firm in Portland and the Bay?

A.   Uh-huh.

Q.   Okay.

A.   And that skips a whole lot because I don't know what day it was, but I was -- I made a presentation to the patent committee with Dr. Summers, and they really liked it, and they decided that they wanted to pursue a license agreement with me.  And so that's when they started -- they brought up the words "intellectual property," and "copyright," and "license," and stuff like that.  Then we worked with the legal department for a while, going back and forth developing a draft license agreement, which would give me exclusive license to market it and see -- because it could have brought -- as Dr. Keaton said -- I presented it to Dr. Keaton.  He said, "Denise, you're sitting on a gold mine."  And so they saw that potential, and then they wanted to license it to me, and I could go out and bring in all this money.  It would have been very possible.  But then --

Q.   Okay.  So --

A.   -- at some point, they just abandoned that.

Q.   And I understand that you're -- the ownership over this platform or software is not an issue in this lawsuit.  This lawsuit relates to your allegations of gender discrimination, harassment, and your due process claim.  Is that correct?

A.   Well, I never disagreed that we had shared ownership.  It was never mine because, part of it, I used for UMC.  So it was ours.  But it does enter into this lawsuit because I was -- it's very similar.  So they were shaping and fashioning the license agreement with me based on Robert Hester's software.  He had done something, software platform, whatever he had done, something similar.  So they were basing that on Robert Hester and the license agreement and the legal document, how he has been allowed to license it, create different companies, market it, and bring money in.  And he was also -- you know, he's been promoted.  He's the chair of the data sciences, I believe, and it's worked out really well.  So that's what they were doing for me at first, and then, all of a sudden, that was abandoned, too.

Q.   And is it correct that you allowed the server that the platform was stored in, after you left

Mississippi, to be -- no longer to be able to access the platform?

A.    Nobody was paying the bill.  You know, nobody wanted to -- Dr. Sum- -- that was part of Dr. Summers' agreement with me, was that I had to -- in order to do this, I would have to, you know, fund it, and pay for it, and build it, and, you know, then I -- they weren't going to help pay for it.  So it was on, you know, it was on the development server, which was with a contractor because DIS wouldn't allow me to build anything at UMC.

Q.    And during the time that you were talking to the patent committee or trying to get a license for that platform, it was during the same time that you were moving to Oregon.  Isn't that correct?

A.    No.  No.  It was well before that.

Q.    So if in 2017 UMMC's records indicate that that was when a licensing agreement was presented to the patent committee, you wouldn't have any reason to dispute that.  Is that correct?

A.    I would have to look at the dates.  This went on for a while back and forth between the, you know, lawyers.  So I'm not sure when the process started and stopped, but it wasn't just something that happened after I decided, you know, I need to go.  And it's

such a similar situation and yet worked out beautifully for Dr. Hester, a male.

Q. And what was the software or the thing that was being patented for Dr. Hester?

A. Hummod, H-U-M-M-O-D, I believe.

Q. What is that?

A. It's kind of a physiology simulation kind of software, or...

Q. Do you have any idea of what the agreement is or what the licensing agreement, the terms of it were between the University and Dr. Hester?

A. Yeah. Yeah. I mean, they said what it was. I can't remember. It was, you know, in e-mails, but that it was some, you know, some royalty agreement number. I don't remember. Exclusive license to. The difference, I think, maybe is that they were providing -- they were going to provide -- well, it provided a lot of support to his platform, and then I had to kind of be responsible for my developing it going forward, you know, funding it, so...

Q. Now, in the proposal that you submitted with Dr. Griggs in June of 2017, at that point, you have not had a licensing agreement. Isn't that correct?

A. I didn't. I didn't ever finish it, but I was never pulling the work out of Mississippi. I was

trying -- each one of my proposals was trying to find a way to continue doing this for Mississippi.

Q.   So even though you didn't have a licensing agreement with UMMC, you -- and it looks like, under option one, you were proposing that you would provide UMMC with user licenses, five of them, at no cost, to the mapping application?

A.   Is that in proposal one?  I don't know.

Q.   Yeah.  That's what you state in proposal one.

A.   Yeah.  That was never really nailed down.

Q.   So even though it's a joint --

A.   Yeah, they were --

Q.   Let me --

A.   -- trying to --

Q.   -- finish my question.

A.   -- to figure out --

Q.   Let me finish my question.  Even though it's a joint platform that UMMC paid you to work on --

A.   They didn't.  It was not part of any of my job.  It was something I did extra.  But I, you know -- but, yes, I used some of the resources, like my computer.

Q.   So your work with the Office of Mississippi Physicians Workforce, part of that was to develop the platform.  Isn't that correct?

A.   That was -- the platform was already in place. I did approach Dr. Beebe and said, look, I can do this for you with physicians. So, yes, she gave me a kind of a grant to develop for that physician piece, which is just a small piece of it.

Q.   And you were paid for that. Isn't that correct?

A.   Yes.

Q.   Okay. So --

A.   And that --

Q.   -- without a licensing agreement --

A.   Yeah.

Q.   -- your proposal was to provide licenses to UMMC's property, the mapping application, at a reduced price?

MS. BASS: Object to the form.

A.   Uh-huh. So the -- you know, it had to be funded by somebody. I was supposed to fund it myself personally, I guess. So I had to come try to figure out how. I mean, I can't just -- I can't just build it and give it away, because it costs a lot to do and takes resources. So trying to figure out ways to make it work. If they would have helped with the platform and all, that would have been nice.

BY MS. TAYLOR:

Q.   If you could go back to Exhibit 23, the second page of that.  It's UMMC 928.  In that second paragraph, you state that you don't have any current applications or data to give you.  What I have is a service.

A.   Uh-huh.

Q.   What do you refer to there?

A.   Where is that?

Q.   In the second paragraph.  It's your e-mail dated September 15th, 2017, to Molly Brasfield.

A.   Yeah.  Okay.  So this is referring to the patent committee had told me that I needed to fund it myself.  So I was trying to get external contracts to help fund the development, but I wasn't getting them. I was having trouble with Dr. Mitchell, you know, kind of derailing contracts that were just about to happen. And so I wasn't developing during that time.  So that had nothing new.  I had nothing current.  It has to -- you know, I was trying to get funding, is what I was working on.

Q.   So you're saying you were trying to get funding during what time?

A.   After I was told that I would do the licensing agreement thing, that I would need to fund it, and then I didn't have any, you know, I didn't

-- it's not a simple task, and it can't be done by one person by themselves.  So I needed funding, I needed to get external funding in order to be able to do it.  And the contract with the School of -- or the Board of Nursing would have done it.  It would have done it.  But Dr. Mitchell derailed it for me.  So I hadn't worked on it in, you know, quite some time.  When they're asking me for whatever I have, I don't have -- I haven't been doing anything on it.  I had no funding.

Q.    So how long had you not worked on it?

A.    I don't know.  Probably -- if you look at the last data sets, you know, they're old.

Q.    Like, would it have been as early as 2015?

A.    Might have, uh-huh.  Because I had to have funding, you know, to keep it running.  Nobody, you know, nobody wanted to fund it, but they wanted to give me the opportunity to do the license agreement, get the funding, bring in the money.  Everybody would have -- it would have worked because UMC was going to get royalties and stuff.  But I was still having that thing between, you know, Dr. Mitchell not really wanting to let me do it outside of him.  So I could never do it.

          MS. TAYLOR:  Okay.  Let's go ahead and mark

this as the next exhibit.

(Exhibit No. 24 marked.)

THE WITNESS:  I'm still perfectly capable of doing it.  It just takes a lot of resources.

BY MS. TAYLOR:

Q.  Okay.  So if you look at the last page of this exhibit, it's dated September 6th, between you and Dr. Mitchell.  And you state -- you kind of go through the -- you had hoped to work on a transfer, but Dr. Felton was not willing to transfer, and he doesn't allow people to work remotely.  And then you state, "Because I had to get my son into middle school, the only path left was to take personal leave and plan to retire."  In your view, you felt like you had no other option but to plan to retire because you had to get your son in middle school?

A.  No.  Because Dr. Felton told me that was what I needed to do, basically.

Q.  You said earlier that Dr. Griggs had encouraged you to stay in Jackson and work or --

A.  He didn't encourage me to.  He mentioned it. And I told him that, you know, why that wouldn't work for the situation.

Q.  But you would agree that, if you had stayed in Jackson and worked, you would have been able to

continue to earn a living, continue to have additional time at your higher salary, and you could have reached whatever retirement date that you wanted. Isn't that correct?

A. No, that's not exactly correct. I wasn't really allowed to -- I wasn't being able to function fully in the School of Dentistry, and I was unable to get out. So I was stuck in between -- Dr. Griggs was trying to encourage me to do the faculty stuff, and Dr. Mitchell was chopping away at everything I did, and my health was suffering, and it just wasn't an option. And I knew that I had enough time, so even in the worst case scenario, I could make the transition smoother, we could, like, try to transfer some of this stuff, we could try to carry on some of this stuff, if I was given the rest of the year to finish it, but...

Q. And you testified earlier, before you moved to Oregon, you knew that Dr. Felton would not allow you to work remotely. Isn't that correct?

A. Before I drove to Oregon, not before I relocated to Oregon. But, yeah, before I drove to Oregon.

Q. Also --

A. I didn't realize I was relocating that permanently at that time.

Q.   Also, before you left for Oregon, you knew that Dr. Griggs would not allow you to work temporarily remotely and keep it between you and him and not let Dr. Felton know.  Isn't that correct?

A.   It wasn't about not letting Dr. Felton know. It was about working out an appointment, some kind of a non-paid appointment through the School of Dentistry, and that we could just, you know --

Q.   So your e-mail, your e-mail is pretty clear, as is his response.  Right?

A.   Between us, but that doesn't -- it wasn't don't tell Dr. Felton.  There was never any of that.

Q.   It was let's keep it between us, and that Dr. Felton doesn't have to create a policy.  Isn't that right?

A.   Yeah.  It was a way for this to work where he wouldn't have to change a policy for the whole school.

Q.   And he told you no.  Isn't that right? Dr. Griggs told you that he had been told by his supervisor?

A.   That he wasn't going to go against what his supervisor said, so, yeah.  So I needed to, you know...

Q.   And you also --

A.   Plan for retirement.

Q.   You also knew that Dr. Felton was not going to allow your position to transfer to another school and lose that budget line.  Isn't that correct?

A.   Yes.  Although other people, men, were allowed to transfer with no problem.  People transferred in at the same time I was trying to transfer out.

Q.   I just want to make sure of the time that you knew.  You knew before you left for Oregon that Dr. Felton would not allow your budget line to transfer out.  Isn't that correct?

A.   Yeah.  He made that clear in many e-mails, and I understood that that was, unfortunately, the position that he was taking.

Q.   And you did not have approval to use paid leave for the next 10 months --

A.   I --

Q.   Let me finish my question.  You did not have approval to use paid leave for the next 10 months when you left for Oregon.  Isn't that correct?

A.   Yeah.  We hadn't got to that point yet.  We were still trying to work out how to finish that year.

Q.   I'm just going to have to ask the question.  If you knew you couldn't work remotely, you knew your budget line could not transfer outside of the School

of Dentistry, and you moved to Oregon anyway, there's no working it out.

A.   Well, my backup plan, as I've said before, if nothing else could work out, I would go on leave and I would take my leave.

Q.   But you didn't get approval for leave before you left.  That --

A.   But I did --

Q.   -- was your backup plan.

A.   I did submit a request for leave approval.  I didn't put it in for the whole 10 months because we hadn't ascertained that.

Q.   You asked for three days of leave, Dr. Krause.

A.   I have another --

MS. BASS:  Object to the form.

A.   Yeah.  There's another leave request that you don't have, evidently.

BY MS. TAYLOR:

Q.   That you submitted before you left for Oregon?

A.   Yes.

Q.   That's different from the three e-mails that you sent to the assistant asking for different days off?

A.    Yeah.

Q.    Okay.  Now, you stated earlier that other people were allowed to transfer and move their budget lines outside of the School of Dentistry to other schools under Dr. Felton's supervision.  Can you tell me who that is?

A.    I know people were allowed to transfer in and out before, but I know that -- I don't have names right now, but the School of Dentistry transfers out, but other people, like, that were in Population Health were allowed to transfer to an appropriate fit.

Q.    So my question is, do you know anyone under Dr. Felton's -- when Dr. Felton was the dean of the School of Dentistry, who Dr. Felton allowed them to transfer their tenure or their position outside of the School of Dentistry?

A.    Not specifically in the School of Dentistry, but in the rest of UMC, yes.

Q.    Do you know any other employee who has moved out of state, and in -- in the School of Dentistry, who moved out of state and was allowed to work remotely?

A.    I know several of them that are in other schools, but School of Dentistry is a very different thing.  It's for dentists.

Q.   So am I correct that you don't know of anyone in the School of Dentistry who has been allowed to move to another state and work remotely?

A.   No.

Q.   Do you know anyone in the School of Dentistry who has been allowed to move out of state and get indefinite paid leave until they retire?

A.   Not specifically.  I do know there were transfers in on the day I wanted to transfer out.

Q.   So correct me if I'm wrong, but that would permit Dr. Felton to take on an additional budget line in the School of Dentistry.  Is that --

A.   I don't know what the arrangements were.

Q.   In looking at the amount of leave that you took during your last year of employment at UMMC, it appears that, in 2016, you took 20 consecutive personal days at a time.  Is that correct?

A.   Yeah, I think so.

Q.   So that would be -- 20 consecutive personal days, that's a long period of time.

A.   Uh-huh.

Q.   Is that right?

A.   Yeah.  Sounds like it.

Q.   Is that four weeks of -- you were off for a month?

A.    Yeah.

Q.    And you were allowed to just leave UMMC and --

A.    Yeah.  They never denied a leave request.  I mean, it was great.  I was -- I had leave.  I was able to use it, and I took my son to -- 7,100 miles to 10 national parks and monuments for his fourth grade year, I think it was.  It was wonderful.

Q.    Is that the road trip that you took in the summer of 2016?

A.    I think so.

Q.    But you weren't gone for just four weeks.  Right?  You were gone for six?

A.    I was gone for four weeks, I think, yeah.

Q.    You told your doctor you were going on a six-week road trip with your son.

A.    Well, I was planning something, but I went for four weeks.

Q.    Well, then when you came back from your road trip, you told your doctor a second time that you had enjoyed your six-week road trip with your son.

        MS. BASS:  Object to the form.

BY MS. TAYLOR:

Q.    Is that correct?

A.    I don't know.

Q. If you'd look in the final paragraph under --

A. Hm.

Q. And then if you'd go to Exhibit 26. Let me see if there's a date on that. This is records from your visit from August 9th of 2016. And it states again that -- if you look under -- it's the middle of the page. It says that you just got back from a six-week trip with your son. Dr. Krause, do you dispute that you took a six-week trip, road trip, with your son in 2016?

MS. BASS: Object to the form.

A. Yes.

BY MS. TAYLOR:

Q. You think the medical records -- do you dispute that you told your physician that you had taken a six-week trip with your son?

A. I don't know what I told my physician. I know what I took.

Q. Earlier today we had discussed some e-mails between -- well, some e-mails and communication on August the 21st of 2017 where Dr. Griggs said that you had notified him that you had moved to or relocated to Oregon.

A. That was his word. I had not relocated to Oregon.

Q.    Okay.  Based on your physician's records, it appears that you contacted your physician -- it appears that, on October the 11th, you notified your physician that you have moved to Oregon.  Do you recall that?

A.    No, I don't recall that.  Is that October 11, 2017?

Q.    Uh-huh, October 11, 2017.  Using the word that you had moved to Oregon.

A.    I might have said that.  I don't remember saying it.

Q.    Now, earlier you testified that you had been subjected to, quote, harassment while you worked at UMMC.  Is that correct?

A.    Yes.

Q.    Could you identify any comments that anyone made to you at UMMC that was disparaging because of your gender?

A.    So harassment and hostile work environment kind of stuff, so there were, like, Julie Smith threatened to kill me one time in a meeting.  And there were plenty of witnesses to that.

Q.    Okay.  I want to make it clear for the record, just so we understand the timeline.  Your complaint about Julie Smith was in 2012, which would

have been about five years before you retired from UMMC.  Isn't that correct?

A.    Yeah.  And she was walked out somewhere.  I don't know when.

Q.    Okay.  So could you identify any disparaging comments that have been made by Dr. Felton about your gender?

A.    I didn't have many conversations directly with Dr. Felton.

Q.    So can we assume --

A.    It was always just through Jason Griggs.

Q.    So can we assume that you have no evidence that Dr. Felton made any disparaging statements about your gender?

A.    My issue was not as much direct statements as actions.

Q.    So you agree that there were no direct statements disparaging your gender?

A.    From Dr. Felton?

Q.    Yeah.

A.    No.  And there were a lot of -- there was a lot of speculation from some people that there were issues with sexual orientation, but I'm not even, you know, going there.

Q.    You said that was speculation?

A.   Yeah.

Q.   Okay.  Did you ever have any disparaging comments or did you ever hear Dr. Griggs make any disparaging comments about your gender?

A.   Dr. Griggs definitely is not a discriminatory kind of guy.

Q.   You don't feel that Dr. Griggs discriminated against you based on your gender?

MS. BASS:  Object to the form.

A.   Not Dr. Griggs.

BY MS. TAYLOR:

Q.   And you can't identify any gender derogatory statements that any other member or -- member of faculty or administration made about your gender?

A.   So people didn't go around saying stuff directly about gender.  It was very clear in the behaviors and the attitudes and the treatment.  I wasn't the only one.  I observed horrible things happen to, like, Karen Crews.

Q.   Now, was Dr. Felton ever sexually inappropriate with you?

A.   No.  Dr. Mitchell, though, he was always trying to refer to me as, like, his technician, and it was interesting because there were people who would refer to -- you would never -- if you were a man, you

were always referred to as Dr. Whatever, and you were treated like regular faculty.  But I had issues with that as sometimes people, you know, referred -- like Dr. Mitchell wanted me to be more like his personal technician.

Q.   Now, you allege in your complaint, under paragraph 14, that you worked under the supervision of Dr. Felton and were continually subjected to sexism by Defendant Felton and UMMC, despite your qualifications.  What do you base that on?

A.   Can you show me in which -- which document is that in?

Q.   Yeah.  That's Exhibit 3.

A.   And at page?

Q.   It would be page 4.

A.   Item number?

Q.   Fourteen.

A.   So that has to do with his unwillingness to allow me to transfer or to do anything except for push me into retirement or termination.

Q.   So your allegation that you were subjected to sexism by Dr. Felton is based on his denial of your request to transfer to another school?

A.   Partially.

MS. BASS:  Object to the form.

BY MS. TAYLOR:

Q.   What else is it based on?

A.   It was really frustrating to see other faculty be able to transfer around.  There was a level of willingness to work with people if you were male, but they didn't -- wouldn't let me -- wouldn't let me leave the School of Dentistry, wouldn't let me function fully within the School of Dentistry, took opportunities -- just if you look earlier with some of the others, that happened repeatedly to women only, like, there's -- if you look at the statistics of the School of Dentistry, in fact, it's pretty top-heavy with male administrators.  But, actually, Karen Crews was made a dean once, but she was -- actually, she called it the dean of party planning.  They didn't give her any real responsibility or take her -- and they took all of her -- what she had built for a long time.

Q.   What was she the dean of?

A.   Huh?

Q.   What was she the dean of?

A.   She just called it the dean of party planning, but I don't know what her official title was.  They didn't allow her to have really real dean responsibilities.

Q.   Do you know when that was?

A.   No, I don't know.  I know that was --

Q.   Could it have been when you were working in DIS?

MS. BASS:  Object to the form.

A.   I don't know.

BY MS. TAYLOR:

Q.   Could it have been when you were in school for your Ph.D.?

A.   I really don't know.

Q.   Okay.  What other incidents where you feel that you were subjected to sexism by Dr. Felton?

A.   Just not getting the same opportunities as men, that he was involved also in -- had to be, I guess, with not allowing my -- me to have the research enhancement two years in a row.  I think that -- I think the time that I did get the research enhancement was probably pre-Felton.

Q.   Now, you say the same opportunities as men. What opportunities are you talking about?

A.   Being a researcher and being allowed to participate in the research enhancement program and -- like others were.

Q.   Did you have any knowledge of whether Dr. Felton was involved at all in the approval process

or award process of --

A.    I'm pretty sure he was the next level.

Q.    Let me finish my question.

A.    Okay.

Q.    For the research enhancement award?  Do you have any knowledge that he had authority over that program?

A.    I believe that's the next level of approval.

Q.    Over the dean of the Department of Research or Office of Research?

A.    It would probably go -- I would assume.  I don't really know, but it would probably go department chair to dean to the Office of Research.

Q.    What other ways do you believe that Dr. Felton didn't give you the same opportunities as men?

A.    That's the main thing.  I just could never -- you know, I did wait for a promotion two extra years, but I also didn't get the research enhancement for two years.  I wasn't allowed to transfer, wasn't allowed to even take a partial appointment somewhere else or where it could have actually functioned a little bit better in my field.

Q.    You also allege generally that you were subjected to a hostile work environment because of

your gender.  Why do you believe that you were subjected to a hostile work environment?

A.  Well, I have never seen -- I've seen men step down from, like, dean positions in the School of Dentistry and go back to their department and give up their administrative title, but not their salaries. And in my case, the salary went away.

Q.  Did those other deans resign and retire from their positions?

A.  No, they actually -- there's a lot of people sitting around in the School of Dentistry just drawing salaries, not doing a whole lot, and they -- this -- they just can sit in their department and draw a salary as long as they feel like it, and then they can retire.  That's what I saw.  I was there a long time. I saw that a lot.

Q.  Do you know of any other dean or faculty members who moved to another state and continued to draw a salary?

A.  Not in the School of Dentistry, since that was not the -- that was against policy, but, yes, I did see that in other parts of UMC, definitely.  And had I been able to transfer, that might have been possible for me, as well.

Q.  So what other circumstances do you think

support your claim for a hostile work environment based on your gender?

A.   So them not being able to transfer, not being able to work remotely.  Even when I was -- lost my position earlier or when I left, when I was terminated, I saw men who were able to leave either on decent terms or on really terrible terms and still be able to continue to be paid through the end of the year without even being allowed on campus.  They'd had their badges and keys removed.  They weren't allowed to be on campus, but they were paid throughout the end of the year.  I was just wanting to actually work or take leave throughout the end of the year and wasn't allowed to do that.  And I really can't find a single man who was treated like that.

Q.   So let's first talk about other members of the School of Dentistry.  Who in the School of Dentistry do you know of that was given paid leave until he retired?

A.   Let's see.  Some of the names I don't really remember, but I would say Glen Robinson.

Q.   And who was the dean when Glen Robinson --

A.   I'm not sure.  Might have been Perry McInnis, but I'm not sure.

Q.   So it would not have been under Dr. Felton,

when he was the dean?

A.    I'm not sure when Dr. Felton came.

Q.    Was Dr. Felton the dean when you transferred back into the School of Dentistry?

A.    No.

Q.    So it was sometime after?

A.    Yes.  I think, yeah, sometime after.

Q.    So that would not have been when Glen Robinson left UMMC.  Is that correct?

A.    I'm not sure when he left UMC.

Q.    You said that someone by the name of Perry may have been the dean?

A.    Perry McInnis was the dean at certain parts, at certain times, but I'm not sure of the years.

Q.    What were the circumstances surrounding Glen Robinson leaving?

A.    Oh, nothing.  He had been dean and he just went back into his faculty department and sat there for, I don't know, seemed like years, didn't do much, and then he retired.

Q.    Okay.  So this was not an individual who was allowed to work from another state.  Is that correct?

A.    No.  I think we've ascertained that.

Q.    And it wasn't someone who was allowed to use 10 months of paid leave until they retire.  Is that

correct?

A.   That's correct.  He was just able to sit there.

Q.   Anyone else that --

A.   And show up if he wanted.

Q.   Is there anyone else that you believe supports your claim for a hostile work environment?

A.   In the School of Dentistry?

Q.   Yes.

A.   Specifically, because it's -- really, when I boil it all down, it looks like it -- it goes from Dr. Felton, Richard Summers and John Mitchell.  So, remember, I wasn't just a typical School of Dentistry employee.  All of my life was not in that.  I was also in the Office of Physician Workforce, DIS at times.

Q.   Earlier you mentioned that you saw men who left on decent or terrible terms and were allowed to have paid leave.

A.   No.  It was they were just paid for administrative leave, didn't even use their leave.

Q.   Oh, they were paid a salary?

A.   (Witness nods head up and down.)

Q.   So they weren't given just indefinite paid time off?

A.   They were given -- they were required to stay

times.  You know, initially, he got the research enhancement and I didn't for the very same role.  He was allowed to transfer to a better fit in Preventive Medicine to the School of Health-Related Professions, and then wherever he needed or wanted to go.

Q.   Let's stop just for a moment.  Dr. Warren May, was he in the School of Dentistry?

A.   He was in the School of Preventive Medicine.  Well, it's wasn't the school -- he was in the School of Medicine.  There was a Department of Preventive Medicine, but it had been disbanded for a while.

Q.   Okay.  So he was not in the School of Dentistry?

A.   Correct.

Q.   Okay.  And you say that he was allowed to transfer?  Where was allowed to transfer?

A.   Where?

Q.   Yeah.

A.   Well, he was in Preventive Medicine, and then he went to the School of Health-Related Professions.  And that's where he kind of ended up at that they were willing to transfer him if he wanted to, but he was kind of pushed into retirement, but -- and asked to sign something to not file for age discrimination and was paid throughout the end of the year.

Q.   Was that part of a negotiated release?

A.   I don't know what was negotiated.

Q.   Anyone else who you believe was treated differently than you were?

A.   There's plenty of examples.  Another one is, like --

Q.   Let me -- so maybe we'll do the School of Dentistry.  Have we talked about -- you don't know of anyone in the School of Dentistry who was allowed to transfer out of the School of Dentistry under Dean Felton to another school.  Is that correct?

A.   No.  I was not physically even there in the School of Dentistry.  I was set up on the other side of campus, and I was not a dentist, so I was -- I was not really -- I was not the same as the dentists.

Q.   But you don't know of any faculty member in the School of Dentistry who was allowed --

A.   Who was not --

Q.   -- to transfer to or school.  Is that correct?

A.   Well, there probably weren't because they're mostly dentists.  But I was the one that was misplaced and couldn't get placed properly.  So you wouldn't -- if you were a dentist, you wouldn't want to go anywhere else.  That's the only place for you.

Q.   So you can't identify anyone who was allowed to transfer out of the School of Dentistry.  Isn't that correct?

A.   Right now, I can't name anybody.  But I probably could figure it out if I need to.  I don't know that it's that relevant because I don't compare myself to dentists.

Q.   So, Dr. Krause, this is my one opportunity to talk to you.

A.   Uh-huh.

Q.   And so it's important that I know what you know.  And so if you don't know of another faculty member who has transferred out of the School of Dentistry, just tell me, and we can move on.  But I need you to answer the question as best as you can.

A.   Yeah, I'm trying to -- so, like I said, I wasn't, like, there all the time knowing what was going on with dentists.

Q.   Okay.  So you do not know of another faculty member who was allowed to transfer out of the School of Dentistry into another school.  Correct?

        MS. BASS:  Object to the form.  She's answered the question, not that she can recall right now.

        THE WITNESS:  Right.  And I don't know of any

dentist that went to nursing or something like that. That just doesn't even make sense. I know that it's a -- just dentists are a different breed and they don't really need to transfer around UMC.

BY MS. TAYLOR:

Q. You don't know of another faculty member in the School of Dentistry who moved out of state and was allowed to continue to work remotely. Isn't that correct?

A. That's correct. I do think that Karen Crews -- I'm not exactly familiar with all of her story, but I know that she was trying to get out of the School of Dentistry, and I think that she -- see, she also had the potential, she was also sitting on a gold mine of tobacco money. And so, ultimately, everything she built, like the ACT Center and everything, was taken, you know, her funding was taken, too.

Q. What was Karen Crews's position?

A. She was actually a dentist, but she was also, you know, grant-funded with the tobacco money. She was very passionate about tobacco cessation, which is really an important part of oral, head and neck cancer.

Q. Was she in the School of Dentistry when

Dr. Felton was the dean?

A.    I'm not sure who was the dean when she had her horrible experience that she's really traumatized by.

Q.    When was the last time that you spoke with Karen Crews?

A.    I don't know.  Four years ago or something. I don't know.  I mean, we're friends on Facebook. She's now practicing dentistry down on the Coast.  She doesn't -- she's very hurt by UMC, and she's not the only one.  There's a track record.

Q.    Is there anyone in the School of Dentistry that you believe was treated differently than you were?

A.    I believe I was treated more similarly to Karen Crews and to Neva Penton, who also went through her own little hell.  And it's the women who seem to go through hell.  It's not the -- I don't have any examples of men in the School of Dentistry having any problems whatsoever.

Q.    And who is -- you said Tinita Penton?

A.    Neva, N-E-V-A.  Lubna Fawad also was destroyed and devastated by the School of Dentistry.

Q.    What was Neva Penton's position?

A.    Chair of Pediatric Dentistry.  They'd chew

women up and spit them out, and just...

Q. And when did she -- is she still with UMMC?

A. No. No. She sued, though.

Q. And when did she sue?

A. I don't know.

Q. Do you know whether it was five years ago, 10 years ago?

A. I would say maybe more like five. I'm not really sure. It's -- you know, I don't even -- it doesn't seem like I've been gone as long as I have.

Q. Any other people who you believe were treated -- or any males who you believe were treated better than you were?

A. All of them. And in my own department, you know, their research was celebrated, and they were given research enhancement, and all the little dentists just go -- they just -- I was there a long time, and I worked really hard as the only IT person, and I saw so much of nothing. There's so many people who are sitting around. But the men can do that. It's fine. But people like Karen Crews was working her tail off, Neva Penton, she was working hers off, I was -- we worked really hard. It's like the women worked so many times harder to get crumbs and scraps.

Q. Okay. Is there anything else or any other

circumstances that you believe support your claim that you were either subjected to a hostile work environment or discriminated against?

A.    In the School of Dentistry; is that the question?

Q.    Yes, in the School of Dentistry.

A.    I think I've answered that question. You know, I've never -- I never saw a man denied a transfer. I never saw a man denied any leave. I never saw -- you know, I never saw everything a man built for their whole career taken away and destroyed just like that. It's pretty good to be -- it's pretty good to be a white guy in the School of Dentistry.

Q.    Let me you ask you this. You said that you've never seen a man denied leave, but you said earlier, you testified earlier you don't know of any males or females who moved out of state and requested leave for 10 months. Isn't that correct?

A.    Well, and you also said in the School of Dentistry.

Q.    In the School of Dentistry.

A.    So that is an unusual situation. So that is correct. But I do know of men who were able to leave UMC and go out of state and still get paid from UMC.

Q.    Now, one of the things that you alleged is

related to your PTO, your paid time off, that was deposited into your account and then withdrawn, I believe, once UMMC received your laptop that had been wiped clean along with your cell phone.

A.   No.

Q.   Isn't that correct?

A.   No.  That's not correct.  First of all --

Q.   Well, let's look at the documents real quick so we can just establish the timeline.

A.   Okay.

MS. TAYLOR:  Mark this as the next exhibit.

(Exhibit No. 27 marked.)

BY MS. TAYLOR:

Q.   Dr. Krause, this is a letter from Mark Ray, who is an attorney at UMMC, to you regarding turning over UMMC property, and it's dated September 26th of 2017.

A.   Uh-huh.

Q.   So at least as of September 26 of 2017, you had not turned over UMMC's property.  Isn't that correct?

A.   No, that is not correct.

Q.   Okay.  So when did you turn in your laptop computer, your cell phone?

A.   As soon as they gave me an address to return

it to.  All of this stuff listed, I just -- it was --
I just left it there, sitting there in my office.  I
didn't take it, touch it, leave it.  I just left it.

Q.   You just left it in your office?

A.   Yeah.

Q.   And you didn't --

A.   And I didn't -- and it was on network servers
and my desktop computer and all of this stuff is --
the only thing I had was my laptop and phone.  Because
I figured I could do, you know, enough work remotely
with that, and then when it looked like they wanted it
right now, I asked the Office of Physician Workforce
where I should send it to, and Mark Ray told me where
to send it and how to send it, and I did that, like,
the next day.

Q.   Okay.  So my question was, as of September
26th of 2017, you had not returned your laptop, your
cell phone, and you also had not identified to anyone
where the rest of the property could be located.
Isn't that correct?

A.   No.  I had a very detailed e-mail stating
where everything was.

Q.   But as of September 26th, 2017, you had done
none of that.  Isn't that correct?

A.   I don't believe that's true.  I don't know.

I have to look at the dates of the things, but I took nothing. I mean, they kept thinking that I took all this stuff, and I'm like what -- I didn't take anything. I always thought I'd be able to come back and continue working in my office, you know. It was -- I didn't know it was so terminal.

MS. TAYLOR: Let's mark that as the next exhibit.

THE WITNESS: You should pull out the e-mail thread where it -- where I explain where every single thing is and how to access it.

(Exhibit No. 28 marked.)

BY MS. TAYLOR:

Q. So this Exhibit 28 is a -- is another letter from Mark Ray to you, again requesting the information that the University had provided to you and --

A. Uh-huh.

Q. Isn't that correct?

A. Uh-huh.

Q. And so between September 26 and October 10th, you had not provided your laptop, you had not provided your cell phone, you had not provided the location of the 25 years of work and research and data that you had worked on to UMC. Isn't that correct?

MS. BASS: Object to the form.

A.   No, it's not correct.  One of the documents that you've already given us showed me asking Zonzie where do I return this to.  So I was trying to get -- nobody was responding to me because Molly had shut down all my communications, I guess.  So I didn't know how or where to return it.  And then as soon as Mark Ray told me -- and they keep assuming that I have all this stuff that I don't have.  All I have is a laptop with no UMC data on it and a phone.  So as soon as he sent me the "send it to this and register it," or whatever, I did that, and then I got another e-mail from him later saying you haven't sent it, and I said, yes, I did, here's the certification.  And then they went and tracked through receiving and all over campus and finally found it.

        MS. TAYLOR:  So let's go ahead and we'll mark this as the next exhibit.

        (Exhibit No. 29 marked.)

        THE WITNESS:  There it is.

BY MS. TAYLOR:

    Q.   So according to this, as of October 23rd, you were telling Mark Ray that it had been delivered the previous Friday.  Isn't that correct?

    A.   Uh-huh.

    Q.   So from a month.  Right?

A.    Where is -- do you have the correspondence that when he tells me finally where to send it?

Q.    So, Dr. Krause, his initial demand for the property was September 26th of 2017.  And it took an entire month in order for you to mail the laptop.

A.    Nobody would tell me where to send it or how to send it.  I asked more than once.  Finally Mark Ray gave me instructions.  The part where he says, oh, we found it, that's also on this thread, looks like.  So it actually -- it was there somewhere at UMC.  There's also an e-mail from me to Rebecca Keefer with detailed instructions of where I left everything.  And had I just been allowed to finish the year, we could have made this transition so smoothly.

MS. TAYLOR:  Go ahead and mark that as the next exhibit.

(Exhibit No. 30 marked.)

BY MS. TAYLOR:

Q.    This appears to be an e-mail from you to Rebecca Keefer dated November 10th of 2017.  Isn't that correct?

A.    Yes.

Q.    And this is the e-mail, I believe, where you state that you identified where the information or intellectual property was within the University?

A.    Yes.

Q.    And that's the first time that you identified where --

A.    That's the first time -- that's an immediate response to the first time they actually said what they're looking for, because they kept acting like I had all this stuff, and I don't even know what you're talking about.  And then they finally put down what they're looking for, and I responded to each item.

Q.    In your experience, in your professional experience, is it not reasonable for an employer to expect, when an employee is exiting, to provide information about the work --

A.    Of course.

Q.    -- that they've performed for the institution and where it can be located --

A.    Absolutely.

Q.    -- to make sure that information is not lost or destroyed?

A.    Yeah.

Q.    And particularly --

A.    I turned over everything.

Q.    And particularly in the research context, where you might have confidential records related to participants or patients or -- and there's a duty to

maintain that information.  Isn't that correct?

A.   That's correct.  That's why we stored that on secured network drives, all of which DIS has access to.

Q.   And you would have to let them know where those are located.  Isn't --

A.   That's what this --

Q.   -- that correct?

A.   That's what that is.

Q.   Now, after UMMC was able to identify the property related to your research, you were paid for your paid time off.  Isn't that correct?

A.   Oh, no.  It was almost two years before they put that money back in my account.

Q.   But they did put that money back in your account.  Isn't that correct?

A.   Yeah.  After I got lawyers and incurred legal fees, then they finally did this, but the legal fees were more than the PTO.

Q.   Now, when you moved to Oregon, I remember seeing some communication about you having had purchased a Prius on credit card.  Is that correct?

A.   Uh-huh, yeah.  But it was -- I think what we're -- I think what we're thinking about is I bought a bigger camper that had a bathroom in it.  As soon as

I saw that my lump sum leave payment had hit my bank account, I went and got a bigger -- I got a bigger camper with a bathroom, and that was the one that was about $8,000.  And then they -- it was reversed after -- yeah.

Q.    I believe you told Mark Ray that you had purchased a Prius.

A.    I did purchase a Prius at an estate sale.

Q.    You purchased a Prius on your credit card as well as a camper on your credit card?

A.    I don't -- it was probably -- I don't know if it was on my credit card or a check or whatever, but it was at an estate sale.  I purchased a Prius for $4,200.  It's the greatest deal I ever made probably.

Q.    And then you also purchased a camper.  Is that correct?

A.    Yeah.  We were living in a very tiny space, yes.

Q.    Earlier you testified that you had lived in the camper, the very tiny space, for one year before you purchased your larger camper.

A.    No.  We lived in a little teeny tiny camper, the Aliner, for probably somewhere around two months, you know, as I moved around trying to find places.  It was after I got my leave payment deposited and secured

a spot at the trailer park that I was able to go over and get a bigger camper.

Q.   Okay.

A.   And that was the camper that we spent over another year in while I looked, you know, and looked for places to live and tried to figure things out.

Q.   Okay.

A.   And then had to try to deal with the financial out -- repercussions of having that leave payment withdrawn right out of my bank account, as also were my wages.

I was still in shock because I thought that I was so dedicated to UMC and to Mississippi, I wasn't -- I was quite surprised to be being treated like this.  I went to church that day and I said -- they wondered where I was staying.  I said, "Well, I'm not really sure.  We don't have anywhere to go tonight."  And somebody said, "You can stay in my driveway."  So we did that for over a month with somebody I had just met that day, but through church, and, of course, we're really good friends now.

MS. TAYLOR:  Go ahead and mark that as the next exhibit.

(Exhibit No. 31 marked.)

BY MS. TAYLOR:

Q.    Now, Dr. Krause, I've handed you what is the Board of Trustees Policies & Bylaws.  I'm just going to touch on a couple.  We had talked about this earlier, but if you look on page 65, under 402-B, it's related to the administrative positions, that there is no right of tenure to the administrative office.  And it says, "The additional salary or methods of salary computation, if any, for the administrative position shall be stated in the employment contract and not paid to the faculty member when he or she ceases to hold the administrative position."

Isn't that similar to what we discussed earlier as it relates to the employee handbook, that there was no right of tenure in administrative appointments, only in the faculty appointment.  Is that correct?  Is that your understanding?

A.    Yes.

Q.    Now, if you look to page 72, and this is 403.0202, it deals with appeals to the Board concerning grievances.  Hold on.  Let me get there. So if we go back to page 71 of that handout, under 403.0201, it deals with faculty grievances and appeals.  And it defines a grievance as a claim by an employee that there has been a violation, misinterpretation or misapplication of rule, policy,

or procedure, in relation to personnel policies, including working hours, working conditions, leaves, promotion, and other conditions of employment.

Then if you look on the next page, it says that's those grievances related to leaves, promotions, or working conditions are not appealable to the Board. The decision of the institutional executive officer is final and binding.

So as it relates to your ability to appeal to the Board for denial of your paid time off leave, you would agree that that decision at the institutional level would be final. Is that correct?

A. I didn't appeal to the IHL, I don't think. I am not really familiar with this document.

Q. Okay.

A. Is this, like, in reference to whether my position was eliminated and that I was demoted to faculty tenured position? And I didn't appeal that. I just tried to work with Dr. Griggs to repair that.

Q. Okay. Now, you stated earlier that you did not know whether or not you filed a grievance, a formal grievance form, after Molly Brasfield provided you with information to do that. Isn't that correct?

A. Yeah. I was pretty damn distraught about this whole thing.

Q.   And I have not -- I have reviewed the documents you have produced in this lawsuit, and you have not produced any records or any documents that indicate that a formal appeal or grievance was ever filed as it relates to your request for paid time off or anything else about your separation from UMMC.  And I have --

A.   I have hit a lot of brick walls there.

Q.   And I do not see that UMMC ever received a formal grievance that was filed by you related to your separation, denial of transfer, or a denial for PTO.  You would have no reason to believe that such document exists if you have not produced it and UMC has not produced it.  Isn't that correct?

A.   Again, I really don't know.  I was -- I was cut off from my laptop.  I couldn't access UMC resources.  I was pretty distraught.  I couldn't communicate with anyone.

Q.   And you don't have memory of doing that, do you?

A.   No, I don't have a memory of doing it or not doing it.

Q.   Okay.

A.   I do have a memory of feeling incredibly frustrated that every time I tried to get help within

UMC, It fell upon deaf ears, and it was kind of like HR doesn't -- it didn't appear to me that they were interested in being of any help to faculty. So any time I returned to them, it never really helped.

Q. In your responses to interrogatories, which are Exhibit 4, you identify, under response to number 10, employers that you state that you have sought employment from since you have left UMMC.

A. That's not the way it's worded, I don't think.

Q. Okay.

A. What number is it?

Q. Ten. It states, "Please identify each employer, entity or company with whom you have sought employment or by whom you have had contact concerning employment since your separation from employment with defendant."

A. Okay.

Q. So you identify a Small Business Development Center --

A. Uh-huh.

Q. -- Southern Oregon University --

A. Uh-huh.

Q. -- in Medford Oregon, Oregon Health Sciences Center School of Nursing, Ashland campus, Southern

she was my assistant when I was the director of research and education IT.  So, basically, she was -- she was in a position to see everything that suddenly came down on me in a really weird way.  And she also is -- she's the assistant for Dr. Didlake.  So she was a good hire.  You know, I had -- I had really good people.  I had such good people.  I had such an awesome team.  And I had people from my team contact me since and say, "If you ever get anything going, I'll work for you again."

Q.   Well, good.  Good.

A.   I loved my team.  They were -- it was getting a lot done.  It's was fun.

Q.   What about Carol Denton?

A.   Carol Denton was the director of Compliance, and she was the one that we were supposed to go to about harassment violation, whom I reached out to her for help about this whole Showalter debacle, plus all my server data and all that sort of stuff getting taken and ruined, and my research destroyed.

Q.   That would have been the 2012 issue or complaint that we talked about earlier?

A.   Yeah.  But I reached out to them again later, still needing help, at -- in a later year.  And then she was also on committees with me while I was

establishing the enterprise data warehouse for the University because she was Compliance. And so, you know, we had a working group. But, mainly, she -- I was needing her help with harassment, but...

Q. What about Dr. James Wilson?

A. James Wilson, he was -- he came in to help Dr. John Hall in research. It was John Hall at that time, before Richard Summers, as the associate vice chancellor of Research. And Jim Wilson came in working with him, and Jim came over, would have a weekly meeting with me because I was setting up research informatics for the institution, and he was really excited about everything that was happening, and he was reporting back to John Hall. And then one day, he sat down and he's like -- he just was like -- said something like you're so -- I don't know, you're so smart but -- and you're getting so much done, but Dr. Hall says that you're doing too much, and then they just dismantled my position and gave it to the men.

Q. That was when you were at DIS?

A. Uh-huh.

Q. Okay. Now, what are you seeking as far as damages in this lawsuit?

A. What I've noticed is that the -- you know, I

always -- I was willing to finish one year at that higher salary. That one year is so critical because our retirement is based on our four highest years. And I -- when I started at UMC, they taught us that in orientation, that you can work your way up here, and you can transfer laterally and change different positions, and you -- there's all kinds of things that can be done at UMC. So I thought that was an opportunity. But they also told us that your retirement is based on your four highest years. And I thought -- well, first of all, I didn't really know that I was going to be staying that long, but it's also good to -- you know, I was starting at a senior secretary II. I wasn't really planning to stay. But every time I thought, well, I probably should leave, I'd get promoted.

Q. Okay.

A. And I would have a fabulously interesting -- as I got into the networking and the IT stuff, I was just -- it was so wonderful because I got to build it. I got to build it all. I got to do every part of it.

Q. Let me -- I'm trying to just keep us back on the --

A. Sorry.

Q. -- damages.

A.    Oh, okay.

Q.    What were you seeking -- it's been a long day.  I understand.  But what are you seeking as far as damages in this lawsuit?

A.    Well, I've also met with Social Security and seen how that's affecting -- it's affecting Social Security.  I'm not getting Social Security yet but, you know, it's based on your earnings record.  And my life expectancy is something like 86, although I'm going for 100.  But I notice that my monthly -- I make it.  I pay my mortgage.  I have old cars, but I -- you know, I don't know.  I was able to -- I'm a saver, so I took advantage of the plans that UMC offered, which is 403(b) and 457, the deferred comp.  Even though I only made $8.59 an hour, I started putting that little teeny tiny bit in there, which it really does, you know, make a difference over time.  And so I was being cut off.  I was no longer able to contribute to my retirement plans.  You can only do that when you're employed.  So any earnings of that would have -- it was arrested.

And then, of course, my wages were withheld, and I could have -- you know, I would have liked to have -- I'm just 57.  I'm a young 57.  And, I mean, I just am only a few days of 57, and I was -- not only

Q.    Okay.  Now, you also claimed that you were denied due process.

A.    Uh-huh.

Q.    What do you base your claim on for that?

MS. BASS:  Object to form.

A.    So I didn't have any -- I hadn't done anything wrong.  I didn't have any disciplinary action.  I saw the people who had disciplinary action.  It was quite a process.  In fact, I had to do it with an employee once, and I didn't -- first of all, I didn't, you know, I didn't do anything wrong.  Second of all, I didn't have any disciplinary action.  Third of all, I got the door slammed without the ability to even finish what I started.

BY MS. TAYLOR:

Q.    You don't know --

A.    What if I would have completed my contract year?  I had no intention of -- oh, and the other thing is that you asked me about open positions.  When I had to fill out the online thing of termination, it was -- I even -- even then, I gave sufficient -- I gave notice, even though I didn't get paid for that whole time, but it was -- I'm now -- I'm never allowed to work at UMC again.

Q.    Okay.  Why do you say you're never allowed to

work at UMC again?

A.    That's what the online form told me.

Q.    Because you didn't give notice?

A.    I did get -- I was -- I think I was a day short on the notice.  But at that point, I was so devastated, and I was so frustrated, and I didn't have any money, and I had bills, and I had a family, and I had no choice but to get PERS to get started as soon as I could.

Q.    Okay.  And so you resigned from your position and retired to get the PERS?

MS. BASS:  Object to the form.

A.    I had to have income.  I had been totally cut off, sucked out of my account, and nobody would approve my leave.

BY MS. TAYLOR:

Q.    Okay.

A.    And I can -- I can tell you, I've been around a long time and I know many people, nobody has ever seen anything like this happen to a man.  They seem to get due process even when they screw the system.

Q.    But you testified earlier you're not aware of any man that has moved out of state, isn't that correct, in the School of Dentistry?

A.    Of the School of Dentistry.  But, yes, I know

of others, yes, in other -- in all the other schools who are able to work remotely. And especially now, it's kind of so interesting now that all those little people like me that didn't have a good home, like Fazlay Faruque, like the little biostatisticians that were holed up in little departments, they're all now -- they all now have a home. They have a home, which is amazing and great. But didn't matter if there was a home for me because Dr. Felton wouldn't let me go home.

Q. **Is there anything else that you think that I need to know about your claims or what you're claiming in this lawsuit?**

A. Not that I can think of right now.

MS. TAYLOR: Okay. Those are all the questions I have.

MS. BASS: No questions.

MS. TAYLOR: Thank you, Dr. Krause.

(Whereupon the deposition was concluded at 6:03 p.m., the same day.)

CERTIFICATE OF COURT REPORTER

I, Catherine M. White, CSR, and Notary Public in and for the County of Rankin, State of Mississippi, hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision and to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer the questions in this matter under the power vested in me by the State of Mississippi. I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal this the 18th day of May, 2021.

_____
CATHERINE M. WHITE, CSR No. 1309

My Commission Expires:
February 1, 2022