**In the Matter of:**

# DENISE D. KRAUSE

# V.

# UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

*KRAUSE, DENISE D.*

*May 25, 2021*



844.533.DEPO

EXHIBIT

**G**

A.    Well, yes.  I mean, he was -- he was given a license agreement.  He was supported by the university, and he was allowed to create his companies and pursue building out his platform. And he was promoted, and he is now the chair of the Data Sciences Department in the School of Population Health.  He's still doing what he does, and he's still there.  And so there's quite a lot of differences.

Q.    Okay.  So he is still employed by the university?

A.    Yes.

Q.    Okay.  So we had produced some e-mail communications as it relates to your -- your licensing process with the university, so I would just like to draw your attention to that, just so we can confirm the timeline.

It appears that, based on the e-mail communication, that in May of 2016, you began to communicate -- or at least you and your attorney, Wilson Carroll, began to communicate with UMMC Associate General Counsel Susan Shands as it relates to your licensing process for that Mississippi Mapper platform.  Does that sound correct to you?

A.    That sounds about right.  Probably.

Q.    Okay.  And it looks to me like, based on the e-mail communication, that there was e-mail communication on May 13th of 2016 following a telephone call that your attorney had with Susan Shands; is that correct?  Does that sound about right?

A.    Maybe.  I don't -- I don't know the dates exactly.

Q.    About how many times did you speak with Susan Shands Jones directly related to the licensing process?

A.    Well, we went back and forth about it quite a few times; but it was usually all three of us, you know, Wilson Carroll and me and Susan --

Q.    Okay.

A.    -- and drafts going back and forth and...

Q.    Okay.  And do you -- do you remember Susan Shands Jones letting you know that the committee had determined that your work was produced while you were employed at UMMC and therefore, it would be -- you would need to file a Record of Invention under the patent policy?

A.    I did file a Record of Invention with the patent policy for the patent committee.

Q.   Okay.  But you remember --

A.   Some of the work was done with UMMC. Some of it was done on my own time, because it started in my student project, that had nothing to do with my job.  But -- but some of it was done definitely with UMMC time.

Q.   But you do remember being told that you would need to file a Record of Invention, correct?

A.   Yes.

MS. TAYLOR:  I'm going to -- let's go ahead and publish Document Number 4.

COURT REPORTER:  Okay.  Adam will be pulling that up for you.

MS. TAYLOR:  Okay.

BY MS. TAYLOR:

Q.   Dr. Krause, I want to draw your attention to this e-mail communication dated November 29th of 2016, and it's from Wilson Carroll to Susan Shands, Cari Fowler, Richard Summers, and Tammy Barnett, and you are copied on that e-mail.

Is it correct that Wilson Carroll represented you in your communications related to the licensing agreement with UMMC?

A.   Yes.

Q.   And it appears, at least on this date, he

forwarded a copy of that licensing agreement to UMMC for their review; is that correct?

A.    It looks like he attached a revised version; but the actual version was originated by UMC and Susan Shands.

Q.    So this is one of the negotiated drafts; is that right?

A.    Right.

Q.    And did UMMC allow you to make revisions to the licensing agreement so that it could be negotiated between you and UMMC?

A.    They allowed for edits to the draft, yes, which -- because the draft was sort of a boilerplate that was rough, so they were working out the -- you know, the language.

Q.    Okay.  And you were allowed to have input as it relates to the royalties that we discussed earlier; isn't that right?

A.    I don't believe that was on the table.  I think UMC stated what they would want.  We didn't negotiate that.

Q.    The 2.5 percent royalty?

A.    Uh-huh.

Q.    Now, you did negotiate whether or not UMMC would be permitted to use the mapping platform

software without cost; isn't that right?

A.    Can you rephrase -- rephrase the question, please?

Q.    Meaning during your negotiation with UMMC, it was your desire to have UMMC pay you for the use of the Mississippi Mapping software; isn't that correct?

A.    I don't know if that was even in the licensing agreement.  The patent -- Dr. Summers or the patent committee told me that I would be responsible for funding it, I wouldn't be getting funding support, so I would have to figure out how to do that through contracts or whatever way to fund it.  So I couldn't, like, exactly give the entire thing away for free, because I had no way to build it.

Q.    Well, I just want to make sure that I understand your testimony.  Isn't it correct that your revisions to the licensing agreement was that UMMC would have to pay you in order to use the Mississippi Mapping software?

A.    I don't know.  I don't remember that part of the license agreement.  I do remember that they were going to get some amount for free and then after that, would need -- would hopefully be able

to pay something for it, because you can't develop it without any funding.

Q.    Let's go ahead and we'll skip forward. So according to the documents, it appears that a draft of that licensing agreement was sent on November 29th of 2016.

MS. TAYLOR:    Let's go ahead and move, Adam, to Exhibit Number 7.

COURT REPORTER:    Ms. Taylor, did you want to mark that -- attach that as Exhibit Number 4 to this transcript?

MS. TAYLOR:    Yes.    And we can -- I guess we can use -- I have them numbered by how they were numbered when they -- the link was provided to you, so...

COURT REPORTER:    I can number them however you like.    I can call that Exhibit 1 to this transcript if you want.

MS. TAYLOR:    Okay.    That sounds great.

COURT REPORTER:    Okay.

(Exhibit 1 was marked.)

BY MS. TAYLOR:

Q.    Now, in here, what is -- we'll mark it as Exhibit 2, it appears to be an e-mail communication between Susan Shands and you related to the notes

that she had from reviewing the draft of the license agreement that was provided by your attorney, and she indicates that -- that you want the license to apply to the base product only so that you will get the funds for the improvements and customization, and she indicates that, "We want the license for the main product and improvements."

Do you remember there being discussion about what the license would be for, whether it would be for only the base product or whether it would be for any improvements?

(Exhibit 2 was marked.)

A.   I think that they were trying to figure that out; but in the end, I remember Susan saying that it was for the base product only, according to Richard Summers.

BY MS. TAYLOR:

Q.   Okay. And if you look in Number 2, it appears that there was a difference of opinion related to the use by UMMC researchers, and she indicates that you proposed that UMMC folks paying direct cost of labor and services and overhead rather than free, and that's paragraph 2.1. She says, "Traditionally, the committee wants the licensed work to be available for free for academic

work at UMMC." And she says she recognizes that this situation is different, but proposed ten to 15 free licenses for users.

Does that help refresh your recollection that there was a discussion about whether or not the Mississippi Mapper platform would be provided to UMMC for free or whether there would be a cost?

A. Yes.

Q. It also appears that there were some changes made to the reporting process changing the reporting dates and also the payments from 90 days to 30 days, and she indicates that UMMC would agree to that; is that correct?

A. I think it was actually from 30 days to 90 days.

Q. That's correct. So it made it longer --

A. Right.

Q. -- in time for you to not only report, but also to pay any royalties; is that correct?

A. That looks correct, although this isn't the final; so I'm not sure how it ever ended up.

Q. Okay. At least at this time, this is where y'all were in negotiation; is that right?

A. Yes.

Q. And she also asked a question. It

doesn't look like the infringement issue is resolved. It's just a point of discussion. And she said -- she asked if these costs would be reimbursed. And then she also, under Number 5, indicates that they agree with the changes that Wilson Carroll made as it related to the assignment; is that correct?

A. Yes, it looks like it.

Q. And that's dated December 15th of 2016.

And then it appears that in January of 2017, there is additional communication related to the licensing agreement between you and Susan Shands, beginning on January 13th, requesting a call.

MS. TAYLOR: If we can look at Document Number 8?

BY MS. TAYLOR:

Q. Now, based on this e-mail, it appears that Susan Shands is letting you know that she wants to have -- or that she would prefer to have Cari on the line when y'all discuss the licensing agreement, and she indicates that there was a deadline for the February board.

Were you familiar with what the typical licensing process is for the patent committee?

your question.

MS. TAYLOR:  Okay.  I think we might be having some...

COURT REPORTER:  Can we go off the record just one second, please?

MS. TAYLOR:  Sure.

(Off the record.)

MS. TAYLOR:  Let's go to the first page of this document.  That's good.  Stop there.

BY MS. TAYLOR:

Q.    Now, Dr. Krause, if you'll look midway down this page, it indicates that you were under the Action Items Agenda for that patent committee meeting on January 31st of 2017.  And it indicates that -- your licensing agreement to Health Data Analytics for State Health Mapper Status: Licensing agreement for review and approval. Copyright application to be filed.

Tell me, what is Health Data Analytics?

A.    That is the -- my LLC, personal company.

Q.    Okay.

A.    Robert Hester has got one or more, but I think one of them is, like, HCC Simulations.  So they license to the company and then I guess a --

an exclusive license to an LLC.

Q.   Okay.  So it appears, at least on January 31st of 2017, that a licensing agreement was going to be reviewed by the patent committee; isn't that right?

A.   Yes, looks like it.

MS. TAYLOR:  Let's go to UMMC-001954.  It's part of the -- Adam, this might be helpful:  If you look at the bottom of the page, there's a Bates number, and so it would be Document 10.

Just one second.

Actually, you know, I'll -- let's do this.  We'll go to the next exhibit.  So Exhibit 4 was -- it was the agenda for the patent committee for January 31st of 2017.  If we could look at Document Number 11.  Adam, if we could pull that up, we'll mark that as Exhibit 5.

(Exhibit 5 was marked.)

BY MS. TAYLOR:

Q.   This is dated Monday, February 6th of 2016.  It appears to be an e-mail from Susan Shands to you, Denise Krause, and your attorney, Wilson Carroll.  And it indicates that it is the

licensing agreement with the comments from the patent committee for you to review.

Do you remember receiving a draft of the licensing agreement with the patent committee's feedback on it after you met with the patent committee?

A.   Oh, I don't specifically remember that; but there was a lot of back and forth, so I didn't see it if it probably did.

Q.   Now, in February of 2017, you were -- had you -- had you decided to move to Oregon at that point?

A.   In February of '17 -- I had decided to move to Oregon a long time ago; I just didn't exactly know when.

Q.   Okay.  Okay.  Have you -- as of February of 2017, had you intended to enroll your son in school in Oregon for the upcoming school year?

A.   I'm not sure exactly when I made that decision.  I know I'd been thinking about it for quite some time --

Q.   Okay.

A.   -- about what to do with him when he went from -- you know, into middle school.

Q.   Okay.

MS. TAYLOR:  Let's go to -- it would be page 3 of the licensing agreement that's attached to this e-mail.  If we could go down just a bit so that we can see Article 2. Thank you.

BY MS. TAYLOR:

Q.   So Dr. Krause, it appears that the -- that the changes or the draft of the licensing agreement that the patent committee reviewed and provided comment on indicated that you, the licensee, would provide UMMC with the use of two Mississippi Mappers for no cost and royalty fee, and then it indicates the location of both of those.  Was that your understanding of what the patent committee was willing to do as far as a licensing agreement at that time?

A.   I didn't remember the details, but yeah, it looks like that's where it ended up.

Q.   And then it also indicates that the licenses for the base product would be available to UMMC faculty, staff, for direct cost of labor, services, and applicable overhead, correct?

A.   Yeah.  What does that mean exactly?  I don't even really quite know what that means.

Q.   Okay.  But as far as your discussions as

-- with the licensing agreement, you understood that UMMC would only receive two -- the use of two Mississippi Mapper applications at no cost; isn't that right?

A. Well, you know, it's really confusing the way this is written, because the -- because it's a mapper, it is a very big, broad framework. And so I'm not sure if we're talking about -- it seems like a lot of times, they think we're talking about the physician workforce tool. So I am not even clear, looking at this now, what that means, "to provide UMMC the use of two Mississippi Mappers for no cost and royalty fee," which, you know, as long as that's clarified, just -- what does it mean to say, "Product will be available for the direct cost of labor, support, and applicable overhead"?

I don't -- I don't know what that -- so the -- the question for me in this whole thing is that I'm trying to figure out how to fund it, because UMC's not going to give me any resources. The only resources I had ever, you know, gotten for it was from OMPW, but nothing from UMC. And I'm still not going to, with the license agreement, so I have to figure out how to fund it.

Q. Okay. So, Dr. Krause, just to be clear,

as of February 6th of 2017, you understood that the licensing or patent committee was willing to enter into a licensing agreement where UMMC would have use of two applications at no cost; isn't that right? That was your understanding at that point?

A.   Yeah.

Q.   Okay.  Isn't it correct that in Dr. Hester's licensing agreement, he provided UMMC with a free use of the license technology, including for all staff and faculty and researchers?

A.   Yeah, I think so; but it's only specifically for physiology, so that's not very many licenses that would be using it.

Q.   So according to Dr. Hester's licensing agreement, UMMC would have a non-transferable royalty-free right to use the license technology in the field, including use by its faculty, staff, and researchers, including all UMMC schools, UMMC pharmacy schools, clinical sites, and educational and research purposes only; isn't that correct?  So according to his licensing agreement, UMMC would not have to pay for the use of that license technology; isn't that right?

A.   If that's what his license agreement

says, that sounds like that would be right, although most of those areas don't use that targeted software. And I think he also had support from UMC in developing it.

MS. TAYLOR: Let's go to -- it's UMMC-1874.

BY MS. TAYLOR:

Q. If you'll look under Section 3.2, it indicates -- it says the licensee shall pay UMMC a royalty of 2.5 percent of net sales of the base product sold for commercial use. And that's consistent with your testimony earlier, that under the licensing agreement proposal, that you would be -- you would have to pay 2.5 percent royalty; isn't that right?

A. Yes.

Q. Okay. And so as of February 6th of 2017, you understood that the patent committee was willing to propose a licensing agreement that included that 2.5 percent of net sales; isn't that right?

A. Yeah, I think that was what was agreed on.

Q. Now, in Dr. Hester's licensing agreement, he paid much more than that; isn't that correct?

He paid 5 percent of net sales and royalties; isn't that right?

A.    I don't know.

Q.    But you would have no reason to dispute that if that was what Dr. Hester's licensing agreement says; isn't that right?

MS. BASS:  Object to the form.

A.    Right.  What -- what I know is that Susan Shands said we were fashioning this upon Dr. Hester's, so I assume it's about that.

BY MS. TAYLOR:

Q.    But if Dr. -- if Dr. Hester's licensing agreement had double the royalty percentage as yours, you would have no reason to dispute that, correct?

MS. BASS:  Object to the form.  She doesn't have a copy of it in front of her, and she's being asked to speculate about something she has no knowledge of.

MS. TAYLOR:  Adam, I'd like for us to pull up Dr. Hester's agreement.

BY MS. TAYLOR:

Q.    Dr. Krause, if you see -- if you look here, this appears to be the licensing agreement between UMMC Medical Center Research Development

Foundation and HC Simulation, LLC.

MS. TAYLOR:  If we could go to page 7 of this document.

BY MS. TAYLOR:

Q.  Dr. Krause, if you look under Royalties section of this document, it indicates that the licensee shall pay UMMC a royalty of 5 percent of net sales for all products sold for commercial use.

So if UMMC's agreement with Dr. Hester is that he was -- that his company would have to pay 5 percent in royalties, that would be double of what the patent committee was willing to offer you in a licensing agreement; isn't that correct?

A.  Yes.

Q.  If we go down to 3.3, Dr. Krause, if we look, you earlier testified that you asked the -- the patent committee to allow 90 days for reporting instead of 30; isn't that correct?

A.  Yeah.  That came from my attorney.

Q.  And as you can see here, for Dr. Hester's licensing agreement, he was required to pay his royalties 30 days after the last day of the calendar year; isn't that correct?

A.  Yeah.

Q.  So --

A.    We could do 30 if we wanted to.    It didn't -- that seems a little bit kind of unimportant, 30 or 90.    I don't know.

Q.    But --

A.    Usually things moved slower at UMC, but...

Q.    But you would agree that the licensing committee or the patent committee was willing to give you 90 days in order to pay that?    They were willing to give you a longer period of time in order to make the royalty payments and the reporting than what they agreed to with Dr. Hester; isn't that correct?

A.    Yeah.    And I think this agreement is about five years earlier.

Q.    So Dr. Hester's agreement was about five years earlier?

A.    Yeah, I think so.

Q.    Do you know if it was a different patent committee that reviewed Dr. Hester's licensing agreement?

A.    There wasn't a patent committee during that time.    So all these processes were just -- I think his -- his was the first one to be done like this.    I'm not sure exactly when the patent

committee was formed, but it was fairly new at that point. I don't even know if it still exists or if it's something different now, but it was kind of just evolving as --

Q. So --

A. -- we had to deal with, you know, things like this.

Q. So you would agree that his situation was perhaps different from yours as you were going through the patent committee process?

A. I think --

MS. BASS: Object to the form.

A. Yeah, I think his situation was similar. I think that the UMC process was, you know, evolving.

MS. TAYLOR: Let's go to the next page, please. Actually, go to page 9.

BY MS. TAYLOR:

Q. So this is Dr. Hester's licensing agreement where he gives equity to the Medical Center Research Development Foundation of 5 percent of his company or of the -- I'm sorry, 5 percent of the membership interest in the licensee, the company that he formed.

In your agreement, you did not -- you

did not give any equity to UMMC or the Medical Center Research Development Foundation in the Mississippi Mapping license; isn't that correct?

A.    I don't know if the Medical Center Research Development Foundation actually even existed anymore.  I -- I wasn't familiar with that group or term or whatever.

Q.    But you would agree that as part of the licensing agreement that the patent committee was willing to offer you, that you were not required to give the university any equity in your Health Data Analytics company; is that right?

A.    I'm not sure.  I guess that would be specified in the license agreement.

Q.    Okay.

MS. TAYLOR:  Let's go --

A.    I think that I also saw up there that he had a cap on royalties, but -- which I don't believe that I have.

MS. TAYLOR:  Let's do this, Adam, so we don't have to go back and forth between the two documents, let's stay with Dr. Hester's agreement for a moment.

BY MS. TAYLOR:

Q.    Now, Dr. Krause, you were not required to

submit a business plan as part of your license agreement, or meet certain sales quotas in order to maintain your license; isn't that correct?

A.    I don't think there was a business plan, but I'm not sure about the sales quotas.

Q.    Okay.

MS. TAYLOR:   If we go to page 19 of this agreement.  Yeah, 9.3.

BY MS. TAYLOR:

Q.    Dr. Krause, Dr. Hester was required to submit a business plan that was acceptable to UMMC as part of being licensed for his invention; isn't that correct?

A.    Yeah, looks like it.

Q.    And according to his licensing agreement, UMMC could terminate the agreement if he failed to meet the preestablished developmental milestones contained in that development plan; isn't that right?

A.    I don't know.  Does it say that here?

Q.    If you look on the third line, it says, "UMMC shall be entitled to terminate this agreement if licensee fails to meet the preestablished development milestones contained in the development plan."

A.    Okay.

Q.    Isn't that correct?

A.    That's what it says.

Q.    And the agreement that the patent committee was willing to offer you did not contain a requirement --

A.    Hang on.  I'm sorry.  Hold on just one second.

(Interruption.)

THE WITNESS:  Sorry.  I gotta take my child to school.

BY MS. TAYLOR:

Q.    Okay.

A.    What was the question?

Q.    The agreement that the patent committee was willing to offer you did not require you to submit a business plan; isn't that correct?

A.    It didn't require a business plan as such, no.  I mean, not called a business plan, but it may have been terms in the license agreement.

Q.    And we'll get there.  We'll get there.

It also did not require you to -- the termination of the license agreement if you didn't meet certain milestones; isn't that correct?

A.    I'm not sure.  I don't know.  I feel like

the patent committee proposed to you versus the agreement that Dr. Hester entered into with the patent agreement, and I believe we were talking about the equity, that Dr. Hester was required to give 5 percent equity in his company to UMMC; however, in your agreement that the patent committee forwarded to you on February 6th of 2017, there was no requirement that you provide any equity to UMMC in your Health Data Analytics company; isn't that right?

A.   I'm not sure how it is in my contract or my license agreement.

Q.   Okay.

MS. TAYLOR:   Let's go ahead and go back and pull up Exhibit 11.

COURT REPORTER:   That's Exhibit Number 5, Adam.

MS. TAYLOR:   Thank you.

BY MS. TAYLOR:

Q.   And I'm going to try to shortcut this because we are limited on time.  I'm going to represent to you that in the licensing agreement that Susan Shands sent to you on February 6th of 2017, there is no requirement that you give any equity to UMMC in your company.  Based on that

representation, would you agree that Dr. Hester was treated differently in that he was required to give equity in his company to UMMC as part of his licensing agreement?

A.    I don't know what those -- what that decision was based on.  I do know that his agreement was about, you know, five years earlier, so -- and I'm not really sure, you know, anything about how that was structured or how it is now.  I know it was an evolving process with UMC, so...

Q.    Now, as of February 6th of 2017, after you had gone through the patent committee process and been provided with the draft of the licensing agreement that the patent committee would approve, you never reached out and contacted Susan Shands or anyone on the licensing committee in order to move forward with the licensing agreement; isn't that correct?

A.    No, I don't know that that's correct.

Q.    In fact, in none of the documents you have produced do you indicate that you made any effort to follow up on the licensing agreement that you were given in February '17; isn't that correct?

A.    I don't believe that's correct, either.

Q.    And in fact, shortly after February

of 2017, you fired your attorney, Carroll Wilson, in your domestic relations matter; isn't that right?

A.    I'm sorry.  Could you state that again? I just didn't even follow that.

Q.    Shortly after February of 2017, you fired Carroll Wilson -- or Wilson Carroll from representing you in your domestic relations matter; isn't that right?

A.    I'm not sure when I discontinued his services on that matter, which was a different, separate matter.

Q.    In fact, you were upset with how Carroll Wilson represented you in your domestic relations matter; isn't that right?

MS. BASS:  Robin --

A.    No --

MS. BASS:  -- I'm going to -- Dr. Krause, wait a minute.

I'm going to instruct her not to answer. This deposition was reopened for the limited purpose of her licensing software, and that's irrelevant to this issue.

MS. TAYLOR:  So I would disagree, Lilli, only because the same attorney represented

Dr. Krause in both the intellectual property matter and in her domestic relations matter, and I think that it speaks to the fact that there was no though effort made on behalf of Dr. Krause or Wilson Carroll to proceed with the licensing agreement after she terminated him from representing her in the domestic relations agreement.

MS. BASS: And if you want to -- I'm not going to object to you asking her anything about when she fired Wilson Carroll related to this intellectual property matter or whether or not he contacted anyone or she contacted anyone. But I am going to object to any questions about a domestic relations matter or her representation in it.

BY MS. TAYLOR:

Q. So, Dr. Krause, you agree that Wilson Carroll represented you as it relates to your negotiations with UMMC and your licensing agreement, correct?

A. Yes.

Q. And you agree that Wilson Carroll represented you as it relates to your custody proceeding over your son; isn't that correct?

CERTIFICATE OF COURT REPORTER

I, Kati Vogt, RPR, RMR, CRR, RDR, Court Reporter and Notary Public, in and for the County of Jackson, State of Mississippi, hereby certify that the foregoing 50 pages, and including this page, contain a true and correct transcript of the testimony of DENISE D. KRAUSE, as taken by me at the time heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision, to the best of my skill and ability.  Any audio gaps, indiscernibles, or unintelligibles that occur in the transcript are a result of the poor telephonic/video connection.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the 8th day of June, 2021.

_____
Kati Vogt, RPR, RMR, CRR, RDR
My Commission Expires January 4, 2022

EXHIBIT

Krause -5

exhibitsticker.com

| From: | Susan Shands <sshands@umc.edu> |
|---|---|
| Sent: | Monday, February 6, 2017 1:55 PM |
| To: | Denise Krause; Wilson Carroll |
| Cc: | Leslie A. Musshafen; Tammy Barnett |
| Subject: | FW: UMMC License Agreement_Krause - FINAL REVISIONS |
| Attachments: | UMMC License Agreement_Krause - FINAL REVISIONS.doc; UMMC License Agreement_Krause.doc |

Here is the License Agreement with the comments from the Patent Committee for your review.

Susan


Susan Shands Jones
Associate General Counsel
Office of General Counsel
University of Mississippi Medical Center
2500 North State Street Jackson, MS 39216
T:601-984-1031 F:601-984-1997
sshands@umc.edu
ummchealth.com


CONFIDENTIALITY NOTE: This e-mail and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify the sender immediately by reply and delete this copy and the reply from your system.
Thank you for your cooperation.

CIRCULAR 230 DISCLOSURE: Pursuant to treasury guidelines, any federal tax advice contained in this communication or any attachment, does not constitute a formal tax opinion. Accordingly any federal tax advice contained in this communication, or any attachment is not intended or written to be used, and cannot be used by you or any recipient for the purpose of avoiding penalties that may be asserted by the Internal Revenue Service.

1

UMMC-001870

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT is made as of this _____ ("Effective Date") by and between the UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, an educational institution with a principal address at 2500 North State Street, Jackson, Mississippi 39206 ("UMMC") and Health Data Analytics, LLC, a limited liability company organized and existing under the laws of Mississippi with a principal address at 4107 Hawthorne Drive, Jackson, MS 39211 ("Licensee")

## RECITALS

WHEREAS, UMMC is the owner of certain copyright applications and other technology related to Mississippi Mapper web application developed using geographic information systems (GIS) and JavaScript.

WHEREAS, Licensee wishes to acquire certain rights and licenses with respect to UMMC# _____ in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and intending to be legally bound herby, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1    Unless otherwise provided in this Agreement, the following terms when used with initial capital letters shall have the meanings set forth below:

"Affiliate" means, when used with reference to Licensee, any person directly or indirectly controlling, controlled by or under common control with Licensee.

"Bankruptcy Event" means the person in question becomes insolvent, or voluntary or involuntary proceedings by or against such person are instituted in bankruptcy or under any insolvency law, or a receiver or custodian is appointed for such person, or proceedings are instituted by or against such person for corporate dissolution of such person, which proceedings, if involuntary, shall not have been dismissed within sixty (60) days after the date of filing, or such person makes an assignment for the benefit of creditors, or substantially all of the assets of such person are seized or attached and not released within sixty (60) days thereafter.

"Base Product" means the Mississippi Mapper application framework. This does not include underlying data. Improvements will be made to the Base Product over time.

"Calendar Quarter" means each three-month period, or any portion thereof, beginning on January 1, April 1, July 1 and October 1.

"Confidential Information" means (i) the Technical Information, (ii) any other information or material in tangible form that is marked as confidential or proprietary by the furnishing party at the time it is delivered to the receiving party, and (iii) information that is furnished orally if the furnishing party identifies such information as confidential or proprietary when it is disclosed and promptly confirms such

1

UMMC-001871

designation in writing after such disclosure.

"Custom" or "Customization" means alterations or enhancements made to the Base Product to develop a specially designed custom application for a client. Custom applications are not a part of the Base Product.

"Effective Date" shall have the meaning set forth on page 1 of this Agreement.

"Federal Government Interest" [IF APPLICABLE] means the rights of the United States Government and agencies thereof under Public Laws 96_517, 97_256 and 98_620, codified at 35 U.S.C.§§ 200-212, and any regulations issued there under, as such statute or regulations may be amended from time to time hereafter.

"Field" means software development.

"Fiscal Year" means each twelve-month period, or any portion thereof, beginning on July 1.

"Gross Sales and Income" means the gross amount charged by Licensee for the Mississippi Mapper Product. If the Product is sold for consideration other than solely cash, the fair market value of such other consideration shall be included in the Gross Sales Price.

"Net Sales" means Gross Sales plus Sublicensing Revenue less the following,

     i.     Value added, excise and any other taxes and/or duties and

     ii.    Returns (including without limitation spoiled, damaged, outdated and defective goods), allowances, discounts, and adjustments credited to customers and

     iii.   Commissions or fees paid to independent sales representatives, brokers, dealers, or distributors, and

     iv.   Shipping and handling costs if not paid for by the customer, and

     v.    Allocated costs for sales samples of Products, for all Products sold or commercially used by Licensee or its Affiliates.

     vi.   Licensee's documented costs of customization, development, and/or improvement related to the sale in question.

In any case where the price of the Product is not separately stated on licensee's invoice, Net Sales means Licensee's average selling price for such Product during the period covered by the royalty report.

"Improvements" means any improvement, modification or other refinement, regardless of the patentability thereof to (a) the Mississippi Mapper application, within the scope of the inventions claimed in the copyright, or (b) the development, manufacture, use or sale of which, except for the licenses granted herein, would infringe the copyright. Notwithstanding the foregoing, "Improvements" shall not include modifications or other refinements that are made as Customizations to the Base Product.

"Licensed Technology" means and includes UMMC Know-How, the copyrighted invention and Improvements.

"Copyright Expenses" means all reasonable fees, expenses, and charges of outside counsel related to

2

copyright, listed in Exhibit A currently or added by amendment at a future date, incurred by UMMC in connection with the preparation and filing of the copyright, currently contained or that may be added to Exhibit A; and (b) an administrative fee in the amount of twenty percent (20%) of the amounts pursuant to (a).

"Person" means an individual, partnership, corporation, joint venture, unincorporated association, or other entity, or a government or department of agency thereof.

"Products" means any article or portion thereof which is made, produced, or used in whole or in part, by or with the use of the Licensed Technology.

"Service" means any activity that is provided by the Licensee in exchange for a fee that is provided in whole or in part, by or with the use of the Licensed Technology. [IF APPLICABLE]

"Sublicensing Revenue" means all cash, sublicensing fees, royalties and all other payments and the cash equivalent thereof paid to Licensee by sublicensees of Licensee of its rights hereunder, other than research and development money paid to Licensee to conduct research in the Field.

"Technical Information" means and includes all technical information, trade secrets, developments, discoveries, know-how, methods, techniques, formulae, processes and other information relating to the Licensed Technology that UMMC owns or controls on the date hereof or owns or controls in the future, including by way of illustration and not limitation, designs, data, drawings, documents, models, and other similar information.

"UMMC Know-How" means all information, technical data and assistance, inventions and discoveries of UMMC disclosed or provided to Licensee by UMMC relating to the exploitation of any invention described in the Licensed technology.

## ARTICLE 2
## GRANT OF LICENSE

2.1     Grant of License.  Subject to the terms and conditions contained in this Agreement, UMMC hereby grants to Licensee an exclusive, non-transferrable except as otherwise allowed in this Agreement, worldwide, royalty-bearing right and license to use and practice the Licensed Technology to make, have made, use, and sell Products in the Field. [.]Licensee agrees to provide UMMC the use of two Mississippi Mappers for no cost and royalty fee.  One will be housed in the Office of Research and the other will be placed in the Office of Physician Workforce. Licenses to the Base Product will be available to UMMC faculty, staff and researchers for the direct cost of labor, services, and applicable overhead.

2.2     Right to Sub-license.  Licensee shall have the right to sub-license to any third party, in whole or in part, its rights under this Agreement with written permission of UMMC, such permission to will not be unreasonably withheld.   As a condition of granting sub-licenses, Licensee will provide UMMC with full and complete copies of all contracts and agreements between it and any sub-licensee within ten (10) business days after execution of same.  UMMC will maintain such copies and their terms in confidence as required in Article 8.  A grant of a sub-license will be invalid if any agreement between Licensee and such sub-licensee prohibits, restricts or conditions Licensee's provision of such copies to UMMC as required in this article.

3

2.3    No Rights by Implication. No rights or licenses with respect to the Licensed Technology are granted or deemed granted hereunder or in connection herewith, other than those rights or licenses expressly granted in this Agreement.

## ARTICLE 3
## LICENSING FEES AND EQUITY

3.1    Upfront and Milestone Payments. In consideration of the license granted hereunder, Licensee shall pay UMMC the following non-refundable payments:

3.2    Royalties. In further consideration of the rights and licenses granted hereunder, Licensee shall pay UMMC a royalty of two and one-half percent (2.5%) of Net Sales of the Base Product sold for commercial use. No royalty shall be due on Products used for clinical trial or other research or developmental uses, or Customizations.

3.3    Payments. Royalties and other amounts payable under this Agreement shall be paid within ninety (90) days following the last day of the Calendar Quarter in which royalties and other amounts accrue. The last such payment shall be made within ninety (90) days after termination of this Agreement.    Payments shall be deemed paid as of the day on which they are received by UMMC.

3.4    Reports. Licensee shall deliver to UMMC within ninety (90) days after the end of each Fiscal Year following commercial sale of a Product a report setting forth in reasonable detail the calculation of the royalties and other amounts payable to UMMC for such Calendar Quarter pursuant to this Article 4, including, without limitation, the Products sold in each country during such Calendar Quarter, the Net Sales Price thereof, and, within ninety (90) days after the end of each Fiscal Year, similar reports containing corresponding information relating to royalties payable due to sales by permitted sub-licensees pursuant to Article 3.2.    An example of an acceptable royalty report is provided in Appendix B.

3.5    Currency, Place of Payment, Interest.

(a)    All dollar amounts referred to in this Agreement are expressed in United States dollars. All payments to UMMC under this Agreement shall be made in United States dollars (or other legal currency of the United States), as directed by UMMC, by check payable to the University of Mississippi Medical Center" or by wire transfer to an account as UMMC may designate from time to time.

(b)    If Licensee receives revenues from sales of Products in a currency other than United States dollars, royalties shall be based on actual US currency amounts to which foreign revenues are converted.

(c)    Amounts that are not paid when due shall accrue interest-from the due date until paid, at an annual rate equal to the "Prime Rate" plus 5% as published in the "Money Rates" table in the eastern edition of *The Wall Street Journal* as of the due date.

3.6    Records. Licensee will maintain complete and accurate books and records that enable the royalties payable hereunder to be verified. The records for each Fiscal Year shall be maintained for two years after the submission of each report under Article 3.4 hereof. Upon reasonable prior

4

UMMC-001874

notice to Licensee, UMMC and its accountants shall have access to the books and records of Licensee to conduct a review or audit thereof no more than two (2) times per years. Such access shall be available during normal business hours. In the event such audit reveals any error in the computation of Net Sales exceeding 5% of the amount owed, the Licensee shall promptly reimburse UMMC for all reasonable expenses and costs incurred in the conduct of such review or audit.

## ARTICLE 4
## CERTAIN OBLIGATIONS OF LICENSEE

4.1     Licensee Efforts; Reporting.

    (a)     Licensee shall use its reasonable efforts to develop for commercial use and to market this Product as soon as practicable, and to continue to market as long as commercially viable, all as is consistent with sound and reasonable business practice.

    (b)     Licensee shall provide UMMC once per Fiscal Year on July 1 with written reports, setting forth in such detail as UMMC may reasonably request, the progress of the development, evaluation, testing and commercialization of Products. Licensee shall notify UMMC within ninety (90) days of the end of the first quarter in which the first commercial sale of a Product occurs.

4.2     Compliance with Laws. Licensee shall use its best efforts to comply with all prevailing laws, rules and regulations pertaining to the development, testing, manufacture, marketing and import or export of Products. Without limiting the foregoing, Licensee acknowledges that the transfer of certain commodities and technical data is subject to United States laws and regulations controlling the export of such commodities and technical data, including all Export Administration Regulations of the United States Department of Commerce. These laws and regulations, among other things, prohibit or require a license for the export of certain types of technical data to specified countries. Licensee will comply with all United States laws and regulations controlling the export of commodities and technical data.

4.3     Government Approvals. Licensee will be responsible for obtaining, at its cost and expense, all governmental approvals required to commercially market Products.

4.4     Copyright Notices. Licensee shall mark or cause to be marked all Products made or sold in the United States with all applicable copyright notices. If it is not practical for a Product to be so marked, then Licensee shall mark or cause to be marked the package for each Product with all applicable copyright notices.

4.5     Bankruptcy or Equivalent. Licensee will provide written notice to UMMC prior to the filing of a petition in bankruptcy or equivalent if Licensee intends to file a voluntary petition, or, if known by Licensee through statements or letters from a creditor or otherwise, if a third party intends to file an involuntary petition in bankruptcy against Licensee. Notice will be given at least 75 days before the planned filing or, if such notice is not feasible, as soon as Licensee is aware of the planned filing. Licensee's failure to perform this obligation is deemed to be a material pre-petition incurable breach under this Agreement not subject to the 60-day notice requirement of Section 9.2, and UMMC is deemed to have terminated this Agreement forty-five (45) days prior to the filing of the bankruptcy.

5

## ARTICLE 5
## REPRESENTATIONS

5.1    Representations of UMMC. UMMC represents to Licensee as follows:

(a)    this Agreement, when executed and delivered by UMMC, will be the legal, valid and binding obligation of UMMC, enforceable against UMMC in accordance with its terms;

(b)    UMMC subject to certain rights under 37 CFR 401.14 retained by the federal government in inventions resulting from federally supported work is the owner of all right, title and interest in and to the Patents and the Technical Information, and has not granted rights in or to the Licensed Technology to any person other than Licensee;

(c)    UMMC has not received any written notice that the Licensed Technology infringes the proprietary rights of any third party;

(d)    the inventions claimed in the Patents to the knowledge of UMMC have not been publicly used, offered for sale, or disclosed in a printed publication by employees of UMMC more than one year prior to the filing of the U.S. application for the Patents.

5.2    Representations and Warranties of Licensee. Licensee represents and warrants to UMMC as follows:

(a) Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of Mississippi and has all requisite power and authority to execute, deliver and perform this Agreement;

(b) This Agreement, when executed and delivered by Licensee, will be the legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms;

(c) the execution, delivery and performance of this Agreement by Licensee does not conflict with, or constitute a breach or default under,

(i)    the charter documents of Licensee,

(ii)    any law, order, judgment or governmental rule or regulation applicable to Licensee, or

(iii)    any provision of any agreement, contract, commitment or instrument to which Licensee is a party; and the execution, delivery and performance of this Agreement by Licensee does not require the consent, approval or authorization of, or notice, declaration, filing or registration with, any governmental or regulatory authority.

6

UMMC-001876

## ARTICLE 6
## LIABILITY AND INDEMNIFICATION

6.1    No warranties; Limitation on Liability. EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, UMMC MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO: (I) COMMERCIAL UTILITY; OR (II) MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; OR (III) THAT THE USE OF THE LICENSED TECHNOLOGY WILL NOT INFRINGE ANY PATENT, COPYRIGHT OR TRADEMARK OR OTHER PROPRIETARY OR PROPERTY RIGHTS OF OTHERS. UMMC SHALL NOT BE LIABLE TO LICENSEE, LICENSEE'S SUCCESSORS OR ASSIGNS OR ANY THIRD PARTY WITH RESPECT TO ANY CLAIM ON ACCOUNT OF, OR ARISING FROM, THE USE OF INFORMATION IN CONNECTION WITH THE LICENSED TECHNOLOGY SUPPLIED HEREUNDER OR THE MANUFACTURE, USE OR SALE OF PRODUCTS OR ANY OTHER MATERIAL OR ITEM DERIVED THEREFROM.

6.2    Liability. UMMC is an agency of the State of Mississippi under the management and control of the Board of Trustees of the State Institutions of Higher Learning (IHL). As authorized by law, IHL maintains a program of self-insurance for purposes of workers' compensation and general liability, pursuant to the Mississippi Tort Claims Act as set forth in Chapter 46, Title 11, Mississippi Code 1972, as amended. Accordingly, any liability of UMMC for any damages, losses, or costs arising out of or related to acts performed by UMMC or it employees under this Agreement is governed by the Tort Claims Act.

6.3    Licensee Indemnification. Licensee will indemnify, defend and hold harmless UMMC, its trustees, officers, agents and employees (collectively, the "Indemnified Parties"), from and against any and all liability, loss, damage, action, claim or expense suffered or incurred by the Indemnified Parties which results from or arises out of (individually, a "Liability" and collectively, the "Liabilities"):

(a) breach by Licensee of any duty, covenant or agreement contained in this Agreement or a lawsuit, action, or claim brought by any third party that includes any allegation which, if proven true, would constitute a breach by Licensee of any duty, covenant or agreement contained in this Agreement;

(b) the development, use, manufacture, promotion, sale, distribution or other disposition of any Products by Licensee, its Affiliates, assignees, vendors or other third parties, for personal injury, including death, or property damage arising from any of the foregoing. The indemnification obligation under Article 6.3 shall not apply to any contributory negligence or product liability of the Indemnified Party which may have occurred prior to the execution of this Agreement. Licensee will indemnify and hold harmless the Indemnified Parties from and against any Liabilities resulting from:

(i)    any product liability or other claim of any kind related to the use by a third party of a Product that was manufactured, sold, distributed or otherwise disposed by Licensee, its Affiliates, assignees, vendors or other third parties;

(ii)    clinical trials or studies conducted by or on behalf of Licensee relating to any Products, including, without limitation, any claim by or on behalf of a human subject of any such clinical trial or study, any claim arising from the procedures specified in any protocol used in any such clinical

7

trial or study, any claim of deviation, authorized or unauthorized, from the protocols of any such clinical trial or study, any claim resulting from or arising out of the manufacture or quality control by a third party of any substance administered in any clinical trial or study;

(iii) Licensee's failure to comply with all prevailing laws, rules and regulations pertaining to the development, testing, manufacture, marketing and import or export of Products.

6.4 Procedures. The Indemnified Party shall promptly notify Licensee of any claim or action giving rise to a Liability subject to the provisions of Article 6.3. Licensee shall have the duty to defend any such claim or action, at its cost and expense. Indemnified Party must have the right, however, to approve counsel through the Mississippi Attorney General and through its governing board to represent it, and such approval will not be unreasonably withheld. In the event Licensee or any of its parents, affiliates or subsidiaries is also named in a particular claim, Licensee may choose the same attorneys who defend the Indemnified Parties to defend Licensee unless there arises a conflict of interest between the Licensee and one or more of the Indemnified Parties or among the Indemnified Parties. The indemnification rights of UMMC or other Indemnified Party contained herein are in addition to all other rights which such Indemnified Party may have at law or in equity or otherwise.

6.5 Liability Insurance. Licensee shall maintain general liability and product liability insurance that is reasonable based upon industry standards. Licensee shall provide UMMC with copies of such policies, upon request of UMMC. Licensee shall provide UMMC with copies of such policies, upon request of UMMC. Licensee shall notify UMMC at least ten (10) days prior to cancellations of any such coverage. Under no circumstances shall either party be liable for consequential, incidental, punitive, exemplary or indirect damages, lost profits or other business interruption damages whether by statute, in tort, in contract or otherwise, under or as a result of this agreement.

## ARTICLE 7
## COPYRIGHTS AND INFRINGEMENT

7.1 Copyrights.

(a) Responsibilities for Copyrights and Maintenance.

(i) UMMC using one of its approved outside patent attorneys is responsible for preparing, filing, and any copyright applications and maintaining any issued copyrights.

(ii) UMMC will prepare and file Copyrights in the United States.

(iii) Licensee will cooperate with UMMC in the filing and maintenance of any Copyrights. UMMC will advise Licensee promptly as to all material developments with respect to the applications.

(iv) Each party agrees to promptly forward all written communications from the other party regarding copyrights to its intellectual property counsel as appropriate, with a written confirmation to the other party that the communications have been forwarded.

7.2 Infringement by Third Party.

8

UMMC-001878

(a) Each party will promptly notify the other party of any infringement or possible infringement of any of the Copyrights or other Licensed Technology. Upon discovery of such infringement or possible infringement, UMMC will use all reasonable efforts to prosecute such infringement at its own expense. Licensee shall have the right, but not the obligation, to prosecute such infringement at its own expense. In such event, Licensee shall cooperate with UMMC. UMMC shall not settle or compromise any such suit in a manner that imposes any obligations or restrictions on Licensee or grants any rights to the Licensed Technology which are inconsistent with the rights and obligations of Licensee or UMMC pursuant to this Agreement, without Licensee's written consent.

(b) If UMMC fails to prosecute or chooses not to prosecute such infringement within one hundred and twenty (120) days after receiving notice thereof, Licensee shall have the right, but not the obligation, to prosecute such infringement at the expense of UMMC. In such event, UMMC shall cooperate with Licensee, at UMMC's expense.

(b) Any recovery obtained by the prosecuting party as a result of such proceeding, by settlement or otherwise, shall be applied first to the prosecuting party, for payment of legal fees divided equally between the parties.

## ARTICLE 8
## CONFIDENTIALITY AND PUBLICATIONS

8.1    Confidentiality. To the extent allowed by law, both parties shall maintain in confidence and shall not disclose to any third party the Confidential Information received pursuant to this Agreement, without the prior written consent of the disclosing party except that the Confidential Information may be disclosed by either party only to those third parties (x) who have a need to know the information in connection with the exercise by either party of its rights under this Agreement and who agreed in writing to keep the information confidential to the same extent as is required of the parties under this Article 8.1, or (y) to whom either party is legally obligated to disclose the information. The foregoing obligation shall not apply to information which:

(a) is, at the time of disclosure, publicly known or available to the public, provided that Information will not be deemed to be within the public domain merely because individual parts of such Information are found separately within the public domain, but only if all the material features comprising such Confidential Information are found in combination in the public domain;

(b) is known to recipient at the time of disclosure of such Confidential Information provided that recipient promptly notifies disclosing party in writing of this prior knowledge within thirty (30) days of receipt;

(c) is hereafter furnished to recipient by a third party, as a matter of right and without restriction on disclosure, provided that recipient promptly notifies disclosing party in writing of this third party disclosure after receipt thereof;

(d) is made public by disclosing party;

9

UMMC-001879

(e) is disclosed with the written approval of either party;

(f) is the subject of a legally binding court order compelling disclosure, provided that recipient must give disclosing party notice of any request for disclosure pursuant to any legal proceeding, within two (2) days of receipt of such request by recipient, and recipient must cooperate with disclosing party in obtaining appropriate protective orders to preserve the confidentiality of the Confidential Information.

8.2    Use of Name. Neither Licensee nor UMMC shall directly or indirectly use the other party's name, or the name of any trustee, officer or employee thereof, without that party's prior written consent, or disclose the terms of this Agreement to third parties except that UMMC or Licensee may disclose this Agreement to any sub-licensee or Affiliate and may disclose an accurate description of the terms of this Agreement to the extent required under federal or state securities, tax, grant administration, or other disclosure laws, provided that UMMC shall take steps to preserve the confidentiality of such information to the extent allowed by law.

## ARTICLE 9
## TERM AND TERMINATION

9.1    Term. This Agreement and the licenses granted herein shall commence on the Effective Date and shall continue, subject to earlier termination under Articles 9.2 or 9.3 hereof, for twenty (2) years from the effective date of this License Agreement. In the event the copyright application is denied for any reason, this entire agreement shall be deemed null, void and of no force and effect.

9.2    Termination by UMMC. Upon the occurrence of any of the events set forth below ("Events of Default"), UMMC shall have the right to terminate this Agreement by giving written notice of termination, such termination effective with the giving of such notice:

(a) nonpayment of any amount payable to UMMC that is continuing sixty (60) calendar days after UMMC gives Licensee written notice of such nonpayment;

(b) any material breach by Licensee of any covenant (other than a payment breach referred to in clause (a) above or a Development Plan breach referred to in section 9.3 below) or any representation or warranty contained in this Agreement that is continuing sixty (60) calendar days after UMMC gives Licensee written notice of such breach;

(c) the administrative dissolution of Licensee by the Mississippi Secretary of State;

(d) If after the first commercial sale of a Product and during the term of this Agreement, Licensee fails to make reasonable efforts to commercialize at least one (1) Product or fails to keep at least one (1) Product on the market after the first commercial sale for a continuous period of one (1) year.

9.3    Termination by Licensee. Licensee shall have the right to terminate this Agreement, at any time with or without cause, upon sixty (60) days' written notice to UMMC. In the event UMMC fails to prosecute any infringement, or possible infringement, of the subject copyright under Section 7.2 above within 6 months of receipt of notice of such infringement or possible infringement,

10

UMMC-001880

Licensee shall have the right to terminate this agreement without further notice, and UMMC will convey and transfer ownership of the subject copyright to Licensee.

9.4   Rights and Duties Upon Termination. Within thirty (30) days after termination of this Agreement, each party shall return to the other party any Confidential Information of the other party. If terminated by Licensee the Licensee also shall return all Licensed Technology which is embodied in physical form to the UMMC promptly upon the termination of this Agreement. In the event of an early termination of this Agreement, Licensee and its sub-licensees shall have the right to use or sell all the Product(s) on hand or in the process of manufacturing at the time of such early termination, provided that Licensee shall be obligated to pay to UMMC a royalty on such sales as set forth in this Agreement if, at that time there remains in existence any of UMMC's Patent rights covering the transfer of such Product(s) and a royalty or other payment is payable pursuant to the terms of this Agreement. Within thirty (30) days after termination of this Agreement by UMMC under Article 9.2 or by Licensee without Cause under Article 9.4, Licensee agrees:

    (a)  to provide UMMC with copies of all results of research, development and marketing studies pertaining to the Products and Licensed Technology;

    (b)    to provide UMMC with an electronic and paper copy of any and all copyright and trademark documents and correspondence related to the Licensed Technology and Product(s) between Licensee and the U.S. Patent Office and foreign government equivalents.

    (c)  to perform all acts deemed necessary or desirable by UMMC to permit and assist it, at UMMC's expense, in evidencing, perfecting, obtaining, maintaining, defending and enforcing UMMC's ownership rights and/or any assignment with respect to inventions and patents to be assigned to UMMC in any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. Upon termination, Licensee herby irrevocably designates and appoints UMMC and its duly authorized officers and agents, as its agents and attorneys-in-fact to act for and in its behalf and instead of Licensee, to execute and file any documents and to do all other lawfully permitted acts to further the foregoing purposes with the same legal force and effect as if executed by Licensee.

9.5   Provisions Surviving Termination. Licensee's obligation to pay any royalties accrued but unpaid prior to termination of this Agreement shall survive such termination. Licensee shall owe UMMC royalties on sales when Licensee has received payments from a sub-licensee or Affiliate. In addition, all provisions required to interpret the rights and obligations of the parties arising prior to the termination date shall survive expiration or termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

11

UMMC-001881

10.1    Assignment. This Agreement and the rights and benefits conferred upon Licensee hereunder may not be transferred or assigned to any Person, directly or by merger, by sale or assignment of membership interests in Licensee, or by other operation of law, without the express written permission of UMMC, which permission will not be unreasonably withheld. This Agreement shall inure to the benefit of permitted assigns of Licensee.

10.2    No Waiver. A waiver by either party of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

10.3    Independent Contractor. Nothing herein shall be deemed to establish a relationship of principal and agent between UMMC and Licensee, nor any of their agents or employees for any purpose whatsoever. This Agreement shall not be construed as constituting UMMC and Licensee as partners, or as creating any other form of legal association or arrangement that could impose liability upon one party for the act or failure to act of the other party. No employees or staff of UMMC shall be entitled to any benefits applicable to employees of Licensee. Neither party shall be bound by the acts or conduct of the other party.

10.4    Notices. Any notice under this Agreement shall be sufficiently given if sent in writing by prepaid, first class, certified or registered mail, return receipt requested, addressed as follows:

if to UMMC, to:
University of Mississippi Medical Center
2500 North State Street
Jackson, MS 39216
Attention: Leslie A. Musshafen
Director, Sponsored Programs

if to Licensee, to:
Health Data Analytics, LLC
4107 Hawthorne Drive
Jackson, MS 39206
Attention: Denise Krause
Managing Member

or to such other addresses as may be designated from time to time by notice given in accordance with the terms of this Article.

10.5    Entire Agreement. This Agreement embodies the entire understanding between the parties relating to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral. This Agreement may not be modified or varied except by a written document signed by duly authorized representatives of both parties.

10.6    Severability. In the event that any provision of this Agreement shall be held to be unenforceable, invalid or in contravention of applicable law, such provision shall be of no effect, the remaining portions of this Agreement shall continue in full force and effect, and the parties shall negotiate in good faith to replace such provision with a provision which effects to the extent possible the original intent of such provision.

12

UMMC-001882

10.7    Force Majure.  In the event that either party's performance of its obligations under this Agreement shall be prevented by any cause beyond its reasonable control, including without limitation acts of God, acts of government, shortage of material, accident, fire, delay or other disaster, provided that the affected party shall have used its reasonable best efforts to avoid or remove the cause of such nonperformance and to minimize the duration and negative effect of such nonperformance, then such affected party's performance shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence.  The affected party shall continue performance under this Agreement using its best efforts as soon as such cause is removed.

10.8    Headings.  Any headings and captions used in this Agreement are for convenience of reference only and shall not affect its construction or interpretation.

10.9    No Third Party Benefits.  Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their permitted assigns, any benefits, rights or remedies.

10.10   Governing Law.  This Agreement shall be construed in accordance with and governed by the internal laws of the State of Mississippi, excluding such state's rules relating to conflicts of laws, and its form, execution, validity, construction and effect shall be determined in accordance with such internal laws.

10.11   Counterparts.  This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures of each of the parties hereto.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

10.12   Resolution of Disputes.  In the event of any dispute, controversy or claim arising out of or relating to this Agreement, or to any breach hereof, the parties shall attempt first to resolve the dispute by good faith negotiation.  If the parties are unable to reach agreement by negotiating in good faith within sixty (60) days of written assertion of a claim, they agree to settle the dispute by mediation in accordance with the mediation rules of the American Arbitration Association ("AAA").  Such mediation shall take place in Jackson, Mississippi, unless the parties agree to an alternative location.  All administration fees related to the mediation, including charges of AAA, the expenses of the meeting rooms, the fees and expenses of the mediator, or similar expenses, shall be borne equally by the parties thereto.  In the event the dispute is litigated and UMMC is the prevailing party in the litigation, Licensee will reimburse UMMC's legal and attorneys' fees, costs, and expenses.

13

UMMC-001883

IN WITNESS WHEREOF, the parties hereto have duly executed this License Agreement as of the date first above written.

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

_____    _____
Richard L. Summers, MD                                      Date
Associate Vice Chancellor for Research

Acknowledged by:

_____    _____
Denise Krause                                              Date
Managing Member, Health Data Analytics, LLC

14

UMMC-001884

## APPENDIX A

### COPYRIGHTS

Mississippi Mapper web application developed using geographic information systems (GIS) and JavaScript.

15

UMMC-001885

**APPENDIX B**
Example Sales and Royalty Report


Licensee:_____    UMMC Agreement ID:_____

**Period** Covered:_____ through_____.

**Prepared** by:_____          Date:_____

                (Company Representative)

**Approved** by:_____          Date:_____

                (Company Representative)

If license agreement covers several major product lines, please prepare a separate report for each line. Then combine all product lines into a summary report.

**Report Type:**       ☐       Single Product or Process Line Report:_____

                                                  (product name)

                ☐       Multiproduct Summary Report, Page ____ of ____

**Other Compensation:**   ☐       Annual Payments, milestones, or other fees & compensation

                        Details:_____

                        Amount Due:_____

                ☐       No Compensation of Royalty Due this Period

                        Reason:_____


16

UMMC-001886

| Country | Quantity Produced | Quantity Sold | Gross Sales ($) | *Net Sales ($) | Royalty Rate | Conversion Rate (if applicable) | Royalty Due this Period |
|---------|-------------------|---------------|-----------------|----------------|--------------|----------------------------------|-------------------------|
| USA | | | | | | | |
| Canada | | | | | | | |
| Japan | | | | | | | |
| Other: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL: | | | | | | | |

* To calculate net sales, use the following space to list separately the specific types of allowed deductions under the license agreement and the corresponding amounts:_____

_____

Then calculate the final Net Sales amount by subtracting these amounts from Gross Sales, and note in the column above.

17

UMMC-001887

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT is made as of this _____ ("Effective Date") by and between the UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, an educational institution with a principal address at 2500 North State Street, Jackson, Mississippi 39206 ("UMMC") and Health Data Analytics, LLC, a limited liability company organized and existing under the laws of Mississippi with a principal address at 4107 Hawthorne Drive, Jackson, MS 39211 ("Licensee")

### RECITALS

WHEREAS, UMMC is the owner of certain copyright applications and other technology related to Mississippi Mapper web application developed using geographic information systems (GIS) and JavaScript.

WHEREAS, Licensee wishes to acquire certain rights and licenses with respect to UMMC# _____ in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and intending to be legally bound herby, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Unless otherwise provided in this Agreement, the following terms when used with initial capital letters shall have the meanings set forth below:

"Affiliate" means, when used with reference to Licensee, any person directly or indirectly controlling, controlled by or under common control with Licensee.

"Bankruptcy Event" means the person in question becomes insolvent, or voluntary or involuntary proceedings by or against such person are instituted in bankruptcy or under any insolvency law, or a receiver or custodian is appointed for such person, or proceedings are instituted by or against such person for corporate dissolution of such person, which proceedings, if involuntary, shall not have been dismissed within sixty (60) days after the date of filing, or such person makes an assignment for the benefit of creditors, or substantially all of the assets of such person are seized or attached and not released within sixty (60) days thereafter.

"Base Product" means the Mississippi Mapper application framework. This does not include underlying data. Improvements will be made to the Base Product over time.

"Calendar Quarter" means each three-month period, or any portion thereof, beginning on January 1, April 1, July 1 and October 1.

"Confidential Information" means (i) the Technical Information, (ii) any other information or material in tangible form that is marked as confidential or proprietary by the furnishing party at the time it is delivered to the receiving party, and (iii) information that is furnished orally if the furnishing party identifies such information as confidential or proprietary when it is disclosed and promptly confirms such

1

UMMC-001888

designation in writing after such disclosure.

"Custom" or "Customization" means alterations or enhancements made to the Base Product to develop a specially designed custom application for a client.  Custom applications are not a part of the Base Product.

"Effective Date" shall have the meaning set forth on page 1 of this Agreement.

"Federal Government Interest" [IF APPLICABLE] means the rights of the United States Government and agencies thereof under Public Laws 96_517, 97_256 and 98_620, codified at 35 U.S.C §§ 200-212, and any regulations issued there under, as such statute or regulations may be amended from time to time hereafter.

"Field" means software development.

"Fiscal Year" means each twelve-month period, or any portion thereof, beginning on July 1.

"Gross Sales and Income" means the gross amount charged by Licensee for the Mississippi Mapper Product.  If the Product is sold for consideration other than solely cash, the fair market value of such other consideration shall be included in the Gross Sales Price.

"Net Sales" means Gross Sales plus Sublicensing Revenue less the following,

      i.    Value added, excise and any other taxes and/or duties and

      ii.    Returns (including without limitation spoiled, damaged, outdated and defective goods), allowances, discounts, and adjustments credited to customers and

      iii    Commissions or fees paid to independent sales representatives, brokers, dealers, or distributors, and

      iv.    Shipping and handling costs if not paid for by the customer, and

      v.    Allocated costs for sales samples of Products, for all Products sold or commercially used by Licensee or its Affiliates

      vi.    Licensee's documented costs of customization, development, and/or improvement related to the sale in question.

In any case where the price of the Product is not separately stated on licensee's invoice, Net Sales means Licensee's average selling price for such Product during the period covered by the royalty report. -

"Improvements" means any improvement, modification or other refinement, regardless of the patentability thereof to (a) the Mississippi Mapper application, within the scope of the inventions claimed in the copyright, or (b) the development, manufacture, use or sale of which, except for the licenses granted herein, would infringe the copyright. Notwithstanding the foregoing, "Improvements" shall not include modifications or other refinements that are made as Customizations to the Base Product

"Licensed_Technology" means and includes UMMC Know-How, the copyrighted invention and Improvements.

"Copyright Expenses" means all reasonable fees, expenses, and charges of outside counsel related to

2

UMMC-001889

copyright, listed in Exhibit A currently or added by amendment at a future date, incurred by UMMC in connection with the preparation and filing of the copyright, currently contained or that may be added to Exhibit A; and (b) an administrative fee in the amount of twenty percent (20%) of the amounts pursuant to (a).

"Person" means an individual, partnership, corporation, joint venture, unincorporated association, or other entity, or a government or department of agency thereof.

"Products" means any article or portion thereof which is made, produced, or used in whole or in part, by or with the use of the Licensed Technology.

"Service" means any activity that is provided by the Licensee in exchange for a fee that is provided in whole or in part, by or with the use of the Licensed Technology. [IF APPLICABLE]

"Sublicensing Revenue" means all cash, sublicensing fees, royalties and all other payments and the cash equivalent thereof paid to Licensee by sublicensees of Licensee of its rights hereunder, other than research and development money paid to Licensee to conduct research in the Field.

"Technical Information" means and includes all technical information, trade secrets, developments, discoveries, know-how, methods, techniques, formulae, processes and other information relating to the Licensed Technology that UMMC owns or controls on the date hereof or owns or controls in the future, including by way of illustration and not limitation, designs, data, drawings, documents, models, and other similar information.

"UMMC Know-How" means all information, technical data and assistance, inventions and discoveries of UMMC disclosed or provided to Licensee by UMMC relating to the exploitation of any invention described in the Licensed technology.

## ARTICLE 2
## GRANT OF LICENSE

2.1    Grant of License. Subject to the terms and conditions contained in this Agreement, UMMC hereby grants to Licensee an exclusive, non-transferrable except as otherwise allowed in this Agreement, worldwide, royalty-bearing right and license to use and practice the Licensed Technology to make, have made, use, and sell Products in the Field. [Notwithstanding the foregoing UMMC expressly reserves a nontransferable non-divisible right to use the Licensed Technology in the Field itself including use its faculty staff and researchers for educational and research purposes only.] Licensee agrees to provide UMMC the use of two Mississippi Monkeys for the cost and royalty fee. One will be housed in the office of the and the other will be placed in the office of Physician Workforce Licensee to the Base Product will be available to UMMC faculty staff and researchers for the direct cost of labor services and applicable costs for a ...

2.2    Right to Sub-license. Licensee shall have the right to sub-license to any third party, in whole or in part, its rights under this Agreement with written permission of UMMC, such permission to will not be unreasonably withheld.    As a condition of granting sub-licenses, Licensee will provide UMMC with full and complete copies of all contracts and agreements between it and any sub-license within ten (10) business days after execution of same.  UMMC will maintain such copies and their terms in confidence as required in Article 8.  A grant of a sub-license will be

3

UMMC-001890

invalid if any agreement between Licensee and such sub-licensee prohibits, restricts or conditions Licensee's provision of such copies to UMMC as required in this article.

2.3    No Rights by Implication. No rights or licenses with respect to the Licensed Technology are granted or deemed granted hereunder or in connection herewith, other than those rights or licenses expressly granted in this Agreement.

### ARTICLE 3
### LICENSING FEES AND EQUITY

3.1    Upfront and Milestone Payments. In consideration of the license granted hereunder, Licensee shall pay UMMC the following non-refundable payments:

3.2    Royalties. In further consideration of the rights and licenses granted hereunder, Licensee shall pay UMMC a royalty of two and one-half percent (2.5%) of Net Sales of the Base Product sold for commercial use. No royalty shall be due on Products used for clinical trial or other research or developmental uses, or Customizations.

3.3    Payments. Royalties and other amounts payable under this Agreement shall be paid within ninety (90) days following the last day of the Calendar Quarter in which royalties and other amounts accrue. The last such payment shall be made within ninety (90) days after termination of this Agreement. Payments shall be deemed paid as of the day on which they are received by UMMC.

3.4    Reports. Licensee shall deliver to UMMC within ninety (90) days after the end of each Fiscal Year following commercial sale of a Product a report setting forth in reasonable detail the calculation of the royalties and other amounts payable to UMMC for such Calendar Quarter pursuant to this Article 4, including, without limitation, the Products sold in each country during such Calendar Quarter, the Net Sales Price thereof, and, within ninety (90) days after the end of each Fiscal Year, similar reports containing corresponding information relating to royalties payable due to sales by permitted sub-licensees pursuant to Article 3.2. An example of an acceptable royalty report is provided in Appendix B.

3.5    Currency, Place of Payment, Interest.

(a)    All dollar amounts referred to in this Agreement are expressed in United States dollars. All payments to UMMC under this Agreement shall be made in United States dollars (or other legal currency of the United States), as directed by UMMC, by check payable to the University of Mississippi Medical Center" or by wire transfer to an account as UMMC may designate from time to time.

(b)    If Licensee receives revenues from sales of Products in a currency other than United States dollars, royalties shall be based on actual US currency amounts to which foreign revenues are converted.

(c)    Amounts that are not paid when due shall accrue interest from the due date until paid, at an annual rate equal to the "Prime Rate" plus 5% as published in the "Money Rates" table in the eastern edition of *The Wall Street Journal* as of the due date.

4

> **Commented [DK1]:** So this means no royalties to UMMC on subscriptions to UMMC. Right?
>
> **Commented [SSJ2R1]:** Yes.

UMMC-001891

3.6    Records. Licensee will maintain complete and accurate books and records that enable the royalties payable hereunder to be verified. The records for each Fiscal Year shall be maintained for two years after the submission of each report under Article 3.4 hereof. Upon reasonable prior notice to Licensee, UMMC and its accountants shall have access to the books and records of Licensee to conduct a review or audit thereof no more than two (2) times per years. Such access shall be available during normal business hours. In the event such audit reveals any error in the computation of Net Sales exceeding 5% of the amount owed, the Licensee shall promptly reimburse UMMC for all reasonable expenses and costs incurred in the conduct of such review or audit.

## ARTICLE 4
## CERTAIN OBLIGATIONS OF LICENSEE

4.1    Licensee Efforts, Reporting.

(a)    Licensee shall use its reasonable efforts to develop for commercial use and to market this Product as soon as practicable, and to continue to market as long as commercially viable, all as is consistent with sound and reasonable business practice.

(b)    Licensee shall provide UMMC once per Fiscal Year on July 1 with written reports, setting forth in such detail as UMMC may reasonably request, the progress of the development, evaluation, testing and commercialization of Products. Licensee shall notify UMMC within ninety (90) days of the end of the first quarter in which the first commercial sale of a Product occurs.

4.2    Compliance with Laws. Licensee shall use its best efforts to comply with all prevailing laws, rules and regulations pertaining to the development, testing, manufacture, marketing and import or export of Products. Without limiting the foregoing, Licensee acknowledges that the transfer of certain commodities and technical data is subject to United States laws and regulations controlling the export of such commodities and technical data, including all Export Administration Regulations of the United States Department of Commerce. These laws and regulations, among other things, prohibit or require a license for the export of certain types of technical data to specified countries. Licensee will comply with all United States laws and regulations controlling the export of commodities and technical data.

4.3    Government Approvals. Licensee will be responsible for obtaining, at its cost and expense, all governmental approvals required to commercially market Products.

4.4    Copyright Notices. Licensee shall mark or cause to be marked all Products made or sold in the United States with all applicable copyright notices. If it is not practical for a Product to be so marked, then Licensee shall mark or cause to be marked the package for each Product with all applicable copyright notices.

4.5    Bankruptcy or Equivalent. Licensee will provide written notice to UMMC prior to the filing of a petition in bankruptcy or equivalent if Licensee intends to file a voluntary petition, or, if known by Licensee through statements or letters from a creditor or otherwise, if a third party intends to file an involuntary petition in bankruptcy against Licensee. Notice will be given at least 75 days before the planned filing or, if such notice is not feasible, as soon as Licensee is aware of the planned filing. Licensee's failure to perform this obligation is deemed to be a material pre-petition incurable breach under this Agreement not subject to the 60-day notice requirement of

5

UMMC-001892

Section 9.2, and UMMC is deemed to have terminated this Agreement forty-five (45) days prior to the filing of the bankruptcy.

## ARTICLE 5
## REPRESENTATIONS

5.1 Representations of UMMC. UMMC represents to Licensee as follows:

    (a) this Agreement, when executed and delivered by UMMC, will be the legal, valid and binding obligation of UMMC, enforceable against UMMC in accordance with its terms;

    (b) UMMC subject to certain rights under 37 CFR 401.14 retained by the federal government in inventions resulting from federally supported work is the owner of all right, title and interest in and to the Patents and the Technical Information, and has not granted rights in or to the Licensed Technology to any person other than Licensee;

    (c) UMMC has not received any written notice that the Licensed Technology infringes the proprietary rights of any third party;

    (d) the inventions claimed in the Patents to the knowledge of UMMC have not been publicly used, offered for sale, or disclosed in a printed publication by employees of UMMC more than one year prior to the filing of the U.S. application for the Patents.

5.2 Representations and Warranties of Licensee. Licensee represents and warrants to UMMC as follows:

    (a) Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of Mississippi and has all requisite power and authority to execute, deliver and perform this Agreement;

    (b) This Agreement, when executed and delivered by Licensee, will be the legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms;

    (c) the execution, delivery and performance of this Agreement by Licensee does not conflict with, or constitute a breach or default under,

        (i) the charter documents of Licensee,

        (ii) any law, order, judgment or governmental rule or regulation applicable to Licensee, or

        (iii) any provision of any agreement, contract, commitment or instrument to which Licensee is a party; and the execution, delivery and performance of this Agreement by Licensee does not require the consent, approval or authorization of, or notice, declaration, filing or registration with, any governmental or regulatory authority.

6

UMMC-001893

## ARTICLE 6
## LIABILITY AND INDEMNIFICATION

6.1    No warranties; Limitation on Liability. EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, UMMC MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO: (I) COMMERCIAL UTILITY; OR (II) MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR (III) THAT THE USE OF THE LICENSED TECHNOLOGY WILL NOT INFRINGE ANY PATENT, COPYRIGHT OR TRADEMARK OR OTHER PROPRIETARY OR PROPERTY RIGHTS OF OTHERS. UMMC SHALL NOT BE LIABLE TO LICENSEE, LICENSEE'S SUCCESSORS OR ASSIGNS OR ANY THIRD PARTY WITH RESPECT TO ANY CLAIM ON ACCOUNT OF, OR ARISING FROM, THE USE OF INFORMATION IN CONNECTION WITH THE LICENSED TECHNOLOGY SUPPLIED HEREUNDER OR THE MANUFACTURE, USE OR SALE OF PRODUCTS OR ANY OTHER MATERIAL OR ITEM DERIVED THEREFROM.

6.2    Liability. UMMC is an agency of the State of Mississippi under the management and control of the Board of Trustees of the State Institutions of Higher Learning (IHL). As authorized by law, IHL maintains a program of self-insurance for purposes of workers' compensation and general liability, pursuant to the Mississippi Tort Claims Act as set forth in Chapter 46, Title 11, Mississippi Code 1972, as amended. Accordingly, any liability of UMMC for any damages, losses, or costs arising out of or related to acts performed by UMMC or it employees under this Agreement is governed by the Tort Claims Act.

6.3    Licensee Indemnification. Licensee will indemnify, defend and hold harmless UMMC, its trustees, officers, agents and employees (collectively, the "Indemnified Parties"), from and against any and all liability, loss, damage, action, claim or expense suffered or incurred by the Indemnified Parties which results from or arises out of (individually, a "Liability" and collectively, the "Liabilities"):

(a) breach by Licensee of any duty, covenant or agreement contained in this Agreement or a lawsuit, action, or claim brought by any third party that includes any allegation which, if proven true, would constitute a breach by Licensee of any duty, covenant or agreement contained in this Agreement;

(b) the development, use, manufacture, promotion, sale, distribution or other disposition of any Products by Licensee, its Affiliates, assignees, vendors or other third parties, for personal injury, including death, or property damage arising from any of the foregoing. The indemnification obligation under Article 6.3 shall not apply to any contributory negligence or product liability of the Indemnified Party which may have occurred prior to the execution of this Agreement. Licensee will indemnify and hold harmless the Indemnified Parties from and against any Liabilities resulting from:

(i)    any product liability or other claim of any kind related to the use by a third party of a Product that was manufactured, sold, distributed or otherwise disposed by Licensee, its Affiliates, assignees, vendors or other third parties;

(ii)    clinical trials or studies conducted by or on behalf of Licensee relating to any Products, including, without limitation, any claim by or on behalf of a human subject of any such clinical trial or study, any claim arising

7

UMMC-001894

from the procedures specified in any protocol used in any such clinical trial or study, any claim of deviation, authorized or unauthorized, from the protocols of any such clinical trial or study, any claim resulting from or arising out of the manufacture or quality control by a third party of any substance administered in any clinical trial or study;

(iii)    Licensee's failure to comply with all prevailing laws, rules and regulations pertaining to the development, testing, manufacture, marketing and import or export of Products.

6.4    Procedures. The Indemnified Party shall promptly notify Licensee of any claim or action giving rise to a Liability subject to the provisions of Article 6.3. Licensee shall have the duty to defend any such claim or action, at its cost and expense. Indemnified Party must have the right, however, to approve counsel through the Mississippi Attorney General and through its governing board to represent it, and such approval will not be unreasonably withheld. In the event Licensee or any of its parents, affiliates or subsidiaries is also named in a particular claim, Licensee may choose the same attorneys who defend the Indemnified Parties to defend Licensee unless there arises a conflict of interest between the Licensee and one or more of the Indemnified Parties or among the Indemnified Parties. The indemnification rights of UMMC or other Indemnified Party contained herein are in addition to all other rights which such Indemnified Party may have at law or in equity or otherwise.

6.5    Liability Insurance. Licensee shall maintain general liability and product liability insurance that is reasonable based upon industry standards. Licensee shall provide UMMC with copies of such policies, upon request of UMMC. Licensee shall provide UMMC with copies of such policies, upon request of UMMC. Licensee shall notify UMMC at least ten (10) days prior to cancellations of any such coverage. Under no circumstances shall either party be liable for consequential, incidental, punitive, exemplary or indirect damages, lost profits or other business interruption damages whether by statute, in tort, in contract or otherwise, under or as a result of this agreement.

### ARTICLE 7
### COPYRIGHTS AND INFRINGEMENT

7.1    Copyrights.

(a) Responsibilities for Copyrights and Maintenance.

(i) UMMC using one of its approved outside patent attorneys is responsible for preparing, filing, and any copyright applications and maintaining any issued copyrights.

(ii) UMMC will prepare and file Copyrights in the United States.

(iii) Licensee will cooperate with UMMC in the filing and maintenance of any Copyrights. UMMC will advise Licensee promptly as to all material developments with respect to the applications. [illegible text]

| Commented [DK3]: Fragment |

(iv) Each party agrees to promptly forward all written communications from the other party regarding copyrights to its intellectual property counsel as appropriate, with a written confirmation to the other party that the communications have been forwarded.

8

UMMC-001895

7.2    Infringement by Third Party.

    (a) Each party will promptly notify the other party of any infringement or possible infringement of any of the Copyrights or other Licensed Technology. Upon discovery of such infringement or possible infringement, UMMC will use all reasonable efforts to prosecute such infringement at its own expense. Licensee shall have the right, but not the obligation, to prosecute such infringement at its own expense. In such event, Licensee shall cooperate with UMMC. UMMC shall not settle or compromise any such suit in a manner that imposes any obligations or restrictions on Licensee or grants any rights to the Licensed Technology which are inconsistent with the rights and obligations of Licensee or UMMC pursuant to this Agreement, without Licensee's written consent.

    (b) If UMMC fails to prosecute or chooses not to prosecute such infringement within one hundred and twenty (120) days after receiving notice thereof, Licensee shall have the right, but not the obligation, to prosecute such infringement at the expense of UMMC. In such event, UMMC shall cooperate with Licensee, at UMMC's expense.

    (b) Any recovery obtained by the prosecuting party as a result of such proceeding, by settlement or otherwise, shall be applied first to the prosecuting party, for payment of legal fees in amounts equal to two times the costs and expenses of the litigation with the remainder to be paid 50% to the prosecuting party and 50% to the other party excluding attorneys fees and costs.

## ARTICLE 8
## CONFIDENTIALITY AND PUBLICATIONS

8.1    Confidentiality. To the extent allowed by law, both parties shall maintain in confidence and shall not disclose to any third party the Confidential Information received pursuant to this Agreement, without the prior written consent of the disclosing party except that the Confidential Information may be disclosed by either party only to those third parties (x) who have a need to know the information in connection with the exercise by either party of its rights under this Agreement and who agreed in writing to keep the information confidential to the same extent as is required of the parties under this Article 8.1, or (y) to whom either party is legally obligated to disclose the information. The foregoing obligation shall not apply to information which:

    (a) is, at the time of disclosure, publicly known or available to the public, provided that Information will not be deemed to be within the public domain merely because individual parts of such Information are found separately within the public domain, but only if all the material features comprising such Confidential Information are found in combination in the public domain;

    (b) is known to recipient at the time of disclosure of such Confidential Information provided that recipient promptly notifies disclosing party in writing of this prior knowledge within thirty (30) days of receipt;

    (c) is hereafter furnished to recipient by a third party, as a matter of right and without restriction on disclosure, provided that recipient promptly notifies disclosing party in

9

UMMC-001896

writing of this third party disclosure after receipt thereof;

(d) is made public by disclosing party;

(e) is disclosed with the written approval of either party;

(f) is the subject of a legally binding court order compelling disclosure, provided that recipient must give disclosing party notice of any request for disclosure pursuant to any legal proceeding, within two (2) days of receipt of such request by recipient, and recipient must cooperate with disclosing party in obtaining appropriate protective orders to preserve the confidentiality of the Confidential Information.

8.2    Use of Name. Neither Licensee nor UMMC shall directly or indirectly use the other party's name, or the name of any trustee, officer or employee thereof, without that party's prior written consent, or disclose the terms of this Agreement to third parties except that UMMC or Licensee may disclose this Agreement to any sub-licensee or Affiliate and may disclose an accurate description of the terms of this Agreement to the extent required under federal or state securities, tax, grant administration, or other disclosure laws, provided that UMMC shall take steps to preserve the confidentiality of such information to the extent allowed by law.

### ARTICLE 9
### TERM AND TERMINATION

9.1    Term. This Agreement and the licenses granted herein shall commence on the Effective Date and shall continue, subject to earlier termination under Articles 9.2 or 9.3 hereof, ~~until the expiration~~ ~~of the last to expire of the copyright issued for twenty years from the effective date of this License~~ ~~Agreement.~~ In the event the copyright application is denied for any reason, this entire agreement shall be deemed null, void and of no force and effect.

9.2    Termination by UMMC. Upon the occurrence of any of the events set forth below ("Events of Default"), UMMC shall have the right to terminate this Agreement by giving written notice of termination, such termination effective with the giving of such notice:

(a) nonpayment of any amount payable to UMMC that is continuing sixty (60) calendar days after UMMC gives Licensee written notice of such nonpayment;

(b) any material breach by Licensee of any covenant (other than a payment breach referred to in clause (a) above or a Development Plan breach referred to in section 9.3 below) or any representation or warranty contained in this Agreement that is continuing sixty (60) calendar days after UMMC gives Licensee written notice of such breach;

( · ) the administrative dissolution of Licensee by the Mississippi Secretary of State;

(ic) If after the first commercial sale of a Product and during the term of this Agreement, Licensee fails to make reasonable efforts to commercialize at least one (1) Product or fails to keep at least one (1) Product on the market after the first commercial sale for a continuous period of one (1) year.

10

> **Commented [DK4]:** How long is this?
>
> **Commented [SSJ5]:** Copyrights are life of author plus 70. Patents used to be 17 and are now 20 so we propose 20 years.

9.3    Termination by Licensee. Licensee shall have the right to terminate this Agreement, at any time with or without cause, upon sixty (60) days' written notice to UMMC. In the event UMMC fails to prosecute any infringement, or possible infringement, of the subject copyright under Section 7.2 above within [illegible] of receipt of notice of such infringement or possible infringement, Licensee shall have the right to terminate this agreement without further notice, and UMMC will convey and transfer ownership of the subject copyright to Licensee.

9.4    Rights and Duties Upon Termination. Within thirty (30) days after termination of this Agreement, each party shall return to the other party any Confidential Information of the other party. If terminated by Licensee the Licensee also shall return all Licensed Technology which is embodied in physical form to the UMMC promptly upon the termination of this Agreement. In the event of an early termination of this Agreement, Licensee and its sub-licensees shall have the right to use or sell all the Product(s) on hand or in the process of manufacturing at the time of such early termination, provided that Licensee shall be obligated to pay to UMMC a royalty on such sales as set forth in this Agreement if, at that time there remains in existence any of UMMC's Patent rights covering the transfer of such Product(s) and a royalty or other payment is payable pursuant to the terms of this Agreement. Within thirty (30) days after termination of this Agreement by UMMC under Article 9.2 or by Licensee without Cause under Article 9.4, Licensee agrees:

    (a) to provide UMMC with copies of all results of research, development and marketing studies pertaining to the Products and Licensed Technology;

    (b) to provide UMMC with an electronic and paper copy of any and all copyright and trademark documents and correspondence related to the Licensed Technology and Product(s) between Licensee and the U.S. Patent Office and foreign government equivalents.

    (c) to perform all acts deemed necessary or desirable by UMMC to permit and assist it, at UMMC's expense, in evidencing, perfecting, obtaining, maintaining, defending and enforcing UMMC's ownership rights and/or any assignment with respect to inventions and patents to be assigned to UMMC in any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. Upon termination, Licensee herby irrevocably designates and appoints UMMC and its duly authorized officers and agents, as its agents and attorneys-in-fact to act for and in its behalf and instead of Licensee, to execute and file any documents and to do all other lawfully permitted acts to further the foregoing purposes with the same legal force and effect as if executed by Licensee.

9.5    Provisions Surviving Termination. Licensee's obligation to pay any royalties accrued but unpaid prior to termination of this Agreement shall survive such termination. Licensee shall owe UMMC royalties on sales when Licensee has received payments from a sub-licensee or Affiliate. In addition, all provisions required to interpret the rights and obligations of the parties arising prior to the termination date shall survive expiration or termination of this Agreement.

**ARTICLE 10**
**MISCELLANEOUS**

11

UMMC-001898

10.1    Assignment. This Agreement and the rights and benefits conferred upon Licensee hereunder may not be transferred or assigned to any Person, directly or by merger, by sale or assignment of membership interests in Licensee, or by other operation of law, without the express written permission of UMMC, which permission will not be unreasonably withheld. This Agreement shall inure to the benefit of permitted assigns of Licensee.

10.2    No Waiver. A waiver by either party of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

10.3    Independent Contractor. Nothing herein shall be deemed to establish a relationship of principal and agent between UMMC and Licensee, nor any of their agents or employees for any purpose whatsoever. This Agreement shall not be construed as constituting UMMC and Licensee as partners, or as creating any other form of legal association or arrangement that could impose liability upon one party for the act or failure to act of the other party. No employees or staff of UMMC shall be entitled to any benefits applicable to employees of Licensee. Neither party shall be bound by the acts or conduct of the other party.

10.4    Notices. Any notice under this Agreement shall be sufficiently given if sent in writing by prepaid, first class, certified or registered mail, return receipt requested, addressed as follows:

if to UMMC, to:
   University of Mississippi Medical Center
   2500 North State Street
   Jackson, MS 39216
   Attention: Leslie A. Musshafen
   Director, Sponsored Programs

if to Licensee, to:
   Health Data Analytics, LLC
   4107 Hawthorne Drive
   Jackson, MS 39206
   Attention: Denise Krause
   Managing Member

or to such other addresses as may be designated from time to time by notice given in accordance with the terms of this Article.

10.5    Entire Agreement. This Agreement embodies the entire understanding between the parties relating to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral. This Agreement may not be modified or varied except by a written document signed by duly authorized representatives of both parties.

10.6    Severability. In the event that any provision of this Agreement shall be held to be unenforceable, invalid or in contravention of applicable law, such provision shall be of no effect, the remaining portions of this Agreement shall continue in full force and effect, and the parties shall negotiate in good faith to replace such provision with a provision which effects to the extent possible the original intent of such provision.

12

UMMC-001899

10.7 Force Majure.  In the event that either party's performance of its obligations under this Agreement shall be prevented by any cause beyond its reasonable control, including without limitation acts of God, acts of government, shortage of material, accident, fire, delay or other disaster, provided that the affected party shall have used its reasonable best efforts to avoid or remove the cause of such nonperformance and to minimize the duration and negative effect of such nonperformance, then such affected party's performance shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence. The affected party shall continue performance under this Agreement using its best efforts as soon as such cause is removed.

10.8 Headings.  Any headings and captions used in this Agreement are for convenience of reference only and shall not affect its construction or interpretation.

10.9 No Third Party Benefits.  Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their permitted assigns, any benefits, rights or remedies.

10.10 Governing Law.  This Agreement shall be construed in accordance with and governed by the internal laws of the State of Mississippi, excluding such state's rules relating to conflicts of laws, and its form, execution, validity, construction and effect shall be determined in accordance with such internal laws.

10.11 Counterparts.  This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures of each of the parties hereto.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

10.12 Resolution of Disputes.  In the event of any dispute, controversy or claim arising out of or relating to this Agreement, or to any breach hereof, the parties shall attempt first to resolve the dispute by good faith negotiation.  If the parties are unable to reach agreement by negotiating in good faith within sixty (60) days of written assertion of a claim, they agree to settle the dispute by mediation in accordance with the mediation rules of the American Arbitration Association ("AAA").  Such mediation shall take place in Jackson, Mississippi, unless the parties agree to an alternative location.  All administration fees related to the mediation, including charges of AAA, the expenses of the meeting rooms, the fees and expenses of the mediator, or similar expenses, shall be borne equally by the parties thereto.  In the event the dispute is litigated and UMMC is the prevailing party in the litigation, Licensee will reimburse UMMC's legal and attorneys' fees, costs, and expenses.

13

UMMC-001900

IN WITNESS WHEREOF, the parties hereto have duly executed this License Agreement as of the date first above written.

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

_____    _____
Richard L. Summers, MD                              Date
Associate Vice Chancellor for Research

Acknowledged by:

_____    _____
Denise Krause                                       Date
Managing Member, Health Data Analytics, LLC

14

UMMC-001901

**APPENDIX A**

COPYRIGHTS

Mississippi Mapper web application developed using geographic information systems (GIS) and JavaScript

15

UMMC-001902

**APPENDIX B**
Example Sales and Royalty Report

Licensee:_____    UMMC Agreement ID:_____

Period Covered:_____ through_____

Prepared by:_____        Date:_____

(Company Representative)

Approved by:_____        Date:_____

(Company Representative)

If license agreement covers several major product lines, please prepare a separate report for each line.
Then combine all product lines into a summary report.

Report Type:    ☐    Single Product or Process Line Report:_____

(product name)

☐    Multiproduct Summary Report, Page ____ of ____

Other Compensation:    ☐    Annual Payments, milestones, or other fees & compensation

Details:_____

Amount Due:_____

☐    No Compensation of Royalty Due this Period

Reason:_____

16

UMMC-001903

| Country | Quantity Produced | Quantity Sold | Gross Sales ($) | *Net Sales ($) | Royalty Rate | Conversion Rate (if applicable) | Royalty Due this Period |
|---------|-------------------|---------------|-----------------|----------------|--------------|---------------------------------|-------------------------|
| USA | | | | | | | |
| Canada | | | | | | | |
| Japan | | | | | | | |
| Other: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL: | | | | | | | |

* To calculate net sales, use the following space to list separately the specific types of allowed deductions under the license agreement and the corresponding amounts:_____

Then calculate the final Net Sales amount by subtracting these amounts from Gross Sales, and note in the column above.

17

UMMC-001904

EXHIBIT

Krause - 6

### LICENSE AGREEMENT

THIS LICENSE AGREEMENT is made as of this the 20th day of April, 2012 ("Effective Date") by and between the UNIVERSITY OF MISSISSIPPI MEDICAL CENTER (UMMC), an educational institution and Medical Center Research Development Foundation ("MCRDF") with a principal address at 2500 North State Street, Jackson, MS 39216 and HC Simulation, LLC , a corporation organized and existing under the laws of Mississippi with a principal address 1577 Barnes Road, Canton, MS 39046("Licensee").

### RECITALS

WHEREAS, UMMC is the owner of certain patent applications and other technology, including copyrights, related to HumMod, UMMC#2008-06 (the "Intellectual Property").

WHEREAS, Licensee wishes to acquire certain rights and licenses with respect to the Intellectual Property in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and intending to be legally bound herby, the parties hereto agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1    Unless otherwise provided in this Agreement, the following terms when used with initial capital letters shall have the meanings set forth below:

"Affiliate" means, when used with reference to Licensee, any person directly or indirectly controlling, controlled by or under common control with Licensee.

"Bankruptcy Event" means the person in question becomes insolvent, or voluntary or involuntary proceedings by or against such person are instituted in bankruptcy or under any insolvency law, or a receiver or custodian is appointed for such person, or proceedings are instituted by or against such person for corporate dissolution of such person, which proceedings, if involuntary, shall not have been dismissed within sixty (60) days after the date of filing, or such person makes an assignment for the benefit of creditors, or substantially all of the assets of such person are seized or attached and not released within sixty (60) days thereafter.

"Calendar Quarter" means each three-month period, or any portion thereof, beginning on January 1, April 1, July 1 and October 1.

1

"Confidential Information" means (i) the Technical Information, (ii) any other information or material in tangible form that is marked as confidential or proprietary by the furnishing party at the time it is delivered to the receiving party, and (iii) information that is furnished orally if the furnishing party identifies such information as confidential or proprietary when it is disclosed and promptly confirms such designation in writing after such disclosure.

"Copyrights" means any software, computer programs, documentation, algorithms, or other materials subject to copyright protection including in the Intellectual Property as set forth on Appendix A, which shall be amended from time to time to indicate the then-current copyrights.

"Effective Date" shall have the meaning set forth on page 1 of this Agreement.

"Federal Government Interest"  IF APPLICABLE means the rights of the United States Government and agencies thereof under Public Laws 96_517, 97_256 and 98_620, codified at 35 U.S.C.§§ 200-212, and any regulations issued there under, as such statute or regulations may be amended from time to time hereafter.

"Field" means Physiological Modeling Software Development.

"Net Sales" means Licensee's Sales (as defined herein below):

      i.    Less sales, value added, excise and any other taxes and/or duties and

      ii.    Less returns (including without limitation spoiled, damaged, outdated and defective goods), allowances, discounts, and adjustments credited to customers and

      iii.    Less commissions or fees paid to independent sales representatives, brokers, dealers, or distributors, and

      iv.    Less shipping and handling costs if not paid for by the customer,

      v.    Less an allocated (pro rata) cost for any product and/or commercial liability insurance maintained by Licensee in carrying out the commercialization of the Licensed Products (including any insurance specified in Section 6.5 hereof),

      vi.    Less allocated costs for sales samples of Products, or commercially reasonable promotional allowances for all Products sold or Commercially Used by Licensee or its Affiliates,

      vii.    Less any other direct costs of sale substantiated Licensee in writing, including by way of example and not limitation, customer-specific engineering and development costs, implementation costs and/or re-seller compensation or

2

> incentives, and
>
> viii.   On all sales, a 2% deduction as a reasonable estimate of Licensee's administrative and overhead costs in connection with processing the sale.

"Improvements" means any improvement, modification or other refinement, regardless of the patentability thereof to (a) the subject matter of the Licensed Technology, within the scope of the rights   claimed in the Intellectual Property; or (b) the development, manufacture, use or sale of which, except for the licenses granted herein, would infringe a valid claim of any of the Intellectual Property rights.

"Licensed Technology" means and includes UMMC Know-How, the Copyrights Patent Rights, if any, Improvements and Trademarks.

"Patent(s)" or "Patent Rights" means any patents or applications which claim the invention(s) summarized in Appendix A which relate to the Licensed Technology, including without limitation any United States Letters Patent, and all continuations, continuations-in-part, additions, divisions, renewals, extensions, reexaminations and reissues of any of the foregoing, all foreign counterparts of any of the foregoing, and any other patents which relate to the Licensed Technology owned or controlled by UMMC during the term of this Agreement.

"Patent Expenses" means all reasonable fees, expenses, and charges of outside patent counsel related to Patent Rights, listed in Exhibit A currently or added by amendment at a future date, incurred by UMMC in connection with the preparation, filing, prosecution, issuance, re-issuance, re-examination, interference, and/or maintenance of applications for patent rights, currently contained or that may be added to Exhibit A.

"Person" means an individual, partnership, corporation, joint venture, unincorporated association, or other entity, or a government or department of agency thereof.

"Products" means, if applicable, any tangible article or portion thereof which is made, produced, or used in whole or in part, by or with the use of the Licensed Technology.

"Sales" means gross receipts of the Company received in payment from bona fide, third party customers in satisfaction of invoices for the commercial sale and/or sub-licensing of the Licensed Products.  The term Sale expressly includes licensing fees received by Licensee included but not limited to upfront fees (whether paid in cash, equity of the sub-licensee or other consideration), royalties, and milestone payments received in consideration of the grant of sub-licenses of the Licensed Technology, however such sub-licenses may be characterized.   The term "Sale" shall not include receipts of the Company for capital contributions or funds received from the sale of equity interests in the Company; monies received by the Company for research and/or development grants (whether private or governmental); or any other item of receipt, income or gain which is not related to an

3

invoiced transaction with a third-party customer or sub-licensee of the Company.

Service" means any activity, process, formula or technology- or computer-enabled platform that is provided by the Licensee in exchange for a fee that is provided in whole or in part, by or with the use of the Licensed Technology.

"Technical Information" means and includes all technical information, trade secrets, developments, discoveries, know-how, methods, techniques, formulae, processes and other information relating to the Licensed Technology that UMMC owns or controls on the date hereof or owns or controls in the future, including by way of illustration and not limitation, designs, data, drawings, documents, models, and other similar information.

"UMMC Know-How" means all information, technical data and assistance, inventions and discoveries of UMMC disclosed or provided to Licensee by UMMC relating to the exploitation of any of the Intellectual Property.

"Trademark" means "HUMMOD" which is owned by Licensor, as well as any other trade name, trade mark or service mark owned by Licensor and utilized in connection with its commercialization of Products and/or Services under this Agreement.

"Valid Claim" means a claim of an unexpired issued Patent that has not been withdrawn, canceled or disclaimed or held invalid by a court or governmental authority of competent jurisdiction in an unappealable or unappealable decision.

**ARTICLE 2**
**GRANT OF LICENSE**

2.1    Grant of License.

(a) Subject to the terms and conditions contained in this Agreement, UMMC hereby grants to Licensee, it successors and/or permitted assigns, an exclusive, transferrable (but only as allowed in this Agreement), worldwide, royalty-bearing right and license to use and practice the Licensed Technology to make, have made, use, and sell Products or Services in the Field.

(b)    Except as provided in sub-section (d) below, the only exception to the Licensee's exclusivity hereunder is that UMMC expressly reserves a non-transferable royalty-free right to use the Licensed Technology in the Field itself, including use by its faculty, staff and researchers including all UMMC schools, UMMC Pharmacy School and clinical sites, for educational and research purposes only.

(c)    Included within the License granted herein are all rights incidental to or necessary for the commercialization of the Licensed Technology, including, without limitation, the right to: (a) copy, distribute, manufacture, adapt, create derivative works of, translate, localize, port or otherwise modify the Simulation Technology; (b) further assign and/or sub-license the Licensed Technology; (c) pursue, apply for

4

and accept the terms and conditions of any development and research grants/funding to further promote, develop and enhance the Licensed Technology; and (d) to collaborate with other third parties and integrate the Licensed Technology (or certain components thereof) with compatible technologies, portals, and front-end or back-end interfaces developed by such third parties.

(d)    Licensee is hereby guaranteed exclusivity of its license to the Licensed Technology for the first five (5) years of the Term (the "Exclusive Period"). Provided that Licensee has either: (a) generated Sales in excess of $1,000,000 during the Exclusive Period (the "Sales Target"); or (b) attained a market valuation in excess of $1,000,000 during the Exclusive Period (the "Valuation Target"), the license granted hereunder shall remain exclusive unto Licensee for the balance of the Term. If Licensee fails to reach either the Sales Target or the Valuation Target during the Exclusive Period, then this Agreement shall remain in full force and effect on the terms and conditions herein stated, except that UMMC, as its sole and complete remedy, shall have the right to convert this Agreement to a non-exclusive license agreement.   Notwithstanding the foregoing or anything in this Agreement to the contrary, Licensee shall have an exclusive license to the Trademark as long as this Agreement remains in effect, and notwithstanding any conversion of this Agreement to a non-exclusive license as to the remainder of the Licensed Technology.

(e) In the event that UMMC determines that Licensee has not met the Sales Target or the Valuation Target during the Exclusive Period, then UMMC shall provide Licensee at least 90 days notice of its intent to invoke the right to make the license granted by this Agreement non-exclusive.    If UMMC fails to provide the notice within twelve (12) months following the expiration of the Exclusive Period, then UMMC shall be deemed to have acknowledged that Licensee has satisfied the Sales Target or Valuation Target and shall thereafter waive or relinquish any right or option to terminate the exclusivity afforded by this Agreement.

(f)    If UMMC sends a notice of the type described in the immediately preceding Sub-section (e), then UMMC agrees that it will not make any appointment or grant of license rights to another party effective after the expiration of 12 months from the date of such notice (the "Cure Period") and (ii) in the event that, upon completion of such Cure Period, Licensee has exceeded the Sales Target or the Valuation Target, then UMMC's right and option to make the grant non-exclusive licenses to other third parties shall terminate. In the event that Licensee loses its exclusivity rights as provided in the immediately preceding sections, but continues to market and commercialize the Licensed Technology, then Licensee shall continue to make royalty payments on Net Sales in the time and manner provided under this Agreement.   Further, Licensee shall exclusive right and license to the Trademark in connection with its commercialization of the Licensed Technology for so long as this Agreement remains in effect.

5

(g)    If there is a difference of opinion between the parties concerning the computation of Sales or Valuation for purposes of this Section, then such discrepancy shall be resolved by the review of an independent valuation analyst. Each party shall select its own analyst and those parties, in turn, will jointly select the independent analyst.   If the parties do not agree to the determination of the independent analyst within thirty (30) days, then the parties shall then submit the issue to non-binding mediation through a jointly selected mediator, mutually acceptable to both parties, with such mediation.

2.2    Development of Other Intellectual Property.  Any intellectual property or inventions subsequently developed by LICENSEE and unrelated to the Licensed Technology, its agents, owners, employees or contractors of LICENSEE without the collaboration or input from employees or agents of UMMC shall be the sole and exclusive property of LICENSEE, and UMMC shall not make claims to such intellectual property; provided, however, that subsequent improvements, versions, upgrades and enhancements to the Licensed Technology will be owned by UMMC and automatically included within the rights and privileges granted to Licensee under this Agreement.    Correspondingly, any intellectual property or inventions subsequently developed by UMMC, its agents, owners, employees or contractors without the collaboration or input from LICENSEE employees or agents of LICENSEE shall be subject to the intellectual property guidelines of UMMC and LICENSEE will not claim an interest therein.    In the event that any intellectual property is subsequently developed though the joint efforts of LICENSEE and UMMC, such intellectual property will be subject to the terms of this Agreement unless otherwise agreed in a separate written instrument.

2.3    Right to Sub-license.  Subject to the terms and conditions of this Agreement, Licensee shall have the right to sub-license to any third party, in whole or in part, its rights under this Agreement.    Promptly following the execution of this Agreement, UMMC and Licensee will agree to a standard form of End User Sublicense Agreement ("EUSA").  UMMC will provide its consent to the standard EUSA within thirty (30) days of receipt (failure by UMMC to provide any objection within the thirty (30) day period shall constitute a deemed approval).  Licensee shall be free to grant sub-licenses of the Licensed Technology, without the prior consent or approval of UMMC, provided that the final EUSA with the customer or sub-licensee: (a) does not materially deviate from jointly approved EUSA; and (b) does not grant broader or more extensive rights in the Licensed Technology than those that are granted unto Licensee under this Agreement.   As a condition of granting sub-licenses, Licensee will provide UMMC with full and complete copies of all contracts and agreements between it and any sub-licensee within ten (10) business days after execution of same. UMMC will maintain such copies and their terms in confidence as required in Article 8.  A grant of a sub-license will be invalid if any agreement between Licensee

6

and such sub-licensee prohibits, restricts or conditions Licensee's provision of such copies to UMMC as required in this article.

2.4    No Rights by Implication.   No rights or licenses with respect to the Licensed Technology are granted or deemed granted hereunder or in connection herewith, other than those rights or licenses expressly granted in this Agreement.

## ARTICLE 3
## LICENSING FEES AND EQUITY

3.1    Intentionally Omitted.

3.2    Royalties.

(a).    In further consideration of the rights and licenses granted hereunder, Licensee shall pay UMMC a royalty of five percent (5%) of Net Sales of all Products or Services sold for commercial use. No royalty shall be due on Products or Services used for clinical trial or other research or developmental uses.

(b).    No royalties will be earned, accrue or be due and payable hereunder until Licensee has achieved Net Sales in excess of two hundred and fifty thousand and no/100 ($250,000).    Once Licensee's historical Sales have exceeded this amount, royalties will begin to accrue on Net Sales in excess of Two-Hundred Fifty Thousand and No/100 Dollars ($250,000) only.    However, beginning in the third year, but subject to Section 3.3(b), royalties will be paid on Net Sales whether or not the sales have reached $250,000.

3.3    Payments.

(a).    Royalties and other amounts payable under this Agreement shall be paid within thirty (30) days following the last day of the Calendar Year in which royalties and other amounts accrue, unless Licensee, in its discretion, elects to pay the Royalties more frequently.   The last such payment shall be made within thirty (30) days after termination of this Agreement.  Payments shall be deemed paid as of the day on which they are received by UMMC.

(b).    Notwithstanding the foregoing or anything else in this Agreement to the contrary, in the event that royalties earned under this Agreement, when paid, would exceed fifteen percent (15%) of Licensee's EBITDA for the corresponding royalty period (as determined in good faith by Licensee's CPA in accordance with GAAP), then Licensee may elect to accrue and defer the royalties to subsequent payment

7

periods. Any royalties deferred under this Section shall be deemed earned as of the end of the annual period in which they became due and the unpaid portion thereof shall bear interest from that date until paid in full at the rate of five percent (5%) per annum. The accrual of royalties under this Section shall not be deemed a default under this Agreement for non-payment.

3.4    Reports. Licensee shall deliver to UMMC within thirty (30) days after the end of each Calendar Quarter following commercial sale of a Product or Service a report setting forth in reasonable detail the calculation of the royalties for such Calendar Quarter pursuant to this Article 4 (provided that payments shall be annually as set forth in Section 3.3.1), including, without limitation, the Products or Services sold in each country during such Calendar Quarter, the Net Sales Price thereof, and, within sixty (60) days after the end of each Calendar Quarter, similar reports containing corresponding information relating to royalties payable due to sales by permitted sub-licensees pursuant to Article 3.2. An example of an acceptable royalty report is provided in Appendix B.

3.5    Currency, Place of Payment, Interest.

(a)    All dollar amounts referred to in this Agreement are expressed in United States dollars. All payments to UMMC under this Agreement shall be made in United States dollars (or other legal currency of the United States), as directed by UMMC, by check payable to the "University of Mississippi Medical Center" or by wire transfer to an account as UMMC may designate from time to time.

(b)    If Licensee receives revenues from sales of Products in a currency other than United States dollars, royalties shall be converted into United States dollars at the applicable conversion rate for the foreign currency as published in the "Exchange Rates" table in the eastern edition of *The Wall Street Journal* as of the last date of the Calendar Quarter.

(c)    Amounts that are not paid when due shall accrue interest-from the due date until paid, at an annual rate equal to 5%.

3.6    Records. Licensee will maintain complete and accurate books and records that enable the royalties payable hereunder to be verified. The records for each Calendar Quarter shall be maintained for two years after the submission of each report under Article 3.4 hereof, and shall be open at all reasonable times for inspection by a representative of MCRDF and/or UMMC for the purpose of verifying Licensee's royalty statements or Licensee's compliance in other respects with this Agreement. The MCRDF or UMMC representative shall be obliged to treat as confidential all relevant matters. Such access shall be available during normal business hours and such inspections shall occur no more than two (2) times per year. Such inspections shall be at the expense of UMMC, unless the inspection reveals any error in the

8

computation of Net Sales exceeding 5% of the amount owed. In that event, Licensee shall promptly reimburse MCRDF or UMMC for all reasonable expenses and costs incurred in the conduct of such review.

3.7    Equity. In further consideration of the rights and licenses granted hereunder, Licensee shall issue to the Medical Center Research Development Foundation (MCDRF) units representing five percent (5%) of the presently issued and outstanding membership interests in Licensee. The membership interest will be held in MCDRF for the benefit of UMMC. The membership interest issued to MCRDF for the benefit of UMMC shall be represented by a certificate and shall be subject to the terms of the Operating Agreement of Licensee to be agreed upon between the parties and affixed to this Agreement as Appendix C.

## ARTICLE 4
## CERTAIN OBLIGATIONS OF LICENSEE

4.1    Licensee Efforts; Reporting.

(a)    Licensee shall use its reasonable efforts to develop for commercial use and to market Products and/or Services as soon as practicable, and to continue to market Products and/or Services as long as commercially viable, all as is consistent with sound and reasonable business practice.

(b)    Licensee shall provide UMMC once per Calendar year (in the month of December) with written reports, setting forth in such detail as UMMC may reasonably request, the progress of the development, evaluation, testing and commercialization of Products. Licensee shall notify UMMC within thirty (30) days of the end of the first quarter in which the first commercial sale of a Product or Service occurs.

4.2    Compliance with Laws. Licensee shall use its best efforts to comply with all prevailing laws, rules and regulations pertaining to the development, testing, manufacture, marketing and import or export of Products. Without limiting the foregoing, Licensee acknowledges that the transfer of certain commodities and technical data is subject to United States laws and regulations controlling the export of such commodities and technical data, including all Export Administration Regulations of the United States Department of Commerce. These laws and regulations, among other things, prohibit or require a license for the export of certain types of technical data to specified countries. Licensee will comply with all United States laws and regulations controlling the export of commodities and technical data.

4.3    Government Approvals. Licensee will be responsible for obtaining, at its cost and expense, all governmental approvals required to commercially market Products.

9

4.4    Patent Notices. Licensee shall use commercially reasonable efforts to mark or cause to be marked all Products or Services made or sold in the United States with all applicable patent numbers. If it is not practical for a Product or Service to be so marked, then Licensee shall mark or cause to be marked the package, if applicable, for each Product or Service with all applicable patent numbers.

4.5    Bankruptcy or Equivalent. Licensee will provide written notice to UMMC prior to the filing of a petition in bankruptcy or equivalent if Licensee intends to file a voluntary petition or, if known by Licensee through statements or letters from a creditor or otherwise, if a third party intends to file an involuntary petition in bankruptcy against Licensee. Notice will be given at least 75 days before the planned filing or, if such notice is not feasible, as soon as Licensee is aware of the planned filing. Licensee's failure to perform this obligation is deemed to be a material pre-petition incurable breach under this Agreement not subject to the 60-day notice requirement of Section 9.2, and UMMC is deemed to have terminated this Agreement forty-five (45) days prior to the filing of the bankruptcy.

### ARTICLE 5
### REPRESENTATIONS

5.1    Representations of UMMC. UMMC and MCDRF represents to Licensee as follows:

   (a)    this Agreement, when executed and delivered by UMMC and MCRDF, will be the legal, valid and binding obligation of UMMC and MCDRF, enforceable against UMMC and MCDRF in accordance with its terms;

   (b)    UMMC subject to certain rights under 37 CFR 401.14 retained by the federal government in inventions resulting from federally supported work is the owner of all right, title and interest in and to the Patents, the Copyrights and the Technical Information, and has not granted rights in or to the Licensed Technology to any person other than Licensee;

   (c)    UMMC has not received any written notice that the Licensed Technology infringes the proprietary rights of any third party;

   (d)    the inventions claimed in the Patents to the knowledge of UMMC have not been publicly used, offered for sale, or disclosed in a printed publication by employees of UMMC more than one year prior to the filing of the U.S. application for the Patents.

10

5.2 <u>Representations and Warranties of Licensee</u>.  Licensee represents and warrants to UMMC and UMMC as follows:

(a) Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of <u>Mississippi</u> and has all requisite corporate power and authority to execute, deliver and perform this Agreement;

(b) This Agreement, when executed and delivered by Licensee, will be the legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms;

(c) the execution, delivery and performance of this Agreement by Licensee does not conflict with, or constitute a breach or default under,

    (i) the charter documents of Licensee,

    (ii) any law, order, judgment or governmental rule or regulation applicable to Licensee, or

    (iii) any provision of any agreement, contract, commitment or instrument to which Licensee is a party; and the execution, delivery and performance of this Agreement by Licensee does not require the consent, approval or authorization of, or notice, declaration, filing or registration with, any governmental or regulatory authority.


## ARTICLE 6
## LIABILITY AND INDEMNIFICATION

6.1 EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, UMMC MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO: (I) COMMERCIAL UTILITY; OR (II) MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  ; OR (III) THAT THE USE OF THE LICENSED TECHNOLOGY WILL NOT INFRINGE ANY PATENT, COPYRIGHT OR TRADEMARK OR OTHER PROPRIETARY OR PROPERTY RIGHTS OF OTHERS. UMMC SHALL NOT BE LIABLE TO LICENSEE, LICENSEE'S SUCCESSORS OR ASSIGNS OR ANY THIRD PARTY WITH RESPECT TO ANY CLAIM ON ACCOUNT OF, OR ARISING FROM, THE USE OF INFORMATION IN CONNECTION WITH THE LICENSED TECHNOLOGY SUPPLIED HEREUNDER OR THE MANUFACTURE, USE OR SALE OF PRODUCTS OR ANY OTHER MATERIAL OR ITEM DERIVED THEREFROM.

11

6.2    Liability.  UMMC is an agency of the State of Mississippi under the management and control of the Board of Trustees of the State Institutions of Higher Learning (IHL).  As authorized by law, IHL maintains a program of self-insurance for purposes of workers' compensation and general liability, pursuant to the Mississippi Tort Claims Act as set forth in Chapter 46, Title 11, Mississippi Code 1972, as amended.  Accordingly, any liability of UMMC for any damages, losses, or costs arising out of or related to negligent and/or tortious acts allegedly committed or performed by UMMC or it employees under this Agreement is governed by the Tort Claims Act, subject to its limitations.   This foregoing shall not limit claims by Licensee and/or third parties which are not covered by sovereign immunity or the provisions of the tort claims act, or constitute an exception therefrom.

6.3    Licensee Indemnification. Licensee will indemnify and hold harmless UMMC and MCRDF, its trustees, officers, agents and employees (collectively, the "Indemnified Parties"), from and against any and all liability, loss, damage, action, claim or expense suffered or incurred by the Indemnified Parties which results from or arises out of (individually, a "Liability" and collectively, the "Liabilities"):

(a) breach by Licensee of any covenant or agreement contained in this Agreement; and

(b) the development, use, manufacture, promotion, sale, distribution or other disposition of any Products by Licensee, its Affiliates, assignees, vendors or other third parties, for personal injury, including death, or property damage arising from any of the foregoing. The indemnification obligation under Article 6.3 shall not apply to any contributory negligence or product liability of the Indemnified Party which may have occurred prior to the execution of this Agreement. Licensee will indemnify and hold harmless the Indemnified Parties from and against any Liabilities resulting from:

(i) any product liability or other claim of any kind related to the use by a third party of a Product that was manufactured, sold, distributed or otherwise disposed by Licensee, its Affiliates, assignees, vendors or other third parties;

(ii) to the extent applicable, clinical trials or studies conducted by or on behalf of Licensee relating to any Products, including, without limitation, any claim by or on behalf of a human subject of any such clinical trial or study, any claim arising from the procedures specified in any protocol used in any such clinical trial or study, any claim of deviation, authorized or unauthorized, from the protocols of any such clinical trial or study, any claim resulting from or arising out of the manufacture or quality control by a third party of any substance administered in any clinical trial or study; and

12

(iii) Licensee's failure to comply with all prevailing laws, rules and regulations pertaining to the development, testing, manufacture, marketing and import or export of Products.

6.4    Product Liability Insurance. If available at commercially reasonable rates for the type of Product or Service that Licensee markets and sells commercially, Licensee shall endeavor to obtain general liability and product liability insurance with minimum limits of \$1,000,000 occurrence/\$3,000,000 aggregate. Licensee shall provide UMMC with copies of such policies, upon request of UMMC.

## ARTICLE 7
## INTELLECTUAL PROPERTY RIGHTS AND INFRINGEMENT

7.1    Prosecution of Patents.

(a) Responsibilities for Patent Prosecution and Maintenance.

    (i) UMMC using one of its outside patent attorneys approved by Licensee (which approval shall not be unreasonably withheld) is responsible for preparing, filing, and prosecuting any patent applications, maintaining any issued patents, and prosecuting and maintaining any and all continuations, continuations-in-part, divisional, substitutions, reissues, or re-examinations (or the foreign equivalent of these) related to the Patent Rights. UMMC will pay (or caused to be paid, but not by Licensee) all Patent Expenses.

    (ii) UMMC will prepare, file, and prosecute Patent(s) in the United States. UMMC will also prepare, file, and prosecute international applications under the Patent Cooperation Treaty.

        (x) Such international applications shall designate the European Patent Office as the International Searching Authority, and shall designate at a minimum the European States (defined as "EP" on the international application form of the Patent Cooperation Treaty), and additional countries specified by Licensee.

        (y) Licensee will specify in writing to UMMC the additional foreign countries in which patent applications are to be filed and prosecuted. UMMC will notify Licensee ninety (90) days in advance of a national stage filing deadline, and Licensee will specify such additional countries no later than thirty (30) days before the national stage filing deadline for the pertinent patent application.

    (iii) UMMC is solely responsible for making decisions regarding content of U.S. and foreign applications to be filed and prosecution of the applications, continuations, continuations-in-part, divisional, substitutions, reissues, or re-examinations (or the foreign equivalent of these) related thereto. UMMC will not seek to narrow the scope of a pending application without obtaining Licensee's consent, which consent shall not be unreasonably withheld or

13

delayed. UMMC shall use its good faith efforts to provide Licensee with a copy of all final materials to be filed with the U.S. Patent and Trademark Office and its foreign equivalents at least ten (10) business days prior to the planned filing and afford Licensee the right to comment; *provided, however,* in the event such documents are not timely sent, no breach of contract shall be deemed to have occurred, provided that Licensee receives a copy of all final materials to be filed with the USPTO or foreign equivalents at least five (5) business days prior to the planned filing.

(iv) Licensee will cooperate with UMMC in the filing, prosecution, and maintenance of any Patents. UMMC will advise Licensee promptly as to all material developments with respect to the applications. Copies of all papers received and filed in connection with prosecution of applications in all countries will be provided promptly after receipt or filing to Licensee to enable it to advise UMMC concerning the applications.

(v) Each party agrees to promptly forward all written communications from the other party regarding prosecution of Patents to its patent counsel as appropriate, with a written confirmation to the other party that the communications have been forwarded.

(vi) In the event that UMMC has not filed for Patent Rights within twelve (12) months from the Effective Date, and Licensee has a good faith basis to determine that Valid Claims to Patent exist within the Licensed Technology, then Licensee shall send UMMC ninety written notice of its obligations under this Section. If, at the expiration of sixty (60) days from UMMC's receipt of such notice, it has not filed applications associated with the Patent Rights, then Licensee may shall the right to perform UMMC's duties of Patent filing and maintenance under this Agreement. Any such applications submitted by Licensee shall be submitted in the name of and on behalf of UMMC, as the owner of the Valid Claims to the Licensed Technology (and Licensee shall not claim or be vested with any rights by virtue of such actions or applications, except for such rights expressly granted by this Agreement). In the event that Licensee exercises such right, UMMC shall reimburse Licensee within thirty (30) days of demand, for all costs and expenses (including filing fees and reasonable costs of outside counsel) incurred as a result of Licensee's exercise of its rights under this Section. If UMMC does not reimburse such expenses, Licensee shall have a right to offset and withhold such amounts from other royalties or other sums payable from Licensee to UMMC hereunder.

7.2     Copyrights. All Copyrights contained, imbedded or incorporated into the Licensed Technology shall be owned by UMMC. UMMC, at its expense, and using one of its approved outside attorneys is responsible for preparing, filing, and prosecuting any copyright registrations, maintaining any issued or registered Copyrights, and prosecuting

14

and maintaining any and all continuations, continuations-in-part, divisional, substitutions, reissues, or re-examinations (or the foreign equivalent of these) related to the Copyrights, both domestically and internationally (as may be determined to be necessary or advisable by either UMMC or Licensee, with input of outside counsel).

7.3    Trademarks.

(a) All right, title and interest, whether arising under common law or by virtue of statutory registrations (either state or federal) in and to the Trademark shall be vested exclusively in Licensor.    Licensee shall have sole discretion over the trademarks, trade names, service marks, trade dress or other indicia used on connection with the Commercialization of Products or Services under this Agreement, but any such Trademarks shall be owned by Licensor and licensed to Licensee under this Agreement.    Any goodwill or recognition association with the Trademark shall be vested exclusively unto Licensor.    A trademark assignment fee in the amount of $750.00 shall be credited against the first payment of royalties owing from Licensee to Licensor under this Agreement.

(b) Neither this Agreement, nor the relationship of the parties created hereby, shall be deemed or construed to confer any right, privilege or license in either party to use the trademarks of the other party.    Neither party shall use, adopt or employ any trademark owned by the other party, for any purposes, without first having obtained the prior, written consent of the owner.

7.4.    Infringement by Third Party.

(a) Cooperation. Licensee and UMMC each agree to take reasonable actions to protect the Licensed Technology from infringement by third-parties. If one party brings any such action or proceeding, the other party may be joined as a party plaintiff if necessary for the action or proceeding to proceed and, in case of joining, the other party agrees to give the first party reasonable assistance and authority to file and to prosecute such suit.

(b) Notice. If any of the rights comprising the Licensed Technology are infringed by a third party, the party to this Agreement first having knowledge of such infringement, or knowledge of a reasonable probability of such infringement, shall promptly notify the other in writing. The notice shall set forth the known facts of such infringement in reasonable detail.

(c) Institution of Proceedings. As the owner of the rights to the Licensed Technology, UMMC shall have the primary right, duty and obligation, to institute, prosecute and control with counsel reasonably acceptable to

15

Licensee, any action or proceeding with respect to infringement of intellectual property or Patent rights relating to the Licensed Technology. Licensee shall have the right, but not the obligation, at its own expense, to be represented in any such action by its own counsel. No settlement, consent judgment or other voluntary final disposition may be entered into by UMMC without the written consent of Licensee. Such consent may be withheld if such settlement would admit the invalidity or unenforceability of the intellectual property or Patent rights relating to the Simulation Technology or otherwise have a material adverse effect on LICENSEE's interests under this Agreement.

(d) Failure to Institute Proceedings. If UMMC fails to institute, prosecute or control such action or prosecution set forth in 5(b)(ii) within a period of ninety (90) days after receiving notice of the from LICENSEE, then LICENSEE shall have the right to bring and control any such action by counsel of its own choice, and UMMC shall have the right, at its own expense, to be represented in any such action by counsel of its own choice. UMMC shall reasonably cooperate with LICENSEE, in such effort, including being joined as a party to such action if necessary. UMMC shall pay for or promptly reimburse all court costs and reasonable attorneys' fees and expert/consultant fees incurred by LICENSEE in exercising its self-help rights under this Section 5(b)(iii). If UMMC fails to pay for or promptly reimburse such expenses then Licensee may deduct and/or offset such costs against any royalties owed to Licensor under this Agreement.

(e) Any recovery obtained by the prosecuting party as a result of such proceeding, by settlement or otherwise, shall be applied first to the prosecuting party, an amount equal to its reasonable and documented costs and expenses of the litigation, with the remainder to be paid into the Licensee. Any damage awards received by or paid over to the Licensee shall not be deemed a "Sale" (except only to the extent that damages are specifically awarded to compensate Licensee for lost sales or lost revenues).

**ARTICLE 8**

16

## CONFIDENTIALITY AND PUBLICATIONS

8.1    Confidentiality.   To the extent allowed by law, both parties shall maintain in confidence and shall not disclose to any third party the Confidential Information received pursuant to this Agreement, without the prior written consent of the disclosing party except that the Confidential Information may be disclosed by either party only to those third parties (x) who have a need to know the information in connection with the exercise by either party of its rights under this Agreement and who agreed in writing to keep the information confidential to the same extent as is required of the parties under this Article 8.1, or (y) to whom either party is legally obligated to disclose the information.  The foregoing obligation shall not apply to information which:

(a) is, at the time of disclosure, publicly known or available to the public, provided that Information will not be deemed to be within the public domain merely because individual parts of such Information are found separately within the public domain, but only if all the material features comprising such Confidential Information are found in combination in the public domain;

(b) is known to recipient at the time of disclosure of such Confidential Information provided that recipient promptly notifies disclosing party in writing of this prior knowledge within thirty (30) days of receipt;

(c) is hereafter furnished to recipient by a third party, as a matter of right and without restriction on disclosure, provided that recipient promptly notifies disclosing party in writing of this third party disclosure after receipt thereof;

(d) is made public by disclosing party;

(e) is disclosed with the written approval of either party;

(f) is the subject of a legally binding court order compelling disclosure, provided that recipient must give disclosing party notice of any request for disclosure pursuant to any legal proceeding, within two (2) days of receipt of such request by recipient, and recipient must cooperate with disclosing party in obtaining appropriate protective orders to preserve the confidentiality of the Confidential Information.

8.2    UMMC shall have the right to make announcements or publications concerning the Licensed Technology for promotional, academic or research purposes, provided that such presentations and/or announcements do not publicly disclose Confidential Information or trade secrets concerning the Licensed Technology that are not

17

generally known by the public and which provide an actual or potential commercial benefit to Licensee.    All such announcements and/or publications shall be submitted to Licensee for prior review and approval at least sixty (60) days before the anticipated date of the first publication or announcement.    In the event that Licensee determines in good faith that such publication is likely to violate the provisions of this Agreement relating to Confidential Information or may result in a material, adverse affect on Licensee's business, then Licensee may withhold its consent to such publication or condition its consent upon UMMC taking commercially reasonable measures to protect any intellectual property rights contained within such announcements or publications prior their dissemination.

8.3    Use of Name.  Neither Licensee nor UMMC or  MCRDF shall directly or indirectly use the other party's name, or the name of any trustee, officer or employee thereof, without that party's prior written consent, or disclose the terms of this Agreement to third parties except that UMMC or  MCRDF or Licensee may disclose this Agreement to any sub-licensee or Affiliate and may disclose an accurate description of the terms of this Agreement to the extent required under federal or state securities, tax, grant administration, or other disclosure laws, provided that UMMC or  MCRDF shall take steps to preserve the confidentiality of such information to the extent allowed by law.

## ARTICLE 9
## TERM AND TERMINATION

9.1    Term.  This Agreement and the licenses granted herein shall commence on the Effective Date and shall continue, subject to earlier termination under Articles 9.2 or 9.3 hereof, until the expiration of the last to expire of the Patents or 15 years from the Effective Date.

9.2    Termination by UMMC. Upon the occurrence of any of the events set forth below ("Events of Default"), UMMC shall have the right to terminate this Agreement by giving written notice of termination, such termination effective with the giving of such notice:

(a)  nonpayment of any amount payable to UMMC that is continuing sixty (60) calendar days after UMMC gives Licensee written notice of such nonpayment;

(b)  any breach by Licensee of any covenant (other than a payment breach referred to in clause (a) above) or any representation or warranty contained in this Agreement that is continuing sixty (60) calendar days after UMMC gives Licensee written notice of such breach;

18

(c)    Licensee fails to comply with the terms of the license granted under Article 2 hereof and such noncompliance is continuing sixty (60) calendar days after UMMC gives Licensee notice of such noncompliance;

(d)    Licensee becomes subject to a Bankruptcy Event; or

(e)    the dissolution or cessation of operations by Licensee.

9.3    <u>Business Plan..</u>  Licensee has provided UMMC with a Business Plan acceptable to UMMC. Such Business Plan is contained in Appendix B and is incorporated herein by reference. UMMC shall be entitled to terminate this Agreement if Licensee fails to meet the pre-established development milestones contained in the Development Plan. The milestones may be changed as agreed upon in advance in writing by both parties. UMMC shall give written notice of its decision to terminate this Agreement specifying a failure of the Development Plan milestones.  Unless Licensee has remedied such failure or both parties have agreed, in writing, to a revised milestone schedule within sixty (60) days after receipt of such notice, this Agreement will be deemed to terminate as of the expiration of such sixty(60) day period.

9.4    <u>Termination by Licensee</u>. Licensee shall have the right to terminate this Agreement, at any time with or without cause, upon sixty (60) days' written notice to the UMMC.

9.5    <u>Rights and Duties Upon Termination</u>. Within thirty (30) days after termination of this Agreement, each party shall return to the other party any Confidential Information of the other party. If terminated by Licensee, the Licensee also shall return all Licensed Technology which is embodied in physical form to the UMMC promptly upon the termination of this Agreement. Within thirty (30) days after termination of this Agreement by the UMMC under Article 9.2 or by Licensee without Cause under Article 9.4, Licensee agrees:

(a)    to provide UMMC with copies of all results of research, development and marketing studies pertaining to the Products/Services and Licensed Technology;

(b)    to provide UMMC with an electronic and paper copy of any and all patent and copyright documents and correspondence related to the Licensed Technology;

(d)    that UMMC shall own all right, title and interest in research, development and marketing results pertaining to the Licensed Technology as well as regulatory and intellectual property related applications submitted to all

19

government agencies relating to the Licensed Technology (with the exclusion of the Trademarks.

(e) to perform all acts deemed necessary or desirable by UMMC to permit and assist it, at UMMC's expense, in evidencing, perfecting, obtaining, maintaining, defending and enforcing UMMC's ownership rights and/or any assignment with respect to inventions and patents to be assigned to UMMC in any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings, and providing UMMC with access, security keys and like privileges to any third-party or internet hosted site where the Licensed Technology (or any component thereof) is stored (and Licensee shall cooperate in providing notice to such hosting sites of UMMC's rights and privileges to own and/or access such sites from and after termination of this Agreement). Upon termination under Section 9.4, Licensee herby irrevocably designates and appoints UMMC and its duly authorized officers and agents, as its agents and attorneys-in-fact to act for and in its behalf and instead of Licensee, to execute and file any documents and to do all other lawfully permitted acts to further the foregoing purposes with the same legal force and effect as if executed by Licensee.

9.6    Provisions Surviving Termination.    Licensee's obligation to pay any royalties accrued but unpaid prior to termination of this Agreement shall survive such termination. Licensee shall owe UMMC royalties on sales when Licensee has received payments from a sub-licensee or Affiliate. In addition, all provisions required to interpret the rights and obligations of the parties arising prior to the termination date shall survive expiration or termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

10.1    Assignment. This Agreement and the rights and benefits conferred upon Licensee hereunder may not be transferred or assigned to any Person, directly or by merger, by sale or assignment of membership interests in Licensee, or by other operation of law, without the express written permission of UMMC, which permission will not be unreasonably withheld.    Notwithstanding the requirement set forth in the preceding sentence, Licensee may assign or transfer its interests in this Agreement without written permission from UMMC in the following circumstances:

20

(a) an assignment in connection with the sale or transfer of all or substantially all of Licensee's assets which relate to the development or use of UMMC# 2008-06 or a Product(s) provided that the buyer or transferee is at least as financially stable as Licensee and following the sale or transfer would be as capable of performing its obligations under this Agreement as Licensee would be; or

(b) an assignment of a security interest in this Agreement as a part of a security interest in all or substantially all of the Licensee's assets which relate UMMC# or a Product(s).

Any prohibited assignment of this Agreement or the rights hereunder shall be null and void. No assignment shall relieve Licensee of responsibility for the performance of any accrued obligations which it has prior to such assignment. This Agreement shall inure to the benefit of permitted assigns of Licensee.

10.2    No Waiver. A waiver by either party of a breach or violation of any provision of this Agreement will not constitute or be construed as a waiver of any subsequent breach or violation of that provision or as a waiver of any breach or violation of any other provision of this Agreement.

10.3    Independent Contractor. Nothing herein shall be deemed to establish a relationship of principal and agent between UMMC, MCRDF and Licensee, nor any of their agents or employees for any purpose whatsoever. This Agreement shall not be construed as constituting UMMC, MCRDF and Licensee as partners, or as creating any other form of legal association or arrangement which could impose liability upon one party for the act or failure to act of the other party. No employees or staff of UMMC and UMMC shall be entitled to any benefits applicable to employees of Licensee. Neither party shall be bound by the acts or conduct of the other party.

10.4   Notices. Any notice under this Agreement shall be sufficiently given if sent in writing by prepaid, first class, certified or registered mail, return receipt requested, addressed as follows:

if to UMMC, to:

> University of Mississippi Medical Center
> Attention: Director of the Office of Research
> Office of Research
> 2500 North State Street
> Jackson, MS 39216-4505

if to MCRDF, to:

> Medical Center Research Development Foundation
> Secretary- Treasurer
> 2500 North State Street
> Jackson, MS 39216-4505

> Office of the General Counsel
> University of Mississippi Medical Center
> 2500 North State Street
> Jackson, MS 39216-4504

if to Licensee, to:
> H.C. Simulation, LLC
> 1577 Barnes Road
> Canton, MS 39046

With a copy to:

> R. Patrick McCraney
> McCraney, Coco & Lee, PLLC
> 800 Woodlands Parkway, Suite 107
> Ridgeland, MS 39157

or to such other addresses as may be designated from time to time by notice given in accordance with the terms of this Article.

10.5   Entire Agreement. This Agreement embodies the entire understanding between the parties relating to the subject matter hereof and supersedes all prior understandings

22

and agreements, whether written or oral. This Agreement may not be modified or varied except by a written document signed by duly authorized representatives of both parties.

10.6 Severability. In the event that any provision of this Agreement shall be held to be unenforceable, invalid or in contravention of applicable law, such provision shall be of no effect, the remaining portions of this Agreement shall continue in full force and effect, and the parties shall negotiate in good faith to replace such provision with a provision which effects to the extent possible the original intent of such provision.

10.7 Force Majure  In the event that either party's performance of its obligations under this Agreement shall be prevented by any cause beyond its reasonable control, including without limitation acts of God, acts of government, shortage of material, accident, fire, delay or other disaster, provided that the effected party shall have used its reasonable best efforts to avoid or remove the cause of such nonperformance and to minimize the duration and negative effect of such nonperformance, then such effected party's performance shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence. The affected party shall continue performance under this Agreement using its best efforts as soon as such cause is removed.

10.8 Headings. Any headings and captions used in this Agreement are for convenience of reference only and shall not affect its construction or interpretation.

10.9 No Third Party Benefits. Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their permitted assigns, any benefits, rights or remedies.

10.10 Governing Law.  This Agreement shall be construed in accordance with and governed by the internal laws of the State of Mississippi, excluding such state's rules relating to conflicts of laws, and its form, execution, validity, construction and effect shall be determined in accordance with such internal laws.

10.11 Counterparts.  This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures of each of the parties hereto. This  Agreement  may  be  executed  in  any  number  of counterparts, each of which shall be deemed an original as against the party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

23

IN WITNESS WHEREOF, the parties hereto have duly executed this License Agreement as of the date first above written.

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

_____   4-20-12

James E. Keeton, M.D.                                           Date
Vice Chancellor for Health Affairs

MEDICAL CENTER RESEARCH DEVELOPMENT FOUNDATION

_____   4. 18. 12

J. Michael Lightsey                                               Date
Secretary-Treasurer

HC SIMULATION, LLC

_____   4-18-12

Dr. Robert Hester                                                Date
President

**APPENDIX A**
**PATENTS and Fields of Use**

| UMMC Item # | Patent Rights | Fields of Use |
| --- | --- | --- |
| 2008-06 | HumMod | Physiological Modeling/ Software Development |

25

## APPENDIX C

Example Sales and Royalty Report

Licensee:_____        UMMC Agreement ID:_____

Period Covered:_____ through_____

Prepared by:_____        Date:_____

(Company Representative)

Approved by:_____        Date:_____

(Company Representative)

If license agreement covers several major product lines, please prepare a separate report for each line. Then combine all product lines into a summary report.

Report Type:        ☐    Single Product or Process Line Report:_____

(product name)

☐    Multiproduct Summary Report, Page ____ of ____

Other Compensation: ☐    Annual Payments, milestones, or other fees & compensation

Details:_____

Amount Due:_____

☐    No Compensation of Royalty Due this Period

Reason:_____

33

| Country | Quantity Produced | Quantity Sold | Gross Sales ($) | *Net Sales ($) | Royalty Rate | Conversion Rate (if applicable) | Royalty Due this Period |
|---|---|---|---|---|---|---|---|
| USA | | | | | | | |
| Canada | | | | | | | |
| Japan | | | | | | | |
| Other: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL: | | | | | | | |

* To calculate net sales, use the following space to list separately the specific types of allowed deductions under the license agreement and the corresponding amounts:_____

_____

_____

Then calculate the final Net Sales amount by subtracting these amounts from Gross Sales, and note in the column above.

34

**APPENDIX D**
**Operating Agreement**