# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**DENISE D. KRAUSE**                                                  **PLAINTIFF**

**V.**                                      **CIVIL ACTION NO.  3:19-cv-571-HTW-LGI**

**UNIVERSITY OF MISSISSIPPI MEDICAL
CENTER; and JOHN DOES 1-5**                          **DEFENDANTS**

## DEFENDANT'S MEMORANDUM OF AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant University of Mississippi Medical Center ("Defendant" or "UMMC"), by and through its counsel of record, submits this Memorandum of Authorities in Support of its Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

Plaintiff Dr. Denise Krause ("Dr. Krause") resigned and retired as a tenured professor at UMMC after she voluntarily (and unilaterally) relocated to Oregon in August 2017 because she believed Oregon provided better educational opportunities for her son. Once UMMC learned that Dr. Krause had moved to Oregon without securing permission, Dr. Krause requested indefinite paid leave, which UMMC denied. Although Dr. Krause could have returned to UMMC to perform her employment duties, she chose to voluntarily resign from her employment.

Three months later, Dr. Krause filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), then this lawsuit, claiming discrimination based on gender, claims of hostile work environment and harassment based on sex, and violations of due process. The crux of Dr. Krause's complaints is that she believes UMMC should have acceded to her demands to allow her to work from Oregon remotely and transfer to another school at UMMC that she believed was a better fit.   Even though Dr. Krause was the highest paid faculty member in her department (besides the department chair), Dr. Krause claims UMMC

discriminated against her based on her compensation, complaining she was not awarded a research-based salary supplement. UMMC denied her research-based salary supplement because she did not meet the eligibility criteria and Dr. Krause admits she does not know the value or number of grants other male faculty members used to support their requests for award. Dr. Krause cannot establish a genuine dispute of material fact to support any of her claims. Accordingly, UMMC is entitled to judgment as a matter of law on each claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      UMMC's Employment Policies and Procedures

UMMC is an academic medical center located in Jackson, Mississippi. (Krause Dep. 37, Ex. "A"; Brasfield Dec., Ex. "B."). As an employer of faculty and staff from diverse backgrounds, UMMC has an equal employment opportunity policy that prohibits discrimination and harassment based on any protected characteristic, including gender. (Krause Dep. 61-62, Ex. "A"; Att. "B-1" to Brasfield Dec.; Ex. 7 to Krause Dep.). UMMC also has a procedure in place for its employees to file internal work-related grievances. (Krause Dep. 62; Att. "B-2" to Brasfield Dec.). Dr. Krause was well aware of UMMC's reporting policy. (Krause Dep. 62). Nevertheless, during the five years before her resignation, Dr. Krause never reported any discriminatory conduct by UMMC based on her gender. (Brasfield Dec.).

### B.      Dr. Krause's Employment with UMMC

Dr. Krause began working for UMMC in 1993 as a Senior Secretary in UMMC's School of Dentistry. (Krause Dep. 37-38). UMMC permitted Dr. Krause to pursue graduate studies at UMMC for free, which enabled her to earn a Master of Science degree in preventive medicine and a Ph.D. in Preventive Medicine (with an emphasis in Epidemiology). (Krause Dep. 40-41). In 2008, UMMC promoted Dr. Krause to Assistant Professor, and she also served in an administrative

59742532.v1

position of Director of Research and Education Information Technology in UMMC's Division of Information Systems ("DIS"). (*Id.* at 50). (*Id.*).

In 2012, UMMC removed Dr. Krause from her administrative position as Director of Research and Education Information Technology. (*Id.* at 67). Because Dr. Krause was tenured faculty, she returned to the School of Dentistry, working as an Associate Professor.[1] (*Id.* at 52). UMMC transferred Dr. Krause to the Department of Biomedical Materials Science, School of Dentistry effective July 1, 2012. (Krause Dep. 54; Ex. 6 to Krause Dep.). Department Chair of the Biomedical Materials Science, Dr. Jason Griggs, directly supervised Dr. Krause. (Krause Dep. 73; Griggs Dec., Ex. "C."). In January 2016, Dr. David Felton was hired to be the Dean of the School of Dentistry. (Dep. Felton, 4-5, Ex. "E."). Dr. Krause worked as Associate Professor in the Biomedical Materials Science Department from 2012 to 2017, and she was promoted to the rank of Full Professor in 2017. (Ex. 5 to Krause Dep.).

In accordance with IHL Board of Trustees Policies and Bylaws, Dr. Krause's salary was reduced when she was removed as Director of Research and Education Information Technology and transferred to the Department of Biomedical Materials Sciences in 2012. (Krause Dep. 69-70; Att. "B-3" p.65 to Brasfield Dec.). To supplement her salary reduction, Dr. Griggs helped Dr. Krause obtain a position as Geographic Information Systems ("GIS") Analyst for the Office of Mississippi Physicians Workforce ("OMPW") in 2012.[2] (Krause Dep. 112-113).

---

[1] On July 1, 2009, Dr. Krause became a tenured faculty member in the Department of Periodontics and Preventive Science, School of Dentistry. (Krause Dep. 54). Pursuant to Institutions of Higher Learning ("IHL") policy, any faculty member's tenure status attaches to a specific school and department. (Ex. 31 to Krause Dep). Thus, when Dr. Krause was removed as Director, her tenure required her to return to the School of Dentistry. (Krause Dep. 72).

[2] At the time of her resignation, Dr. Krause spent 80% of her full-time effort in her faculty role as Professor with the Department of Biomedical Materials Science, School of Dentistry; she spent the remaining 20% of her full-time effort as GIS Analyst for OMPW, for which she received a salary supplement in the amount of $20,000. (Krause Dep. 114).

3

**C. Dr. Krause Repeatedly Disregarded UMMC's Processes and Departmental Procedures**

Dr. Krause described Dr. Griggs as "a wonderful department chair." (Krause Dep. 74). Dr. Krause testified that Dr. Griggs is "not a discriminatory kind of guy" and when asked if Dr. Krause thought Dr. Griggs was a fair department chair, she responded **"Absolutely."** (Krause Dep. 74, 209). (emphasis added). While Dr. Krause believes she "met and exceeded [Dr. Griggs'] expectations," she agrees that Dr. Griggs had strong criticism of her work. (*Id.* at 74, 79-80). According to Dr. Griggs, Dr. Krause displayed a "variety of troublesome characteristics" related to her performance. (Griggs Dep. 9). As Dr. Krause's immediate supervisor, Dr. Griggs consistently counseled Dr. Krause to increase her applications for research grants and follow UMMC's processes and departmental procedures. (Krause Dep. at 75-76).

Dr. Griggs consistently counseled Dr. Krause for failing to follow departmental rules and insubordination. (Krause Dep., Ex. 8, p. 7). For example, during the 2014-2015 academic year, even though Dr. Krause did not satisfy the minimum requirements for promotion to Full Professor, she sought the promotion by misrepresenting the number of peer-reviewed articles she published. (Krause Dep., Ex. 8, p. 8). Despite prior counseling, Dr. Krause continued to break departmental policy and failed to follow the chain of command. (Griggs Dep. 26-27). During her 2014-2015 evaluation, Dr. Griggs strongly reprimanded Dr. Krause, stating that she needed to "entirely revise the way in which [she] interact[s] with [Dr. Griggs] and that [she was] in violation of policies against providing false information and against uncivil behavior." (Krause Dep. 83-84; Ex. 8, p. 10). Despite Dr. Krause's attempt to downplay her misconduct, she admits Dr. Griggs warned her that if she did not correct her misconduct, her employment would be terminated for cause. (Krause Dep. 85; Ex. 8, p. 10).

59742532.v1

Dr. Krause's refusal to follow the rules is clear in her 2015-2016 evaluation: "Dr. Krause continues to [break] the Chain-of-Command frequently, fails to keep her direct supervisor in the loop, breaks departmental policy, [and] argues against departmental policy."[3] (Krause Dep., Ex. 9, p. 5). In addition, even though she had been instructed to attend, Dr. Krause continued to skip departmental faculty meetings.[4] (*Id.*; Krause Dep. 90). According to Dr. Krause, the faculty meetings "just didn't apply at all to [her] research because [she] was not a biomedical material sciences person." (Krause Dep. 90-91).

Additionally, Dr. Griggs consistently counseled Dr. Krause to focus on increasing the number of her extramural grant applications for research. (Krause Dep., p 83; *Id.*, Ex. 8, pp. 9-10). Dr. Griggs advised Dr. Krause that she needed to submit the required number of grant applications and give herself more time to edit her applications. (Ex. 8 to Krause Dep.). In fact, Dr. Griggs reduced the number of grant applications required of Dr. Krause to three applications per year.[5] (*Id.*; Krause Dep. 83-84). During the 2015-2016 academic year, Dr. Krause received one small grant. (Krause Dep. 95; Krause Dep., Ex. 9, p. 3). Dr. Griggs commended Dr. Krause for applying for the minimum of three extramural projects but noted that she did not submit the application through his office as he had previously requested. (Krause Dep. 86; Ex. 9, p. 2). Again, Dr. Griggs asked Dr. Krause to submit the grants through his office so that he could help her get rewarded appropriately for her accomplishments. (Krause Dep. 86; Ex. 9, p. 2).

---

[3] Moreover, Dr. Griggs reprimanded Dr. Krause for violating departmental policy by curving students' grades for her Evidence-Based Dentistry course. (Krause Dep., Ex. 9, p. 7). Dr. Griggs noted that when he met with Dr. Krause to discuss the final grades, she "appeared confused" and could not explain how she calculated her final grades. (*Id.*; Griggs Dep. 20). Dr. Krause denies curving grades but recalls Dr. Griggs counseling her. (Krause Dep. 93-94).

[4] Moreover, Dr. Krause was frequently absent or tardy to faculty meetings. (*Id.*). Dr. Krause refused to continue teaching one of her assigned courses (without first consulting with Dr. Griggs) following her students' course evaluations. (*Id.*).

[5] According to Dr. Griggs, other faculty wrote between three and nine grant applications per year. (Ex. 8 to Krause Dep.; Krause Dep. 83-84).

59742532.v1

Lastly, Dr. Griggs counseled Dr. Krause on other matters, including the following:

- Dr. Krause was insubordinate and provided false information. (Ex. 8 to Krause Dep., p. 7);
- Dr. Krause informed Dr. Griggs she was not available two weeks before a schedule out-of-state speaking engagement, causing Dr. Griggs to prepare and fill in for her. [6] (*Id.* at p. 6);
- Dr. Krause failed to plan ahead and meet deadlines regarding her travel and grading. (*Id.* at p. 6);
- Dr. Krause violated departmental policy against curving grades. (*Id.*).

### D.        Dr. Krause's Request for Research Salary Enhancement

UMMC's Enhancement Programs for Research Excellence faculty administers various programs to recognize faculty's efforts in research. (UMMC Enhancement Programs for Research Excellence, Ex. 11 to Krause Dep.; Musshafen Dec., Ex. "D."). One of the Enhancement Programs for Research Excellence is formally titled "Research Administrator—Increase in Negotiated Institutional Base Salary" and is generally referred to as a research-based salary enhancement. (*Id.*). The program awards "excellent research productivity concomitant with maintaining a high level of performance in their respective teaching, service and administrative duties." (*Id.* at 5). Under this program, faculty members apply to receive supplements to their base salaries for qualifying research projects. The faculty members who are approved "carry the additional title of "Research Administrator" and their institutional base salaries (IBS) will include compensation for this service. (*Id.*; See also, Krause Dep. 110).

UMMC's Office of Research ("OOR") determines whether faculty members qualify for the salary enhancements based on the OOR's eligibility guidelines. (Musshafen Dec.). To qualify for the salary enhancement, the faculty member must hold a full-time position with a rank of

---

[6] Dr. Griggs criticized Dr. Krause's dependability, noting that Dr. Krause was assigned to provide a lecture on evidence–based dentistry at Grand Rounds, but she cancelled just two weeks before the lecture date. (Krause Dep., Ex. 8, p. 6). After Dr. Griggs assigned her to provide another lecture on the same topic later that year, she openly questioned his decision. (*Id.*).

59742532.v1

Assistant Professor or higher, and the faculty member must display strong evidence of research performance, as determined by the faculty member's total of research grant applications and extramural research awards and whether the grant provider pays full indirect costs for the project. (Krause Dep., Ex. 11, p. 5; Musshafen Dec.). The eligibility criteria also accounts for whether the faculty member has demonstrated aptitude in scholarship activities, including peer-reviewed publications, invitations to present at national and international meetings, service on extramural peer-review panels or editorial boards, election to office or other service in professional societies, and a high level of performance in the faculty member's assigned roles with UMMC. (*Id.*).

In 2016, Dr. Krause applied for a research salary enhancement based on a contract she acquired with the Mississippi State Department of Health. (Krause Dep. 119-20; Musshafen Dec.). Dr. Krause's request was denied pursuant to UMMC's merit-based eligibility criteria, particularly because the contract did not qualify as "research" under the OOR guidelines and a single contract for $25,000 did not satisfy the requirement of strong evidence of research performance. (Exs. 11 and 13 to Krause Dep.; Musshafen Dec). Dr. Richard Summers, Director of the OOR, further explained the reasons for the denial to Dr. Griggs, stating that it would set a "bad preceden[t] to give someone salary enhancement for a $25,000 nonresearch contract that pays zero indirects." (Krause Dep., Ex. 14). Every faculty member in the School of Dentistry had a request for a research salary enhancement denied at some point. (Griggs Dep. pp. 46-47, Ex. "F"; Felton Dep. 16).

Although Dr. Krause does not know the amount or value of grant(s) she used to support her 2017 application, she claims she applied for a research enhancement for 2017 and was denied in July 2017—one month before she moved to Oregon and resigned. (Krause Dep. 103-104, 135; Complaint, Ex. 3 to Krause Dep.). In August 2017, Dr. Leslie Musshafen, Director of Academics and Research Excellence, reconfirmed that the contract relied on by Dr. Krause did not qualify for

the salary enhancement under the eligibility guidelines.[7] (*Id.*; Brasfield Dep. 30; Musshafen Dec.). Significantly, Dr. Krause does not know the number or value of the grants other faculty members used to support their application for a research administrator salary enhancement. (Krause Dep. 127).

    **E.**       **Proposed Licensing Agreement between UMMC and Dr. Krause**

Dr. Krause's work with the OMPW involved the development of a GIS Mapping platform to geographically identify physicians throughout Mississippi. (Krause Dep. 193-194; Griggs Dep. 22). In 2016, Dr. Krause expressed interest in seeking a licensing agreement with UMMC that, according to Dr. Krause, "would give [her] exclusive license to market" the platform. (Krause Dep. 189). In May of 2016, UMMC's Associate General Counsel informed Dr. Krause and her attorney, Wilson Carroll, that the GIS mapping software belonged to UMMC because she was employed by UMMC at the time of its development, and that a licensing agreement between her company, Health Data Analytics, LLC ("HDA"), and UMMC would be necessary. (Second Krause Dep. 13-14, Ex. "G".). UMMC sent the first draft of the proposed licensing agreement to Dr. Krause and her attorney on August 31, 2016 and over the course of several months, UMMC and Dr. Krause attempted to negotiate a license agreement for this purpose. (Second Krause Dep. 13-19). UMMC's Patent Advisory Committee reviewed the proposed licensing agreement on January 31, 2017 and made minor changes, and UMMC e-mailed the proposed licensing agreement to Dr. Krause on February 6, 2017. (*Id.* at 28-29; Ex.5 to Second Krause Dep.). Neither Dr. Krause nor

---

[7] Dr. Krause and Dr. Griggs approached Dr. Mitchell, Director of OMPW, in August 2017 and asked him to release the salary supplement funds related to the contract with the Mississippi Department of Health. (Krause Dep. 132-33; Att. "D-3" to Musshafen Dec. [UMMC000804]. On August 18, 2017, Dr. Mitchell communicated with Dr. Summers and expressed concerns about releasing the funds for a salary enhancement when Dr. Krause's research-based salary enhancement for the same contract was denied the year before and he did not have documentation that OOR now was approving it. (*Id.* [UMMC000804]). Dr. Mitchell asked the ORR to evaluate the grant to confirm whether it now qualified for the salary enhancement. (*Id.*).

59742532.v1

her attorney followed up to finalize the licensing agreement after UMMC's e-mail on February 6, 2017.[8] (*Id.* at 44-45).

### F.     Dr. Krause's Relocation to Oregon and Resignation

According to Dr. Krause, she decided to relocate to Oregon sometime in 2017 to get her son into a better school district. (Krause Dep. 13, 95). While Dr. Krause thought she might move to Oregon someday, the urgency of her move was prompted by her son entering middle school. (Krause Dep. 153) ("-- we had a really, you know, for the most part, we had a pretty good life here, and my career was enjoyable. But it was, for me, it was all -- it was all about middle school and Alexander, and I don't regret that at all because he is thriving.  He's doing well.").

**1.  Before relocating to Oregon, Dr. Krause knew she would not be permitted to work remotely or transfer to another school and Dr. Krause did not seek approval for extended paid time off.**

Sometime between May and June 2017, Dr. Krause approached Dr. Jason Griggs about her desire to move to Oregon to place her son in a better school district. Dr. Krause initially proposed to work remotely from Oregon. (Krause Dep. 99-100; Ex. 10 to Krause Dep. 8). Dr. Griggs and Dr. Felton both denied the request due to the School of Dentistry's operational need. (Krause Dep. 138-39; Felton Dep. 7-8; Griggs Dep. 58-59). No other faculty member in the School of Dentistry had been allowed to work remotely from another state. (Krause Dep. 137; Felton Dep. 7, 16; Griggs Dep. 61). Next, Dr. Krause asked Dr. Griggs to keep her telework arrangement between the two of them so she could get "six months or one year max" that she needed, apparently to reach a retirement milestone. (Krause Dep. 146; Ex. 17 to Krause Dep.). Dr. Griggs was adamant that Dr.

---

[8] There is no evidence that Krause or her attorney responded to UMMC's February 6, 2017 proposed licensing agreement and Dr. Krause cannot identify any communication following up after that date.  (Second Krause Dep. 44-45).

9

Felton reached a final decision and he would not permit her to work remotely behind Dr. Felton's back. (*Id.*).

Dr. Krause also proposed to transfer to another School that would permit her to work remotely. (Ex. 20 to Krause Dep.). However, because Dr. Krause was tenured in the School of Dentistry, Dr. Felton was not willing to permit her to transfer because it would result in the School of Dentistry losing a faculty budget line. (Krause Dep.168-169). Dr. Krause is not aware of any other faculty members in the School of Dentistry who were permitted to transfer out of the School of Dentistry to another school. (*Id.* at 203). To be clear, at least one month before Dr. Krause moved to Oregon, she knew she would not be permitted to work remotely or transfer to another School:

> Q.  So at least as of June 30th, you knew that Dr. Felton was not going to let you work remotely?
>
> A.  Uh-huh.
>
> Q.  You knew that Dr. Felton was not going to allow your position to transfer to another school, and you knew that Dr. Griggs wouldn't go behind Dr. Felton's back and allow you to work remotely –
>
> A.  Right.

(*Id.* at 146-47; *see also Id.* at 201). Dr. Krause testified that Dr. Griggs suggested she stay in Jackson and continue to work at her higher Full Professor salary.[9] (*Id.* at 141, 198).

### 2.  Dr. Krause relocates to Oregon without a plan and resigns.

Dr. Krause relocated to the state of Oregon sometime before August 18, 2017, fully aware that (1) Dr. Felton and Dr. Griggs denied her request to work remotely, (2) Dr. Griggs would not allow her to work remotely temporarily behind Dr. Felton's back, (3) Dr. Felton would not permit

---

[9] Dr. Krause recognized working one more year at a higher salary was "critical because our retirement is based on our four highest year(s)." (Krause Dep. 256-57.)

her position to transfer to another school, and (4) Dr. Griggs or Dr. Mitchell had not approved her to take extended paid personal time. (Krause Dep. 146-47, 201).

Dr. Krause testified she had not preplanned her move. (Krause Dep. 95-96). Instead, she pulled a "little bitty" camper behind her to Oregon, failed to secure accommodations, and she and her son lived in the camper that "didn't even have a bathroom" in a stranger's driveway for over a month while she waited for a spot to be available at a local campground. (*Id.* at 11-12).

As of August 18, 2017, Dr. Krause had not reported to work as scheduled. Dr. Griggs could not find Dr. Krause on campus. (Ex. 19 to Krause Dep.). Dr. Krause contacted Dr. Griggs on Monday, August 21, 2017 and informed him she was in Oregon. (*Id.;* Krause Dep. 159). After multiple communications with Dr. Krause outlining her responsibility to report to work, Dr. Krause requested to apply her accrued paid personal time to the period in which she had failed to report to work. (Ex. 22 to Krause Dep.).

Dr. Krause agrees that she did not have approval for paid leave for ten months when she left for Oregon but claims she "had not gotten to that point yet."[10] (Krause Dep. 201). After arriving in Oregon, Dr. Krause proposed that UMMC permit her to use paid time off indefinitely with no intention of returning to work. (*Id.* at 201-202). UMMC denied her request.[11] (Brasfield Dep. 38-39). Dr. Krause objected to the denial of her request for extended paid time off, and Brasfield provided Dr. Krause with a grievance form to enable her to file a grievance if she desired. (Ex. 22, p. 4 to Krause Dep.). Yet, Dr. Krause did not grieve the denial of her request for paid time off,

---

[10] UMMC policy requires employees to submit leave requests for each instance in which they are away from their official or regular duties. (Krause Dep. 60). The policy specifically requires faculty members to complete and submit a form requesting leave to their immediate supervisor, subject to the supervisor's approval. (Brasfield Dep. 38). Once the supervisor approves (or denies) the request, the supervisor provides the request to the department's administrative office to enter the documentation pertaining to the request into UMMC's Human Capital Management System. (*Id.*).

[11] On August 29, 2017, Ms. Brasfield e-mailed Dr. Krause, informing her that departmental policy prohibited her from applying accrued paid leave time for dates that she failed to report to work as scheduled. (Krause Dep. 166; Ex. 22 to Krause Dep.).

11

her request to work remotely, her request to transfer to another school, or her denial of a research salary enhancement. (Krause Dep. pp. 175-77). Dr. Krause has no memory of filing a grievance. (*Id.* at 240).

On Friday, August 25, 2017, Dr. Krause indicated she had no choice but to execute her retirement. (Krause Dep. 159-60; Ex. 20, p. 2 to Krause Dep.). Dr. Krause was unwilling to return to Jackson, Mississippi to live and work in order to keep her job: "That wasn't even on the table. The fact is that my son was in the sixth grade, just going to start the sixth grade. So I think that the question was did you want -- you know, was I supposed to take him out of school in Ashland and bring him back and put him in a Jackson school.  It wasn't really an option." (Krause Dep. 160).

Dr. Krause resigned from UMMC on September 1, 2017, with an effective date of September 30, 2017. (Att. "B-10" to Brasfield Dec.). Dr. Krause's annual salary as of July 1, 2017, the date of her promotion to Full Professor, was $169,328.85.  (Krause Dep. 113; Brasfield Dec.). At the time of her resignation, Dr. Krause was the second highest paid faculty member in the Department of Biomedical Materials Science behind Department Chair, Dr. Griggs. (*Id.* at 114-116). Yet, Dr. Krause was never satisfied with her compensation. (*Id.* at 112).

**G.     After her resignation, Dr. Krause refused to comply with UMMC's repeated requests to return UMMC's tangible and intangible property.**

When Dr. Krause moved to Oregon without approval, she was in possession of tangible and intellectual property belonging to UMMC, including a laptop, cell phone, decades of research and the GIS mapping software. (Krause Dep. 229-235; Exs. 23, 27, 28 to Krause Dep.). UMMC policy prohibits employees from removing UMMC property without written authorization from the department head. (Excerpts of 2016-2017 Faculty Staff Handbook regarding UMMC's Property, Att. "B-1" to Brasfield Dec. [UMMC000021]). UMMC repeatedly requested that Dr. Krause return its property and provided an inventory of these items to Dr. Krause. (*See* Exs. 23,

27, 28, 29, 30 to Krause Dep.). In response, Dr. Krause stated she was "still waiting for [UMMC's] response about my salary enhancement and leave request's I submitted. Once my issues with leave and the salary enhancement have been resolved, I am willing to address the issues raised by Dr. Summers" about UMMC's property. (Ex. 23 to Krause Dep.). Dr. Krause eventually agreed to return UMMC's tangible property; however, she wiped her UMMC laptop and cell phone clean before returning them. (Krause Dep. 185). UMMC received Dr. Krause's laptop and cell phone on October 26, 2017, and discovered they were wiped clean of all data, including the operating system. (Brasfield Dec.; Att. "B-15" to Brasfield Dec.).

UMMC processed a final payment of the unused paid personal leave time that Dr. Krause accrued via direct deposit into her bank account on October 27, 2017, the amount of which was based on 240 hours-worth of personal leave. (Brasfield Dep. 54-55, Ex. "H."; Brasfield Dec.). However, upon discovering that Dr. Krause had wiped her laptop clean and had not returned all the intellectual property in her possession, UMMC reversed the direct deposit until it could conduct a more detailed inventory and valuation of the missing property. (Krause Dep. 235; Brasfield Dep. 54). Even though UMMC did not recover all the missing intellectual property, UMMC re-deposited the accrued personal paid leave funds into her bank account on May 24, 2019.[12] (*Id.* at 234; Brasfield Dec.).

## **LEGAL ARGUMENT**

### **I.    Summary Judgment Standard**

On a motion for summary judgment, the movant's initial burden requires a showing that no genuine issue of material fact exists. *Celotex Corp.* v. *Catrett, 477* U.S. 317, 325 (1986).  Fed.

---

[12] Dr. Krause provided information regarding the location of some of her prior research on UMMC databases. (Krause Dep. 232-34). However, with respect to the GIS mapping software, Dr. Krause maintained the software on a private server and stopped paying for service to maintain it after she moved to Oregon, rendering the software inaccessible. (*Id.* at 191).

59742532.v1

R. Civ. P. 56 mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 447 U.S. at 322.

The Fifth Circuit has held that "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington,* 276 F.3d 754, 759 (5th Cir. 2002). Also, "generalized testimony by an employee regarding his subjective belief that his discharge was the result of . . . discrimination is insufficient to make an issue for the jury in the face of proof showing an adequate, nondiscriminatory reason for his discharge." *Ivy v. Oxford Mun. Separate Sch. Dist.*, 799 F. Supp. 2d 697, 703 (N.D. Miss. 2011) (quoting *Elliott v. Group Medical & Surgical Service*, 714 F.2d 556, 564 (5th Cir. 1983)).

**II.     Dr. Krause failed to exhaust her administrative remedies on certain purported claims**.

**A.     Any claim of gender discrimination based on the licensing agreement for the Mississippi Mapper Software is beyond the scope of her charge of discrimination and was not alleged in Dr. Krause's Complaint.**

During Dr. Krause's deposition on May 4, 2021, she claimed for the first time that UMMC discriminated against her based on her gender in relation to her negotiation of a licensing agreement beginning in 2016 for the Mississippi Mapper software platform. (Krause Dep. 190). Dr. Krause did not mention, much less allege, the licensing of the platform in her charge of discrimination or in her Complaint. *See Hall v. Continental Airlines, Inc.*, 252 Fed. Appx. 650, 653, n. 1 (5th Cir. 2007); *Cleveland v. Mueller Copper Tube Co., Inc.*, No. 1:10-cv-307-SA-SAA, 2012 WL 1192125, at \*7 (N.D. Miss. Apr. 10, 2012). The Court should disregard any new allegations raised for the first time in Dr. Krause's deposition.

14

**B.     Dr. Krause did not file a timely Charge of Discrimination concerning her newly alleged claim regarding UMMC's July 2016 decision to deny her request for a research-based salary enhancement.**

"A Title VII claimant must file charges with the EEOC within 180 days after the alleged illegal conduct." *Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 232 (5th Cir. 1999) (citing 42 U.S.C. § 2000e–5(e)(1)). UMMC denied Dr. Krause's request for research salary enhancement in July 2016, and Dr. Krause did not file her Charge of Discrimination until approximately 515 days later on December 27, 2017. (Krause Dep., Ex. 2). Furthermore, Dr. Krause did not mention, much less allege, the denial of her research-based salary enhancement in 2016 in her charge of discrimination or in her Complaint. In fact, Dr. Krause alleged in her Charge of Discrimination that the earliest date of discrimination occurred on July 1, 2017, about one year after UMMC denied her request for a research salary enhancement in 2016. (*Id.*). Thus, the denial of the research salary enhancement in 2016 occurred over 180 days from the alleged discrimination, making the claim time-barred. *See Liddell v. Northrop Grumman Shipbuilding, Inc.*, 836 F. Supp. 2d 443, 451-52 (S.D. Miss. 2011).

**III.     Dr. Krause's claims of Gender Discrimination Fail as a Matter of Law.**

**A.     Dr. Krause's Burden under Title VII**

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or discharge an individual . . . because of such individual's  . . . sex." 42 U.S.C. § 2000e-2(a)(1). Dr. Krause has no evidence of direct gender discrimination. (Krause Dep., 209-210). Therefore, she must prove her gender discrimination claim using the *McDonnell Douglas* burden-shifting framework. To establish a prima facie Title VII gender discrimination claim, Dr. Krause must prove (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) she received unfavorable treatment compared to similarly-situated

59742532.v1

employees outside her protected class (i.e. males). *Zeigler v. University of Mississippi Medical Center*, 877 F. Supp. 2d 454, 459 (S.D. Miss. 2012) (citation omitted).

Only if Dr. Krause satisfies her prima facie case does the burden shift to UMMC to rebut the prima facie case by articulating legitimate, non-discriminatory reasons for its actions. *Bugos v. Ricoh Corp.*, No. 07-20757, 2008 WL 3876548, at *5 (5th Cir. Aug. 21, 2008). If UMMC articulates its nondiscriminatory reason, the inference of discrimination created by Dr. Krause's prima facie case disappears, and the burden shifts back to her to show that UMMC's reasons were merely a pretext for discrimination. *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 138-42 (2000)).

Dr. Krause may show pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "But a reason cannot be proved to be a 'pretext for discrimination 'unless it is shown <u>both</u> that the reason was false, and that discrimination was the real reason." *Holliday v. Commonwealth Brands, Inc.*, 483 F. App'x 917, 921 (5th Cir. 2012) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis added). Of course, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee]." *Reeves*, 530 U.S. at 143 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Dr. Krause claims UMMC discriminated against her based on her gender as follows: (1) by denying Dr. Krause's request to work remotely from Oregon; (2) by denying Dr. Krause's request to transfer into the School of Population Health; (3) by denying Dr. Krause's request for ten months of paid leave; (4) by denying Dr. Krause's request for a research-based salary enhancement; (5) by forcing her to resign and constructively discharging her; (6) by delaying its

direct deposit of 240 hours-worth of accrued paid leave funds pending an inventory of UMMC's tangible and intangible property; and (7) by failing to finalize a separate licensing agreement with her related to the Mississippi Mapper software platform.

**B.    Dr. Krause's gender discrimination claim related to UMMC's denial of her request to work remotely from Oregon should be dismissed.**

Dr. Krause cannot meet the third or fourth elements of her prima facie burden to prove gender discrimination related to her request to work remotely from Oregon. A denial of a request to work remotely is not an adverse employment action, and Dr. Krause cannot identify other male faculty who were permitted to work remotely from another state. To establish an adverse employment action, Dr. Krause must show "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 741, 761 (2007). District Courts within the Fifth Circuit have routinely held that an employer's denial of an employee's request to work remotely is not an adverse employment action as required to assert a Title VII discrimination claim. *See Allbritain v. Tex. Dept. of Ins.*, 2014 WL 272223, at *4 (W.D. Tex. Jan. 23, 2014) (denial of employee's request to telecommute, or work from home, was not an adverse employment action); *see also Stone v. Louisiana Dept. of Revenue*, 2016 WL 3746199, at *8 (E.D. La. July 13, 2016); *Oyekwe v. Research Now Group, Inc.*, 2021 WL 1566459, at *5-6 (N.D. Tex. Jan. 26, 2021); *Tirumalesetti v. Caremark RX, Inc.*, 2007 WL 9712193, at *6 (N.D. Tex. Feb. 20, 2007); *Ryerson v. Byerhill*, 2018 WL 4103433, at *5 (N.D. Tex. Aug. 2, 2018); *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 805 (E.D. Tex. 2013).

Tellingly, Dr. Krause has not identified *anyone* in the School of Dentistry who was allowed to work remotely, let alone, a similarly situated male who was allowed to work from another state.

59742532.v1

(Krause Dep. 204, 225). This is because Dr. Felton did not allow any faculty in the School of Dentistry to work remotely. (*Id.*; Felton Dep. 7, 16).

UMMC has articulated legitimate, non-discriminatory reasons for denying Dr. Krause's request to work from Oregon. In his deposition, Dr. Felton explained his reasons for denying Dr. Krause's request to work remotely, indicating he thought it would have set "a very dangerous precedent for other people to do the same thing" and the School of Dentistry did not have the software or other tools needed for her to teach and work remotely. (Felton Dep. 7, 8). As set forth above, Dr. Krause cannot identify another male faculty member in the School of Dentistry who was allowed to move to another state and work remotely. Absent proof that UMMC allowed a male faculty member in the School of Dentistry to work remotely from another state, Dr. Krause cannot establish that Dr. Felton's reasons for denying her request were pretext for discrimination. *Bryant*, 413 F.3d at 478.

**C.      Dr. Krause's gender discrimination claim based on UMMC's denial of her request to transfer into the School of Population Health should be dismissed.**

Likewise, the denial of Dr. Krause's request to transfer to the School of Population Health is not an adverse employment action, and Dr. Krause cannot identify any proper comparators. *See Munoz v. Seton Healthcare, Inc.*, 557 Fed. Appx. 314, 319 (5th Cir. 2014). Dr. Krause's request to transfer from UMMC's School of Dentistry to the School of Population Health amounts to a request for a lateral transfer, and "it is well-established that the denial of a purely lateral transfer is not an adverse employment action redress[a]ble under Title VII." *Alvarado v. Texas Rangers*, 492 F.3d 605 (5th Cir. 2007) (emphasis added) (citing *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999)).

With respect to the fourth element of Dr. Krause's prima facie burden, Dr. Krause admitted she does not know any other faculty member in the School of Dentistry who UMMC allowed to

transfer out of the School of Dentistry and into a different School, which is consistent with Dr. Felton's testimony that he did not allow any other faculty member in the School of Dentistry to transfer their salaries into another School. (Krause Dep., 223-224; Felton Dep. 10).

Even if Dr. Krause could establish her prima facie case, she cannot show UMMC's legitimate non-discriminatory reason for denying her request to transfer into the School of Population Health is a pretext for gender discrimination. UMMC could not accommodate Dr. Krause's request to transfer to another school because (1) there were not any paid faculty positions available in the School of Population Health, and (2) Dr. Felton was unwilling to transfer her budget line. (Felton Dep. 9).

Dr. Krause admitted that she knew her budget line could not transfer outside the School of Dentistry when she moved to Oregon. (Krause Dep. 142). Although Dr. Krause claims her "back-up plan" was to collect paid leave until a paid faculty position became available in the School of Population Health, (Krause Dep. 157), she also admitted that she knew she had not been approved for indefinite paid time off when she moved to Oregon. (*Id.* at 201). Dr. Krause's critical admissions on these points directly undermine any argument that UMMC denied her requests as pretext for discrimination. Dr. Krause's failure to satisfy her burden of proving pretext mandates the entry of summary judgment on her Title VII gender discrimination claim.

**D.      Dr. Krause's gender discrimination claim based on UMMC's denial of Dr. Krause's request for ten months of paid leave pending her retirement fails as a matter of law.**

Dr. Krause cannot satisfy her prima facie burden as it relates to her retroactive request for indefinite leave. The Fifth Circuit and Mississippi district courts have determined in numerous cases that the denial of an employee's request for leave does not constitute an adverse employment action. *See Morris v. Baton Rouge City Constable's Office*, 761 Fed. Appx. 433, 436 (5th Cir.

59742532.v1

2019) (denial of employee's request for vacation leave was not adverse employment action); *Harris v. West*, 180 F.3d 263, at \*4 (5th Cir. 1999); *Larry v. N. Mississippi Med. Ctr.,* 940 F. Supp. 960, 965 (N.D. Miss. 1996), *aff'd in relevant part sub nom. Larry v. Grice,* 156 F.3d 181 (5th Cir. 1998); *Loomis v. Starkville Miss. Pub. Sch. Dist.*, 150 F. Supp. 3d 730, 752 (N.D. Miss. 2015); *Ogden v. Brennan*, 657 Fed. Appx. 232 (5th Cir. 2016).

Similarly, here, according to Dr. Krause, her request for paid leave of approximately 10 months was part of her "executing her retirement" and Dr. Krause cannot demonstrate UMMC's denial altered the terms or conditions of her employment with UMMC to constitute an adverse employment action as a matter of law. Moreover, as it relates to the fourth element of Dr. Krause's prima facie burden, Dr. Krause cannot identify another faculty member in the School of Dentistry who was allowed to move to another state and obtain leave for an indefinite period of time leading up to their retirement. (Krause Dep. 225). Thus, her prima facie case fails.

UMMC has also articulated legitimate, non-discriminatory reasons for denying Dr. Krause's retroactive request for paid leave. Rather than obtaining approval for her paid leave request on the front-end, Dr. Krause made a retroactive request to apply her unused leave time to cover her unexcused absences from work between August 13, 2017 and August 26, 2017 after moving to Oregon without permission. (Krause Dep., Ex. 20). Moreover, Dr. Felton testified that two weeks was the longest period of leave he could recall any faculty member in the School of Dentistry taking during his tenure as dean. (Felton Dep. 23-24). Simply put, UMMC did not allow any faculty member in the School of Dentistry, male or female, to collect compensated leave for ten months leading up to their retirement, and yet, Dr. Krause unreasonably expected UMMC to make an exception for her. Dr. Krause has failed to introduce any evidence to establish a factual dispute that UMMC's reliance on an existing policy was mere pretext for discrimination.

59742532.v1

**E.     Dr. Krause's gender discrimination claim related to UMMC rescinding and delaying its payment of 240 hours-worth of accrued paid leave funds should be dismissed.**

In her Complaint, Dr. Krause claims UMMC discriminated against her because of her gender when it rescinded its direct deposit of 240 hours-worth of accrued paid leave funds into her bank account. Significantly, during her deposition, Dr. Krause did not identify this as a basis for gender discrimination. Nevertheless, UMMC addresses these claims out of an abundance of caution.

Dr. Krause's prima facie case fails because she cannot show an adverse employment action or identify any male faculty who were treated more favorably under nearly identical circumstances. Dr. Krause cannot show that this is an adverse employment action because Dr. Krause admits she was paid 240 hours-worth of accrued paid leave after an inventory of UMMC property concluded. (Krause Dep. 235). Likewise, Dr. Krause cannot identify any male faculty members that were treated more favorably while engaging in similar conduct (i.e. wiping their laptop clean, withholding valuable intellectual property, and leveraging the return of UMMC's property to force UMMC to comply with their unreasonable demands).

Dr. Krause has no evidence that UMMC's legitimate, non-discriminatory reason for rescinding the deposit of Dr. Krause's personal leave terminal payment pending an inventory of UMMC's property is a pretext for gender discrimination. UMMC withdrew these funds only because Dr. Krause had not reported to work for several weeks while in possession of various materials belonging to UMMC, including a laptop, a cell phone, and UMMC's intellectual property. (Krause Dep. 235-236, Ex. 27). Mark Ray, UMMC's Associate General Counsel, sent Dr. Krause two letters requesting her to return UMMC's property on September 26, 2017 and October 10, 2017, yet Dr. Krause did not return the missing property. (*Id.* at Exs. 27 and 28).

59742532.v1

Dr. Krause admitted in her deposition to the reasonableness of UMMC's expectation for her to return its missing property:

> Q.    In your experience, in your professional experience, is it not reasonable for an employer to expect, when an employee is exiting, to provide information about the work –
>
> A.    Of course.
>
> Q.    -- that they've performed for the institution and where it can be located –
>
> A.    Absolutely.
>
> Q.    -- to make sure that information is not lost or destroyed?
>
> A.    Yeah.
>
> […]
>
> Q.    And particularly in the research context, where you might have confidential records related to participants or patients or – and there's a duty to maintain that information.  Isn't that correct?
>
> A.    That's correct. […].

(Krause Dep. 233-235).

Nevertheless, more than a month passed before Dr. Krause returned UMMC's tangible property, and when she did, she wiped her laptop clean. (Krause Dep. 184-85). Attorney Ray's response to Dr. Krause clearly states the legitimate non-discriminatory reason for UMMC's action:

> I do not want to insult you; but I must be candid. I perceive that this difficulty arose because you did not disengage from your employment in a responsible manner. The problem began with your unilateral decision to move your residence to Washington State [*sic*] and work from afar. Once you were there, you were unable to gain assent to continue employment at a distance, and you sought to live on personal leave, which was not approved, then you resigned, having made no arrangement to return tangible personal property to the institution or to transition to the institution the work product that was produced at the expense of the institutions and that was owned by the institution. I am not working directly on tracking down the whereabouts of the work product; that is being spearheaded by Ms. Keefer. But, as I appreciate the situation, she is still trying to marshal all of the property of UMMC, and the only support she has received from you is the position

22

that "you have it-it resides on your systems somewhere." I know that is an oversimplified recap of the communication, but it captures the essence of the situation as I understand it. It does not help that UMMC anticipated the return of the work product when we received the MacBook Pro via FedEx after demanding its return, only to find that the hard drive had been wiped clean of all data, even the operating system. The amount of money that was expended on development of missing intellectual property of UMMC exceeds many times over the amount of personal leave terminal pay.

(Att. "B-16" to Brasfield Dec. [UMMC000983]).

Dr. Krause has failed to offer any evidence that UMMC based its decision to rescind and delay the direct deposit on Dr. Krause's gender, and as a result, the Court should grant summary judgment to UMMC on Dr. Krause's gender discrimination claim.

**F.      Dr. Krause's gender discrimination claim based on UMMC's denial of her request for a research-based salary enhancement should be dismissed.**

UMMC paid Dr. Krause above fair market value, which made her the highest paid faculty member in her department by $30,000, with the exception of the department chair. (Krause Dep.114-15, 117; Ex. 12 to Krause Dep.). Nevertheless, Dr. Krause brazenly alleges gender discrimination regarding her compensation—focusing on her request for a research salary enhancement for which she was deemed no eligible. As set forth above, Dr. Krause's claim related to UMMC's decision to deny her request for a research salary enhancement in July 2016 is stale because she failed to file a charge of discrimination within 180 days of her request being denied. Moreover, according to Dr. Krause, she learned UMMC would not approve her 2017 request shortly before she abandoned her job and moved to Oregon. (Krause Dep. 132-33).

As with her other claims, Dr. Krause cannot meet her prima facie burden to prove gender discrimination because she cannot identify a male faculty member who was treated more favorably under nearly identical circumstances. *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (citations omitted). Whether two employees are "similarly situated" for purposes

of a Title VII discrimination claim hinges not on whether their situations are "similar" but instead on whether they are "**nearly identical**." *Atterberry v. City of Laurel*, 401 F. App'x 869, 2010 WL 4561339, *2 (5th Cir. 2010) (citing *Williams v. Trader Publg. Co.,* 218 F.3d 481, 484 (5th Cir. 2000)). The existence of a "true comparator" may only be established by Dr. Krause if: (1) she can identify other employees; (2) who are not members of protected classes; and (3) who were shown preferential treatment; (4) after they engaged in "nearly identical" conduct; (5) which was considered and reviewed in "nearly identical circumstances"; (6) by the same supervisors and decision makers. *See Okoye*, 245 F.3d at 514; *Little*, 924 F.2d at 97; See also, *Walker v. Tronox LLC*, 2013 WL 2945032, at *3 (N.D. Miss. June 14, 2013) (citing *Lee v. Kansas City S. Ry.*, 574 F.3d 253, 260 (5th Cir. 2009)). "Critically, the . . . shortcoming triggering the allegedly disparate treatment must have been nearly identical[,]" meaning "no presumption of discrimination is raised if the legitimate substantive differences between the plaintiff and proffered comparator adequately explain the disparate treatment." *Id*. (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

Dr. Krause agrees that to be eligible for the research-based salary enhancement, the faculty member must display "strong evidence of research performance," based on the number and the amount of research grant applications or extramural research awards. (Krause Dep. 121). It is expected that Dr. Krause will attempt to compare UMMC's decision to deny her request for a research salary enhancement with Drs. Roach and Williamson's contracts. However, whereas the value of the grant she obtained was for $25,000, she later acknowledged that she does not know the number of grants or value of either Dr. Roach or Dr. Williamson's respective grants. (*Id.* at 120, 127, 136). In fact, as it relates to her 2017 request for a research salary enhancement, Dr. Krause does not even know which grant(s) she submitted for approval, much less the number and

59742532.v1

value of the grant(s) for comparison.  (Krause Dep. 135). Considering Dr. Griggs' testimony, Dr. Krause's grants were not even similar, much less "nearly identical," as required to be a proper comparator:

> Q.    What type of research grant was Dr. Roach doing?
>
> A.    Dr. Roach's research is sponsored by private industry. He has a very large amount of grant funding, millions of dollars, and he is – his projects would pay at the 31 percent indirect cost rate for considerations for qualifying for this program.
>
> Dr. Krause, on the other hand, would bring in funding in the tens of thousands of dollars range. I think she had one grant for $25,000 and then in the previous performance evaluation you just showed to me I think that referred to a $53,000 grant that she was about to get, but it fell through.
>
> So looking at the two, Dr. Roach is bringing in millions of dollars. Dr. Krause, $25,000. Dr. Roach's research is paying 31 percent administrative tax. Dr. Krause, if I remember correctly, paying 0 percent administrative tax.

(Griggs Dep.  48). Dr. Krause cannot prove disparate treatment between her and other male faculty members with respect to her request for a salary enhancement without offering evidence regarding the value and number of the male faculty members' grants. *Okoye*, 245 F.3d at 514. Thus, Dr. Krause cannot meet her prima facie burden of proving gender discrimination.

Even if Dr. Krause could meet her prima facie burden, UMMC has articulated legitimate, non-discriminatory reasons for denying her request, and Dr. Krause has offered no evidence of pretext. To qualify for the salary enhancement, the faculty member must satisfy certain criteria, including: "display strong evidence of research performance, as determined by the number and amount of full and direct cost on grants obtained, and limited/no cost sharing or in-kind matching of university funds requested for grants received." (Krause Dep. 110-111; Exs. 7 and 13 to Krause Dep.) (emphasis added). Dr. Krause's requests in 2016 and 2017 were denied because Dr. Krause's grant efforts did not satisfy the eligibility criteria for the "Research Administrator"—Increase in Negotiated Institutional Base Salary. (Musshafen Dec.).

59742532.v1

In 2016, when Dr. Griggs inquired on Dr. Krause's behalf about why her request for the salary enhancement was denied, Dr. Richard Summers from the OOR explained that Dr. Krause's project did not qualify as research under the eligibility guidelines, and that even if it did, she only procured funding for a single project. (Krause Dep., Ex. 13). Dr. Summers specifically informed Dr. Griggs that it would "set a bad preceden[t] to give someone salary enhancement for a $25,000 nonresearch contract that pays zero indirects." (Krause Dep., Ex. 14). Dr. Krause does not dispute that the eligibility guidelines are based on "strong evidence of performed research." (*Id.* at 120-121). According to Dr. Griggs and Dr. Felton, every faculty member in the School of Dentistry was denied the research salary enhancement at some point.  (Griggs Dep. 46-47; Felton Dep. 16).

As it relates to her 2017 request for a research enhancement, Dr. Leslie Musshafen reconfirmed that the contract relied on by Dr. Krause did not qualify for the salary enhancement under the eligibility guidelines, which had not changed. (Musshafen Dec; Brasfield Dep. 30). Dr. Krause does not even know which grants she submitted in support of her 2017 request, and further, she does not know which grants Dr. Roach or Williamson submitted. (Krause Dep. 103-04; 135).

Significantly, the fact that UMMC attempted to find other ways to increase Dr. Krause's compensation undercuts any finding of pretext. In 2016, UMMC's Human Resources Department conducted a fair market value (FMV) analysis to determine whether it could increase Dr. Krause's salary. (Att. "B-5" to Brasfield Dec. [UMMC000789]; Brasfield Dep. 32-34). However, the FMV analysis determined that Dr. Krause's compensation was above current FMV, which made a salary increase impermissible. (Brasfield Dep. 32-33). Nevertheless, UMMC did not decrease her salary, even though Dr. Krause's salary exceeded FMV. (*Id.*)

Moreover, Dr. Krause cannot show UMMC discriminated against her as it relates to her compensation considering she was the highest paid faculty member in her department, with the

59742532.v1

exception of her Department Chair, and was paid $30,000 more than the males to which she attempts to compare her compensation. (Krause Dep. 114-116). Dr. Krause cannot rebut UMMC's legitimate, non-discriminatory reasons for denying her the salary enhancement as required to establish pretext.

**G. Dr. Krause's gender discrimination claim related to the negotiation of a licensing agreement with UMMC regarding the GIS Mapping software platform should be dismissed.**

Even if Dr. Krause timely raised her allegations regarding the licensing agreement in her Charge of Discrimination and in her Complaint, Dr. Krause cannot meet her prima facie burden because she cannot identify another male faculty member who was treated more favorably under nearly identical circumstances. Although Dr. Krause claims Dr. Hester was treated more favorably, she admits she does not know what terms were included in his licensing agreement and in fact, she admits she has no reason to dispute that UMMC's Patent Advisory Committee offered her a licensing agreement with *more favorable* terms than the terms it negotiated with Dr. Hester. (Second Krause Dep. 32, 35-39).

For instance, under the terms of Dr. Hester's licensing agreement, Dr. Hester provided UMMC with unfettered use of his "his invention for all UMMC staff and faculty researchers." (*Id.* at 32). Conversely, UMMC's Patent Advisory Committee only wanted Dr. Krause to provide UMMC with two free applications of the Mississippi Mapper software. (*Id.* at 31-32). Additionally, Dr. Hester was required to pay 5% royalty fee for net sales of his invention and the Committee proposed that Dr. Krause pay only 2.5% for all net sales of the Mississippi Mapper software. (*Id.*). Dr. Hester was required to pay the 5% royalty fee to UMMC within 30 days after the calendar year, where the Committee proposed that Dr. Krause could have 90 days to pay. (*Id.* at 35; Ex. 6 to Second Krause Dep.). Finally, Dr. Krause was not required to submit a business plan, but UMMC required Dr. Hester to submit a business plan for his invention, and his failure to

27

do so would have given UMMC the right to terminate the licensing agreement. (*Id.*at 38-39; Ex. 6 to Second Krause Dep.). Therefore, Dr. Krause cannot identify male comparators who were treated more favorably under nearly identical circumstances.

Most importantly, Dr. Krause failed to follow up after she was sent the slightly revised agreement approved by the Patent Committee on February 6, 2021. (*Id.* at 28-29). And there is no evidence in the record to create a factual dispute as to whether Dr. Krause responded to the patent committee's proposed licensing agreement after February 6, 2021. (*Id.*)*.* The ball was in Dr. Krause's court and she dropped it. (*Id.* at 44-45). For all the above reasons, Dr. Krause cannot base her claim of gender discrimination on her failure to follow up with UMMC to negotiate the licensing agreement.

### H. Plaintiff has no evidence of Constructive Discharge. [13]

Dr. Krause voluntarily resigned from employment, and thus, she did not suffer an adverse employment action. Dr. Krause incredulously attempts to recast her voluntary, unilateral move to Oregon to enroll her son in middle school and subsequent refusal to return to Mississippi to perform her job duties as a constructive discharge. While a constructive discharge may constitute an adverse employment action, Dr. Krause has no evidence of "working conditions so intolerable that a reasonable employee would feel compelled to resign." *Williams v. Barnhill's Buffet Inc.*, 290 F. App'x 759, 762 (5th Cir. 2008) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (internal quotation marks and further citation omitted)); *see also, Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 480-81 (5th Cir. 2008). "[P]roving constructive discharge requires a

---

[13] Even if Dr. Krause could demonstrate intolerable conditions for constructive discharge, her gender discrimination claim fails because she cannot meet her prima facie burden. UMMC did not fill her position. Instead, Dr. Felton used her salary to satisfy the significant budget cuts. (Felton Dep. 9). A portion of her former budget line was used to promote another female. (Griggs Dec.). And, her former department chair Dr. Griggs taught her class in addition to his former duties.

28

59742532.v1

greater degree of harassment than a hostile-work-environment claim." *Donaldson*, 335 F. App'x at 500-01 (citing *Lauderdale v. Tex. Dep't of Crim. Justice, Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007)). In determining whether an employee has been constructively discharged, courts consider the following non-exclusive factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status]. *Brown*, 207 F.3d at 782. Further, "[t]he work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Donaldson*, 335 F. App'x at 501-02 (quoting *Aryain*, 534 F.3d at 479 (internal quotation marks and further citation omitted)).

Dr. Krause's allegations do not meet the heavy burden of a constructive discharge claim. She was not demoted; neither her salary nor her responsibilities were reduced; she was not reassigned; and she was not offered continued employment on terms less favorable than her former status. Instead, Dr. Krause voluntarily resigned from employment because of her desire to place her son in middle school in Oregon rather than returning to Jackson, Mississippi to perform her work duties. Dr. Krause admitted that she "knew that might be an eventuality" but hoped that she "could continue to serve UMMC and Mississippi." (Ex. 22 to Krause Dep. 8). Dr. Krause acknowledged she had just gotten "an amazing promotion" to full tenured professor right before her move. (*Id.* at 95-96). Dr. Krause has no claim for constructive discharge; she is simply disgruntled because UMMC would not agree to her unreasonable demands and reasonably required her to perform her job duties within the State of Mississippi.

**IV.     Dr. Krause's Hostile Work Environment Claim Fails as a Matter of Law.**

To establish a prima facie hostile work environment claim, Dr. Krause must prove "(1) [she] belongs to a protected group; (2) [she] was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) [her] employer knew or should have known of the harassment and failed to take prompt remedial action." *EEOC v. WC&M Enters.*, Inc., 496 F.3d 393, 399 (5th Cir. 2007); *Huang v. Huang*, No. 20-50445, 2021 WL 519411, at *5 (5th Cir. Feb. 10, 2021). Dr. Krause has not offered any evidence (other than her self-serving, unsupported testimony) that she was subjected to a hostile work environment based on a protected characteristic (i.e., gender).

**A.     Krause offers no evidence that the alleged harassment was "based on her sex."**

To begin, Dr. Krause admitted that no one at UMMC made disparaging comments or direct statements about her gender. (Krause Dep. 209-210). When asked to provide the specific basis for her claim that UMMC subjected her to sexism, she merely responded with vague, unsupported allegations that men were treated better. (*Id.* at 211-217). In her deposition, Dr. Krause generally referred to the following incidents to support her claim that she was subjected to a hostile work environment: (1) the denial of her request to transfer (*Id.* at 211); (2) the denial of her request for paid leave (*Id.* at 227-28); and (3) the denial of her requests for research-based salary enhancements.[14]

As with her gender discrimination claim, Dr. Krause has not offered any evidence to support her allegations that she was subjected to a hostile work environment because of her gender.

---

[14] In addition, Dr. Krause refers to her prior complaint raised relating to her work in DIS prior to 2012 (five years before her resignation related to a female leader). (Krause Dep. 208-09).

30

As set forth above, UMMC's decisions that Dr. Krause now complains about were based on legitimate, non-discriminatory reasons unrelated to Dr. Krause's gender.[15]

**B.     The alleged harassment did not "affect a term, condition, or privilege of her employment."**

The Court need not go further, but regardless, Dr. Krause cannot demonstrate the alleged harassment was severe or pervasive enough to alter the terms and conditions of her employment and to create an abusive working environment. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999); *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). The Fifth Circuit has made clear that this is a high bar:

> A claim for a sexually hostile working environment is not a trivial matter. Its purpose is to level the playing field for women who work by preventing others from impairing their ability to compete on an equal basis with men. One must always bear this ultimate goal in mind. A hostile environment claim embodies a series of criteria that express **extremely insensitive conduct against women**, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace. **Any lesser standard of liability, couched in terms of conduct that sporadically wounds or offends but does not hinder a female employee's performance, would not serve the goal of equality**.

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) (emphasis added). By any stretch of the imagination, Dr. Krause's evidence cannot meet this exacting standard.

---

[15] Significantly, Dr. Krause attributes her troubles after relocating to Oregon to another female-- Ms. Brasfield. She testified:

> Do you know what distress I was in at this point in time? I was really -- I was emotionally a train wreck.  As she cut off my communication, she cut off my salary, she denied me leave, I was in a – I was in a new place in a tiny camper with six individuals in this camper. I did not know -- everything was working out so wonderfully and then, all of sudden, enter Molly Brasfield, everything went crazy. So I would just -- you know, you can read, read the rest of them.

(Krause Dep. 177-78.)

59742532.v1

The Supreme Court has held, in determining whether conduct is "severe or pervasive," courts must look at "all the circumstances," including "the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The challenged conduct must cross another legal bar – it must be both objectively offensive (meaning that a reasonable person would find it hostile and abusive) and subjectively offensive (meaning that the victim perceived it to be so). *Shepherd*, 168 F.3d at 874.

 Dr. Krause's complaints about UMMC's unwillingness to accede to her unreasonable demands after she unilaterally made the decision to move to Oregon are not so egregious as to alter the terms and conditions of her employment. In fact, she could have simply returned to UMMC to continue her employment unfettered. Her evidence falls far short of "extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace." *DeAngelis*, 51 F.3d at 593.

## V.      Dr. Krause's Due Process Claim Fails as a Matter of Law.

Dr. Krause cannot survive summary judgment on her due process claim. To prevail on her claim, she must establish that she was "deprived of a life, liberty, or property interest protected by the Fourteenth Amendment," *Wilson v. Birnberg*, 667 F.3d 591, 597 (5th Cir. 2012), in which case she would have been entitled to "notice and an opportunity to be heard…at a meaningful time and in a meaningful manner." *Gibson v. Tex. Dep't of Ins.—Div. of Workers' Comp.*, 700 F.3d 227, 239 (5th Cir. 2012).

As an initial matter, Dr. Krause fails to allege any connection between UMMC's alleged actions and its desire to avoid subjecting its actions to the scrutiny of a termination-related hearing,

32

which is fatal to her claims. The Fifth Circuit has repeatedly emphasized that to state a due process claim based on constructive discharge, there must be some connection between the defendant's actions and the avoidance of the pretermination procedures. *Autin v. Fire Prot. Dist. No. 3*, No. 93-3265, 1993 WL 347101, at *2 (5th Cir. Aug. 17, 1993) (employee could not carry burden on constructive discharge claim because there was no evidence that the employer "hoped to avoid its pretermination remedies" and employer's "actions were not motivated by a desire to shield its actions from the scrutiny that would arise in a termination hearing"); *Fowler v. Carrollton Pub. Library*, 799 F.2d 976, 981 (5th Cir. 1986) (a claim of constructive discharge is not viable if there is no "proof of the constitutionally proscribed purpose"); *see also Idom v. Natchez-Adams Sch. Dist.*, 115 F. Supp. 3d 792, 801 (S.D. Miss. 2015) (granting summary judgment to employer on former employee's due process claim under constructive discharge theory because plaintiff, who resigned from her employment, did not allege the employer's failure to provide her with "written notice of nonreemployment […] or the option for a fair and impartial hearing regarding the same" as a reason for her alleged constructive discharge) (citing *Fowler*, 799 F.2d at 981 ("Constructive discharge in a procedural due process case constitutes a[n actionable] claim only if it amounts to forced discharge to avoid affording pretermination hearing procedures.")).

Moreover, Dr. Krause did not file a formal grievance with respect to her alleged constructive discharge from UMMC.[16] (Krause Dep. 240). Instead, she resigned from her position and retired effective September 30, 2017 so that she could receive her PERS retirement. (Krause

---

[16] As a threshold matter, Dr. Krause had no property interest in her request for paid leave, request to work remotely, request to transfer, or requests for research-based salary enhancements with Research Administrator designation. Pursuant to IHL's written policies and bylaws, grievances related to working conditions are not appealable and faculty has no property interest in Administrative appointments. (*Id.* at 29, 61; Ex. 7 to Krause Dep.). Therefore, the final decisions regarding these requests rested with UMMC. (Krause Dep. 238-239). Nonetheless, UMMC provided Dr. Krause a process to file grievances related to these decisions, and Dr. Krause testified that she does not recall filing a formal grievance with respect to her separation from UMMC, the denial of her request for paid time off, or the denial of her request to transfer to the School of Population Health. (Krause Dep. 240). And there is no evidence in the record to create a factual dispute as to whether she filed any such grievances. (*Id.*).

59742532.v1

Dep. 272; Att. "B-10" to Brasfield Dec. [UMMC000426-000427]). "An employee cannot ignore the process duly extended to [her] and later complain that [s]he was not accorded due process." *Galloway v. Louisiana*, 817 F.2d 1154, 1158 (5th Cir.1987). Accordingly, UMMC is entitled to summary judgment on Dr. Krause's due process claim as a matter of law.

**CONCLUSION**

Dr. Krause cannot establish a genuine dispute of material fact to support any of her claims. Accordingly, UMMC is entitled to judgment as a matter of law on each claim.

This the 18th day of June 2020.

Respectfully submitted,

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**, Defendant,

By: _/s/ Robin Banck Taylor_____
Robin Banck Taylor (MS Bar No. 100195)
Timothy M. Threadgill (MS Bar No. 8886)
Marcellus D. Chamberlain (MS Bar No. 105672)

*ITS ATTORNEYS*

OF COUNSEL:

Robin Banck Taylor (MS Bar No. 100195)
Timothy M. Threadgill (MS Bar No. 8886)
BUTLER SNOW LLP
1020 Highland Colony Park, Suite 1400
Ridgeland, MS 39157
Tel: (601) 948-5711
Fax: (601) 985-4500
robin.taylor@butlersnow.com
tim.threadgill@butlersnow.com
marc.chamberlain@butlersnow.com

59742532.v1

## **CERTIFICATE OF SERVICE**

I, Robin Banck Taylor, hereby certify that on this date I electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Lilli Evans Bass, Esq.
LaToya T. Jeter, Esq.
BROWN BASS & JETER, PLLC
Post Office Box 22969
Jackson, Mississippi 39225
Telephone: (601) 487-8448
Facsimile: (601) 510-9934
bass@bbjlawyers.com

**ATTORNEYS FOR PLAINTIFF**

This the 18th day of June 2020.

> */s/ Robin Banck Taylor*
> ROBIN BANCK TAYLOR

59742532.v1